FILED BY FAX

1 | Martin S. Bakst (65112)
**LAW OFFICES OF MARTIN S. BAKST**
2 | 15760 Ventura Boulevard, Sixteenth Floor
Encino, California 91436
3 | Telephone: 818-981-1400
Facsimile: 818-981-5550
4 |
Mark C. Gardy
5 | James S. Notis
Jennifer Sarnelli (242510)
6 | Kelly A. Noto
**GARDY & NOTIS, LLP**
7 | 560 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
8 | Telephone: 201-567-7377
Facsimile: 201-567-7337
9 |
James J. Sabella
10 | **GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
11 | New York, New York 10017
Telephone: 646-722-8500
12 | Facsimile: 646-722-8501

13 | *Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

ROBERT B. DE MARS and LORENA
BARRIOS, individually and on behalf of all
others similarly situated,

                                    Plaintiffs,

            v.

GOOGLE, INC.,

                                    Defendant.

**CASE NO.:** CV12-01382

**CLASS ACTION**

**COMPLAINT FOR DAMAGES,
EQUITABLE, AND INJUNCTIVE
RELIEF**

**DEMAND FOR JURY TRIAL**

        Plaintiffs Robert B. DeMars and Lorena Barios ("Plaintiffs"), by and through their attorneys,

bring this class action complaint on their own behalf and on behalf of all others similarly situated, to

obtain an injunction, damages, costs of suit, and attorneys' fees from defendant Google, Inc.

---
Complaint

("Google").  Plaintiffs complain and allege, upon knowledge as to themselves and their acts, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     This is a nationwide class action against Google on behalf of all persons and entities in the United States (or, alternatively, in the State of California) that maintained a Google account from August 19, 2004 to February 29, 2012, and continued to maintain that Google account on or after March 1, 2012, when Google's new privacy policy went into effect (the "Class").

2.     Plaintiffs also bring this nationwide class action against Google on behalf of a subclass of persons and entities in the United States (or, alternatively, in the State of California) that owned a device powered by Android from August 19, 2004 to February 29, 2012, and continued to own that device on or after March 1, 2012 (the "Android Subclass").

3.     Google is a technology company that provides free web products to consumers, including its widely used web-based email service, Gmail, which has been available since 2004 and allows consumers to send and receive emails, chat with other consumers through Google Chat (Google's instant messaging service), and store email messages, contact lists, calendar entries, and other information on Google's servers.

4.     Google also offers consumers Google+, a social network where consumers can set up a profile and share text, links, photos and videos with friends through a variety of Google products, such as Google Reader (which allows consumers to subscribe to, read, and share content), Google Blogger (Google's weblog publishing tool that allows consumers to share text, photos, and video), and Picasa (which allows consumers to edit, post, and share digital photos).

5.     In addition, Google provides a variety of other products, including its well-known and globally utilized Google search engine (Google.com), as well as YouTube (where consumers can stream videos of interest to them); Google Docs (where consumers can create and edit documents online while collaborating in real-time with other consumers); and Google Maps (where consumers can view satellite images of locations all over the world, plan routes for traveling by foot, car, or public transport, and which has a GPS-like service that tracks the consumer's location).

6.      Different Google products log and keep track of different information about the consumer. Among the information about consumers that is collected through Google's products and services is the consumer's first and last name; the consumer's home or other physical address (including street name and city or town); the consumer's current, physical location; the consumer's email address or other online contact information (such as a consumer's identifier or screen name); the consumer's IP address; the consumer's telephone number (including home and mobile telephone numbers); the consumer's list of contacts; the consumer's search history from Google's search engine; the consumer's web surfing history from cookies Google places on consumers' computers; and all of the consumer's posts in Google+.

7.      Although Google always had access to all of this information, the information collected in one Google product was not previously commingled with information collected during the consumer's use of other Google products. Thus, Google did not previously tie a consumer's Gmail account (and therefore his or her name and identity) to the credit card, banking, and brokerage websites that the consumer visited. In addition, if a consumer had a Gmail account, the content of the consumer's Gmail communications would not be used by Google to optimize search results when that consumer used Google's search engine.

8.      On March 1, 2012, however, Google announced that it had changed its privacy policy. As stated by Google, "The main change is for consumers with Google Accounts…. Our new Privacy Policy makes clear that, if you're signed in, we may combine information you've provided from one service with information from other services. In short, we'll treat you as a single user across all our products, which will mean a simpler, more intuitive Google experience."

9.      Thus, Google's new privacy policy does not allow consumers to keep information about a consumer on one Google service separate from information gathered about the consumer by other Google services.

10.      This change violates Google's prior privacy policies, which deceived and misled consumers by stating that Google would not utilize information provided by a consumer in

1    connection with his or her use of one service, with any other service, for any reason, without the

2    consumer's consent.

3        11.    It also violates consumers' privacy rights, allowing Google to take information from a

4    consumer's Gmail account and Google+ account, which may have one expectation of privacy, and

5    use it in a different context, such as to personalize results from the Google search engine, or to

6    personalize advertisements viewed while the consumer is surfing the Internet, in which a consumer

7    has an entirely different expectation of privacy.

8        12.    Similar cross-referencing of billions of consumers' personal information previously

9    resulted in an October 13, 2011 Consent Order with the Federal Trade Commission ("FTC"), in

10   which the FTC found that Google deceptively claimed it would seek the consent of consumers

11   before using their information for a purpose other than for which it was collected, and that Google

12   had misrepresented consumers' ability to exercise control over their information.  In announcing the

13   Consent Order, Jon Leibowitz, Chairman of the FTC, stated, "when companies make privacy

14   pledges, they need to honor them."

15       13.    Here, billions of consumers across the globe are affected by Google's new privacy

16   policy.  Google's products and services have become a staple of society and are the base systems

17   used by many other third parties, such as operating systems for cell phone manufacturers, and onsite

18   search engines to power onsite search for third party publishers such as The New York Times.

19       14.    For example, Google's Android operating system has been incorporated into cell

20   phones built by multiple companies, including Motorola, LG, HTC, and Samsung.

21       15.    Similarly, Google's Internet search product dominates, powering over 65% of

22   Internet searches in the United States.  Over one billion searchers use Google's Internet search

23   engine (Google.com) each week; over 350 million consumers use Gmail; and YouTube streams over

24   4 billion videos per day to consumers.

25       16.    Google can offer these important, globally pervasive products free of charge to

26   consumers due to its primary business model – advertising.  Google obtains its advertising revenue

27   by:  (1) allowing advertisers to market their products on Google's products while consumers are

28

using them; and (2) selling and serving advertisements on third-party websites using its AdSense and AdMob products. Indeed, Google's advertising revenue was 97% of its profit last year.

17.     Google's display advertising revenue is second in the United States only to Facebook. Facebook garners a larger market share of display advertising revenue because consumers that use Facebook set up, manage, maintain, and populate personal profiles with very specific information about themselves. This allows Facebook to deploy a more complete picture of the individual to most effectively target advertisers' messages only to qualified consumers, providing advertisers the best return on their investments, using information each consumer willingly supplies to Facebook.

18.     Unlike Facebook, a holistic view of each consumer was unavailable to Google, and intended consumers were not easily identified by advertisers.   Google previously targeted its advertising using bits and pieces of anonymous information garnered from each, discrete Google service that had more than 70 distinct privacy policies.

19.     Thus, Google's new privacy policy is nothing more than Google's effort to garner a larger market share of advertising revenue by offering targeted advertising capabilities that compete with or surpass those offered by social networks, such as Facebook, where all of a consumer's personal information is available in one site.

20.     However, the profiles on those social networking sites are created and managed by the consumers themselves, and the consumers have control over the personal information appended to their Facebook profiles.   Thus, a consumer's expectation of privacy on Facebook is much different than his or her expectation of privacy when using Google products, where Google collects and aggregates information about the consumer without the consumer's consent, and which likely includes information that the individual would keep very private, and choose not to post, even on Facebook.

21.     Indeed, given the privacy policies that were in effect when Plaintiffs and the Class and Android Subclass began using Google products, they did not expect that their separate, distinct use of each of Google's products for separate, discrete purposes would be combined, by Google, into

1  a single profile for each consumer that Google creates, maintains, and then uses to better target its

2  consumers for advertising.

3      22.    Further, Google's new privacy policy fails to either disclose or adequately explain

4  that Google's primary purpose for aggregating this information is to garner a larger market share of

5  advertising revenue.

6      23.    Accordingly, contrary to Google's previous privacy policies, Google is now

7  aggregating consumers' personal information without consumers' consent; has failed to provide a

8  simple, effective opt-out mechanism; and Google's primary, undisclosed purpose for doing so is its

9  own commercial advantage, private commercial gain, and financial benefit.  Consumers are entitled

10  to damages as a result.

11                              **JURISDICTION AND VENUE**

12      24.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this

13  action arises under federal statutes, namely the Federal Wiretap Act, 18 U.S.C. § 2511 and the

14  Stored Communication Act, 18 U.S.C. § 2701, and the Computer Fraud and Abuse

15  Act, 18 U.S.C. § 1030, and pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because

16  the aggregated claims of the individual Class members exceed the sum or value of $5,000,000,

17  exclusive of interests and costs, and this is a class action in which more than two-thirds of the

18  proposed Class, on the one hand, and defendant Google, on the other, are citizens of different states.

19      25.    This Court has jurisdiction over Google because it maintains its principal

20  headquarters in California; is registered to conduct business in California; has sufficient minimum

21  contacts in California; or otherwise intentionally avails itself of the markets within California

22  through the promotion, sale, marketing, and distribution of its products and services to render the

23  exercise of jurisdiction by this Court proper and necessary.  Moreover, Google's wrongful conduct

24  (as described herein) emanates from California and foreseeably affects consumers in California.

25

26  Most, if not all, of the events complained of below occurred in or emanated from Google's corporate

27  headquarters located in Mountain View, California.

28

26. Venue is proper in this District under 28 U.S.C. § 1391(a) because Google resides in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## THE PARTIES

27. Plaintiff Robert B. DeMars ("DeMars") is a California resident. DeMars acquired his Gmail account in or about May of 2011, and continued to maintain his Gmail account on March 1, 2012. He was required to set up his Gmail account when he purchased his LG Optimus powered by Android, in or about May of 2011. He continued to own that mobile device on or after March 1, 2012. Like all members of the Class, Google aggregated DeMars' personal information without his consent. Like all members of the Android Subclass, DeMars cannot prevent Google's aggregation of his personal information without purchasing a new mobile device that is not powered by Android.

28. Plaintiff Lorena Barrios ("Barrios") is a California resident. Barrios acquired her Gmail account in or about February of 2012, and continued to maintain her Gmail account on March 1, 2012. She was required to set up her Gmail account when she purchased her Verizon HTC, powered by Android, in or about February of 2012. She continued to own that mobile device on or after March 1, 2012. Like all members of the Class, Google aggregated Barrios personal information without her consent. Like all members of the Android Subclass, Barrios cannot prevent Google's aggregation of her personal information without purchasing a new mobile device that is not powered by Android.

29. Google is a Delaware corporation with its principal place of business located at 1600 Amphitheatre Parkway, Mountain View, California 94043. At all times relevant hereto, Google was a multinational, public and Internet search technologies corporation. Google owns, services, and develops Internet-based services and products. Google was first incorporated as a privately held company on September 4, 1998, with its initial public offering to follow on August 19, 2004. Google consumers do not pay to use Google's services and products. Instead, Google's primary business model is advertising, which constituted 97% of Google's profits last year.

## PLAINTIFFS' CLASS ALLEGATIONS

30.     Plaintiffs seek to bring this case as a nationwide class action on behalf of themselves and all others similarly situated in the United States as members of the proposed Class, defined, in the alternative, as follows:

> All persons and entities in the United States that maintained a Google account from August 19, 2004 to February 29, 2012, and continued to maintain that Google account on or after March 1, 2012, when Google's current privacy policy became effective.

> **or**

> All persons and entities in the State of California that maintained a Google account from August 19, 2004 to February 29, 2012, and continued to maintain that Google account on or after March 1, 2012, when Google's current privacy policy became effective.

31.     Plaintiffs also seek to represent a subclass similarly situated individuals as members of the Android Subclass, defined, in the alternative, as follows:

> All persons and entities in the United States that owned a device powered by Android from August 19, 2004 to February 29, 2012, and continued to own that device on or after March 1, 2012.

> **or**

> All persons and entities in the State of California that owned a device powered by Android from August 19, 2004 to February 29, 2012, and continued to own that device on or after March 1, 2012.

32.     Excluded from the Class and Android Subclass are all claims for wrongful death, survivorship and/or personal injury by Class and Subclass members.  Also excluded from the Class and Android Subclass is Google, any entity in which Google has a controlling interest, and its legal representatives, heirs, and successors.

## NUMEROSITY

33.     The Class and Android Subclass are so numerous that joinder of all of its members is impractical.  Upon information and belief, Google has provided millions of products and services to consumers in the United States, and there are thousands of devices powered by Android.

34.     Although the precise number of Class and Android Subclass members, and their addresses and/or email addresses, are unknown to Plaintiffs, that information is readily ascertainable from Google's records.  Class and Android Subclass members may be notified on the pendency of

1  this action by mail, email, or Internet publication, supplemented (if deemed necessary or appropriate

2  by the Court) by published notice.

3  ## COMMON QUESTIONS OF LAW AND FACT

4      35.    Common questions of law and fact exist as to all Class and Android Subclass

5  members. These questions predominate over questions affecting only individual Class and Android

6  Subclass members. These common legal and factual questions include but are not limited to the

7  following:

8      a.    Whether Google violated its previous privacy policy by merging data across products

9  and services without consumers' consent;

10      b.    Whether Google deceptively claimed that it would seek the consent of consumers

11  before using their personal information for a purpose other than that for which it was collected;

12      c.    Whether Google misrepresented the ability of consumers to exercise control over

13  their personal information;

14      d.    Whether Google misrepresented the extent of its compliance with the U.S.-EU Safe

15  Harbor Framework by claiming that the company complied with the framework while violating the

16  principles of Notice and Choice;

17      e.    Whether Google's new privacy policy deceptively claims that it does not sell personal

18  information to advertisers when advertisers can, and in fact do, purchase targeting from Google that

19  uses consumers' personal information and Google profits as a result;

20      f.    Whether Google's new privacy policy allows Google to profit from the deceptive use

21  of consumers' personal information through acquisition of a larger share of advertising revenue;

22      g.    Whether Google's opt-out practices for its new privacy policy are deceptive and

23  misleading;

24      h.    Whether consumers can effectively opt-out of Google's new privacy policy;

25      i.    Whether Google should, alternatively, provide an opt-in measure for its new privacy

26  policy;

27      j.    Whether Android users can effectively opt-out of Google's new privacy policy;

28

k.      Whether Android users are entitled to the cost of purchasing a new device or reimbursement for the purchase of their current Android device;

l.      Whether Google concealed or failed to disclose material information concerning its advertising practices and future plans for revenue growth;

m.      Whether Plaintiffs and the Class and Android Subclass are entitled to injunctive relief; and

n.      Whether Plaintiffs and the Class and Android Subclass are entitled to damages and attorneys' fees.

## TYPICALITY

36.      Plaintiffs' claims are typical of the claims of the Class and the Android Subclass. Plaintiffs and each member of the proposed Class maintained a Google product or service prior to February 29, 2012, and continued to maintain that product or service after March 1, 2012.  Plaintiffs and each member of the Android Subclass owned a device powered by Android prior to February 29, 2012, and continued to own that device after March 1, 2012.

37.      In connection with their respective use of Google products, Plaintiffs and each Class and Android Subclass member were subject to the same disclosures and received the same privacy policy or terms and conditions at the time they began using Google products.

38.      Google has used Plaintiffs' and all Class and Android Subclass members' personal information without their consent, inconsistent with Google's affirmative representations, and to Google's financial benefit which was undisclosed.  Plaintiffs and all Class and Android Subclass members have sustained damages as a result, including losses directly caused by Google's actions as alleged herein.

## ADEQUACY OF REPRESENTATION

39.      Plaintiffs can and will fairly and adequately represent and protect the interests of the Class and Android Subclass, and have no interests that conflict with or are antagonistic to the interests of the Class or Android Subclass.   Plaintiffs have retained attorneys competent and experienced in class action litigation.

**SUPERIORITY**

40.     A class action is superior to any other available method for the fair and efficient adjudication of this controversy, since, as demonstrated above, common questions of law and fact overwhelmingly predominate over any individual questions that may arise.

41.     The prosecution of separate actions by individual members of the Class or Android Subclass would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and Android Subclass which would establish incompatible standards of conduct for Google, or adjudication with respect to individual members of the Class or Android Subclass which would, as a practical matter, be dispositive of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

42.     Google has acted or refused to act on grounds generally applicable to all Class and Android Subclass members, thereby making appropriate any final judgment with respect to the Class and the Android Subclass as a whole.

**SUBSTANTIVE ALLEGATIONS**

**Google's Previous Privacy Policy Misrepresented How Google Would Use Consumers' Personal Information**

43.     Google previously maintained more than 70 separate privacy policies for its products.

44.     Google's previous privacy policies indicated, "When you sign up for a particular service that requires registration, we ask you to provide personal information. If we use this information in a manner different than the purpose for which it was collected, then we will ask for your consent prior to such use."

45.     Additional statements in specific privacy policies further indicated that Google uses the consumer's personal information strictly in order to provide that particular product or service to the consumer, and that Google would not use it for any other purpose without the consumer's consent. For example, Google's prior Gmail privacy policy indicated, "Gmail stores, processes and maintains your messages, contact lists and other data related to your account in order to provide the service to you."

46. Accordingly, Google's previous privacy policies indicated that Google would not use the consumer's personal information for any purpose other than that for which it was intended – to set up a specific account for a specific Google product.

47. In addition, Google has always maintained – and continues to maintain – that it will not sell or share with third parties a consumer's personally identifying information without the consumer's consent.

48. All consumers that signed up for Google products prior to March 1, 2012, when Google's new privacy policy took effect, were subject to these misrepresentations.

**Google's Prior Privacy Violations and Citations for Unfair and Deceptive Practices**

49. Approximately two years ago, Google launched a social networking service called Google Buzz. Two of Google Buzz's key features where "Rich fast sharing" (which combined a variety of social media sources such as Picasa and Twitter into a single news feed), and "Automatic friends lists" (contacts that the consumer had emailed through Gmail were automatically added to a consumer's Google Buzz account). Thus, Google Buzz was Google's first attempt at cross-pollinating content across different Google products.

50. Indeed, Google took information consumers provided for use within Gmail and used it to populate Google Buzz – a separate and discrete social network service.

51. Google transferred this information despite the fact that, as described above, Google's prior privacy policies stated that Google would only use a consumer's Gmail information for the purpose of providing Gmail services, and would not use this information for any other purpose without the consumer's consent. Contrary to its terms of service, however, Google was using consumers' Gmail information to populate Google Buzz.

52. Such cross-referencing of data harmed all consumers by violating their expectation of privacy in their emails; but was particularly harmful to clients of mental health professionals, attorneys, and finance professionals, as well as to the professionals themselves, who must promise confidentiality.

53.  Not only did Google cross-index this information between products without the consumer's consent, but Google did not adequately disclose that Google was automatically making certain private information public through use of the Google Buzz product, and there was no clear way for a consumer to opt out of Google Buzz or to make the information non-public.  Indeed, options for controlling the privacy of this information were very difficult to locate and confusing to consumers.

54.  These unfair and deceptive trade practices resulted in an October 13, 2011 Consent Order between Google and the Federal Trade Commission ("FTC").  The FTC found that Google "failed to disclose adequately that consumers' frequent email contacts would become public by default."

55.  The FTC also found that controls for limiting disclosure of personal information were "confusing and difficult to find…."

56.  Further, the "options for declining or leaving the social network were ineffective."

57.  Google had also "failed to give consumers notice and choice before using their information for a purpose different from that for which it was collected."

58.  In announcing the Consent Order, Jon Leibowitz, Chairman of the FTC, stated, "when companies make privacy pledges, they need to honor them."

59.  The FTC found that Google deceptively claimed that it would seek consumers' consent before using their information for a purpose other than that for which it was collected; Google misrepresented the consumers' ability to exercise control over their information; and Google misrepresented the extent of its compliance with the U.S.-EU Safe Harbor Framework by claiming that the company complied with the framework while violating the principles of Notice and Consent.

60.  In addition to these findings, the Consent Order governs Google's current and future conduct.  Part I of the Consent Order prohibits Google from misrepresenting:  (a) the extent to which it "maintains and protects the privacy and confidentiality" of personal information; and (b) the extent to which it complies with the U.S.-EU Safe Harbor Framework.  Part II of the Consent Order

requires Google to obtain "express affirmative consent" before "any new or additional sharing by [Google] of the Google user's identified information with any third party...."

61.     Google's new privacy policy violates both of these provisions; commingles data in the same manner that resulted in the Consent Order; and consumers of Google's products and services have been harmed as a result.

**Google's New Privacy Policy Violates Google's Prior Privacy Policies and Misrepresents and Fails to Disclose Its Primary Purpose**

62.     On March 1, 2012, Google announced that changes to its privacy policies had been made and that it had consolidated more than 60 of its privacy policies down to just one document.

63.     As stated by Google, "The main change is for users with Google Accounts.... Our new Privacy Policy makes clear that, if you're signed in, we may combine information you've provided from one service with information from other services.  In short, we'll treat you as a single user across all our products, which will mean a simpler, more intuitive Google experience."

64.     Thus, contrary to representations made in Google's prior privacy policies, Google's new privacy policy does not allow consumers to keep information about a consumer of one Google service separate from information gathered from other Google services.

65.     For example, consumers will no longer be able to keep the personal information they provided to Gmail, the Google email service, for simply that service.  Instead, Google will be able to combine the information provided by the consumer on Gmail with other Google services, including Google+, Google's social network service.

66.     Thus, whereas previously information that was shared in email (such as Gmail) and on personal profiles (such as Google+) was contained within the context of the product the consumer was using, it is now available to all other products the consumer uses, and all of the products that that his or her contacts use.

67.     For example, if a consumer conducts a Google search for restaurants in Munich, the search results will not only provide answers from the web, but will provide information from the consumer's – as well as the consumer's friends and contacts – Google accounts (Gmail, Google+, etc.).  The result:  the consumer will get web results, but will also get personal search results that

1  show posts, blogs, or photos that not only the consumer, but that the consumer and his or her friends

2  and contacts, have shared across all other Google products, such as Google+.

3      68.      In addition, Google can tie your web-surfing and search history to your Gmail and

4  Google+ accounts and, therefore, build detailed and accurate targeting segments for advertising

5  purposes.  Thus, Google can use the consumer's actual sex and age to target that consumer for

6  advertising, rather than its prior use of an anonymous profile created by algorithms that use web

7  browsing history to target a consumer based upon a guess that the consumer is, for example, a

8  female age 30-45.

9      69.      Another example – instead of selling automobile advertisements to consumers Google

10 marks as an "auto intender" merely based upon web-surfing and search history (which may include a

11 12 year old boy that can't drive or purchase a vehicle), Google can now scan a consumer's emails

12 and Google+ account, confirm that the consumer is of driving age, and see that the consumer wrote

13 about shopping for a Mercedes-Benz, or include a picture from a friend's Google+ account in a

14 Mercedes-Benz advertisement that shows the friend with her Mercedes-Benz vehicle.  Google could

15 then allow BMW to advertise its vehicles to the consumer, specifically trumpeting reviews that say

16 BMW is better than Mercedes-Benz (for which BMW, in this example, would pay a premium).

17 Thus, Google can provide its advertisers with data that is specific, verified, and more reliable, and

18 advertisements can be personalized to each consumer's specific preferences, including implied

19 endorsements from their friends on Google+.

20     70.      Further, when the consumer is not signed in to a Google account, Google continues to

21 aggregate data in an anonymous profile and customize each consumer's searches.  Google stores up

22 to 180 days of signed-out search activity, including queries and results you click in a cookie on a

23 consumer's browser.  When a consumer logs back into his or her Google account, that anonymous

24 profile information can then be appended to that consumer's account, at which point that anonymous

25 information could be used to customize results for that consumer on that computer or any other

26 computer where the consumer is logged onto a Google account.

27

28

Complaint

15

71.   Indeed, every time a consumer uses a Google product, Google retains information about that use. Some of the information Google may have includes:

a.   Your location: Google Maps, both mobile and desktop, shows your location on the map. On the desktop, Google Maps obtains your location from your web browser, through its geolocation feature. On your mobile, Google Maps obtains your location through the device.

b.   Your search logs: Google stores data about your Google searches, including the search query, the time and date it was typed, the IP address and cookie of the computer it was entered from, and its browser type and operating system.

c.   Your contacts: Google stores your Gmail contacts on its server.

d.   Your personal identifying information: Your name, home address, age, and likes and dislikes can easily be obtained from your Google+ profile.

e.   Your email content: Google scans the contents of the emails you send and receive on Gmail to target contextually related advertisements while you are using Google's Gmail product.

72.   Prior to implementation of the Google's new privacy policy, the information Google obtained from each of its services would remain with the product that gathered the information. Now, all of the foregoing information is combined, creating a very personal, specific profile for each consumer, including not just an IP address, but some of the consumer's most personal identifying information.

73.   Thus, contrary to the representations in Google's prior privacies pursuant to which Plaintiffs and the Class acquired their Google accounts, Google is now taking the personal information the consumer used to set up a specific account for a specific Google product, and combining that information with information submitted by that consumer on every Google product the consumer uses without the consumer's consent.

74.   Not only has Google done so without each consumer's consent; it has not provided consumers with an easy, efficient, or effective way to opt-out of Google's co-mingling and cross-pollination of data. While Google has made it very easy to universally merge data across product

Complaint                                          16

lines, it has not made it easy to opt out – consumers must manage their privacy settings for each Google product they use; a universal opt-out function is not available. Google product users have the ability to minimize the accessibility of some of their data, but there are significant obstacles to doing so, and complete privacy cannot be accomplished.

75.     Indeed, Google has misrepresented that the impetus for the consolidation, stating that it is to provide "a simpler, more intuitive Google experience." However, the primary reason for Google's privacy change is to use consumers' personal information to grow profits by achieving a larger market share of advertising revenue. Thus, Google has no incentive to provide an effective opt-out function, or, in the alternative to provide an opt-in function.

76.     Perhaps it is best stated by the 35 Attorneys General that sent a letter dated February 22, 2012 to Google opposing implementation of Google's new privacy policy,

> Your company claims that users of Google products will want their personal information shared in this way because doing so will enable your company to provide them with a "simple product experience that does what you need, when you want it to," among many other asserted benefits. If that were truly the case, consumers would not only decline to opt out of the new privacy policy, but would freely opt *in* if given the opportunity. Indeed, an "opt-in" option would better serve current users of Google products by enabling them to avoid subjecting themselves to the dramatically different privacy policy without their affirmative consent. Unfortunately, Google has not only failed to provide an "opt-in" option, but has failed to provide meaningful "opt-out" options as well.

*available at* http://epic.org/privacy/google/20120222-Google-Privacy-Policy-Final.pdf.

77.     Further, studies show that an overwhelming number of consumers do not want to receive advertisements targeted based on behavior, or search results based on their prior activity.

78.     According to a March 9, 2012 study released by the Pew Internet & American Life Project, 800 Web users were asked how they would feel about a search engine remembering their prior queries and using that data to personalize future results. Seventy-three percent of the respondents said they "would not be okay with it" because they felt it was an invasion of privacy.

79.     The study also asked 1,700 Web users how they felt about receiving targeted advertisements. Sixty-eight percent of respondents were "not okay with it" because they do not want

to be tracked and profiled.  Only 28% said they were "okay with it" because they received ads and information relevant to their interests.

80.    These results are consistent with a study released in September of 2009 by professors at the University of Pennsylvania's Annenberg School for Communication and the University of California, Berkeley School of Law, which found that two out of three Web users don't want customized ads.

81.    Despite consumers' opinions to the contrary, Google's new privacy policy makes it much easier for Google to track its product users' activity for the purpose of serving up personalized advertisements.

82.    In the past, Google's search results may not always give consumers what they were looking for because, inevitably, there is an element of guesswork involved – the search engine did not know your personal identity (including age your age and location) or other preferences.  For example, if – prior to implementation of the new privacy policy – a consumer had typed the term "Chelsea" into Google's search engine, the search engine may not have known whether to provide results for neighborhoods in Manhattan or London.  At the same time, the advertising that was paired with the results may not have been accurate – should the consumer be targeted for advertisements for restaurants in Manhattan or London?

83.    However, with Google's new privacy policy, Google is able to cross-reference the information it has about you from other Google products, such as Google Maps.  Thus, Google may learn from a consumer's prior use of Google Maps that he or she is located in Manhattan, and could then provide results that contain information about restaurants in Chelsea, Manhattan.

84.    By providing search results that are tailored to the consumer, Google can keep consumers engaged and, therefore, using its products and services for longer periods of time.  If consumers are using its products longer, Google can sell more advertising space because the advertising displays have more time to rotate.

85.    Google can also use this information to tailor the advertising to its intended user – if the consumer is located in Manhattan, it can advertise restaurants located in Manhattan – thus

Complaint

18

1    optimizing marketing for its advertisers, resulting in Google's ability to charge more for

2    advertisements.

3         86.    Thus, optimizing search results (1) keeps consumers engaged longer, and longer

4    engagement allows Google to sell and deliver more advertisements (engagement creates inventory);

5    and (2) allows Google to display advertising that is specifically targeted to intended users, rather

6    than the masses (which raises the likelihood that the consumer will "click" on the advertisement).

7    Google can, therefore, sell more advertisements *and* command a higher price for them, by delivering

8    more intended users to its advertisers.

9         87.    For example, marketers could tap into a consumer's YouTube browsing history when

10   targeting search advertisements on Google.com, and recommend golfing instruction videos and

11   advertisements for golf courses and vacations to a signed-in YouTube, Gmail, or Google+ consumer

12   who recently searched for "golf" on Google.com.

13        88.    Better recommendations leading consumers to more relevant content will presumably

14   keep them inside the Google ecosystem longer and potentially help Google begin to catch up to

15   Facebook in terms of time spent lingering on their respective sites, and, therefore, in terms of

16   revenue from advertising from the additional advertising inventory that is created by keeping the

17   consumer on the site longer.

18        89.    Thus, as long as the consumer is signed-in to any Google account, such as Gmail or

19   Google+, Google will now aggregate all of your activity under one profile on any other Google

20   product you utilize.  It will merge data from each of its platforms and services (including Android

21   devices), aggregating the content of the emails you draft, the content of emails you receive, the

22   searches you run using Google Search, the locations you search using Google Maps, the articles you

23   read and upload to Google+; it is all combined to create a detailed profile of the consumer.  The

24   consumer's name and personal information are associated with the Gmail or Google+ account

25   (because the consumer provides that information to Google when he or she originally creates those

26   accounts) and the consumer's identity is now associated with the whole spectrum of the consumer's

27   activity.

28

90.     Google can sell advertisers that ability to target specific, intended consumers, rather than the masses.  Google has access to everything about the consumer – including his or her name, location, likes, dislikes, interests; up to and including places he or she has made reservations for dinner that very night.  The value in Google's ability to create a clear, well-rounded picture of the consumer – as opposed to its previous privacy policy that created largely anonymous puzzle pieces that could not be linked together (and were not always accurate) – is unquestionably significant.  It is also unquestionably invasive, and is being done in violation of its previous privacy policies pursuant to which the Class and Android Subclass agreed to utilize Google's products, and without the consumer's consent or an effective ability to opt-out.  Indeed, the new unified privacy policy is emblematic of what former Google executive James Whittaker has called Google's recent shift from "innovation factory" to "advertising company."  (James Whittaker, "Why I left Google." March 13, 2012, *available at* http://blogs.msdn.com/b/jw_on_tech/archive/2012/03/13/why-i-left-google.aspx.)

91.     Furthermore, consumers of devices powered by Google's Android platform are automatically, and permanently, "logged-in" for purposes of aggregation of their personal information.  They have no way to opt-out, and cannot avoid this unauthorized invasion of privacy unless they replace their Google Android device with a non-Android device, which would cost hundreds of dollars.

92.     Again, the issue is best stated by the 35 Attorney Generals in their February 22, 2012 letter to Google objecting to Google's new privacy policy:

> Even more troubling, this invasion of privacy is virtually impossible to escape for the nation's Android-powered smartphone users, who comprise nearly 50% of the national smartphone market.  For these consumers, avoiding Google's privacy policy change may mean buying an entirely new phone at great personal expense.  No doubt many of these consumers bought an Android-powered phone in reliance on Google's existing privacy policy, which touted to these consumers that "We will not reduce your rights under this Privacy Policy without your explicit consent."  That promise appears not to be honored by the new privacy policy.  Given the way the new privacy policy is being implemented, i.e., without genuine opt-put options and without pre-purchase notice to users of Android-powered smartphones, it seems these users can only register non-consent by abandoning their phones altogether.

*available at* http://epic.org/privacy/google/20120222-Google-Privacy-Policy-Final.pdf.

93.     Thus, Google's increased optimization comes at a significant cost to privacy, consumers' rights, and consumers' wallets. What a consumer may discuss with friends on Gmail, may be different than that which he or she would search on a computer at work. By commingling data (including searches, locations, and email contacts), and tying it to a specific Gmail account or Google+ account (and therefore a specific consumer), the consumer's personal information is no longer tied to the account; it is tied to an overarching profile in that person's name, that is regularly appended through use of or interaction with Google products. That person no longer remains anonymous where he or she intended to remain anonymous. The various portions of each person's life are no longer separate and given the expectation of privacy associated with each of them; they are no longer pieces to an impossible puzzle; they are pieces that can be, and as of March 1, 2012 have been, linked to create a clear picture of that consumer.

94.     Google's top advertising executive, Susan Wojcicki, has best described how Google's new privacy policy will raise Google's advertising revenues. Ms. Wojcicki stated at a Search Marketing Expo conference that Google's biggest innovations over the next several years will be in personalized search results and advertisements. She also stated that Google+ was the gateway to "the next generation of Google products," which will be "different because our users are logged in and are telling us something about themselves." At the conference, Wojcicki described how different users typing in the same "best vacations" search would get different results – her results would be more family friendly, because Google would have been able to aggregate information about her and determined that she had a family. This is the precise, controversial conclusion that Google's new privacy policy allows Google to make by analyzing a consumer's combined usage data.

95.     She also stated that she hopes Google will reach a point where it provides only advertisements that consumers "want to see." She did not mention the windfall of profits Google will achieve by using the consumer's personal information to deliver such targeted advertising, without the consumer's consent.

96.     As a result of the foregoing, and in addition to the relief requested below, Google has violated Part I of the Consent Order by: (a) misrepresenting the extent to which it maintains and protects the privacy and confidentiality of covered information; and (b) misrepresenting the extent to which it complies with the U.S.-EU Safe Harbor Framework. Google is also in violation of Part II of the Consent Order by failing to obtain affirmative consent from consumers prior to sharing their information with third parties.

97.     Google has also misrepresented, and failed to disclose, its primary purpose for implementing its new privacy policy – to monetize its unauthorized use of consumers' personal information by garnering a larger market share of advertising revenue, for its own financial benefit.

## TOLLING OF THE STATUTE OF LIMITATIONS

98.     The ability to opt-out of Google's new privacy policy is ineffective, latent and self-concealing. Accordingly, exercising reasonable care, Plaintiffs, the Class, and the Android Subclass members cannot effectively opt-out of Google's new privacy policy.

99.     By suppressing the dissemination of truthful information regarding the intended purpose of the privacy policy, and the ability to opt-out, Google has actively foreclosed Plaintiffs, the Class, and Android Subclass members from opting-out.

100.    By reason of the foregoing, the claims of Plaintiffs and other Class and Android Subclass members are timely under any applicable statute of limitations (as tolled by the filing of this class action petition) pursuant to the discovery rule and the doctrine of fraudulent concealment.

101.    Google has been aware of the deceptive nature of its prior privacy policies for several years.

102.    Despite this knowledge and awareness, Google continues to aggregate consumers' personal data without their consent and a meaningful ability to opt-out.

103.    Google's failure to obtain consumers' consent, failure to provide a meaningful opt-out mechanism, failure to disclose its primary purpose, and failure to abide by the Consent Order, was and is willful, wanton, malicious, outrageous, and was and continues to be undertaken in

1    deliberate disregard of, or with reckless indifference to, the rights and interests of Plaintiffs and the

2    Class and Android Subclass members.

### COUNT I

### VIOLATIONS OF THE FEDERAL WIRETAP ACT
**18 U.S.C. § 2511**
**(For all Class members)**

6    104.    Plaintiffs reallege and incorporate by reference each and every allegation set forth

7    above as though fully set forth herein.

8    105.    The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act

9    of 1986, prohibits the willful interception of any wire, oral or electronic communication.

10    106.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral,

11    or electronic communication is intercepted.

12    107.    Google is intercepting and aggregating the personal information of Plaintiffs, and all

13    others similarly situated, and is placing cookies on its users' computers that intercepted records of

14    Google users' Internet communications even after the user has logged out of his or her Google

15    accounts.

16    108.    Neither Plaintiffs nor members of the Class or Android Subclass consented, nor were

17    they aware that Google was violating its own privacy policy, and tracking and aggregating

18    consumers' Internet use across Google platforms, creating a single profile of each consumer that

19    aggregates all information about the consumer across Google platforms – even after logging off of

20    Google accounts, and then appending the aggregated information to consumers' Google accounts

21    when they log back in.

22    109.    The data Google is intercepting and aggregating are "communications" within the

23    meaning of the Wiretap Act.

24    110.    Google intentionally and willfully intercepts the electronic communications of its

25    consumers and intentionally and willfully aggregates consumers' personal information for its own

26    financial benefit.

27

28

111.    Plaintiffs and the Class are persons whose electronic communications were intercepted within the meaning of Section 2520.

112.    Section 2520 provides for preliminary, equitable and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 a day for each day of violation, actual and punitive damages, reasonable attorneys' fees, and disgorgement of any profits earned by Google as a result of the above-described violations.

## COUNT II

### VIOLATIONS OF THE STORED ELECTRONIC COMMUNICTIONS ACT
### 18 U.S.C. § 2701
### (For All Class Members)

113.    Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

114.    The Stored Electronic Communications Act ("SECA") provides a cause of action against a person who intentionally accesses without authorization a facility through which an electronic communication service is provided, or who intentionally exceeds an authorization to access that facility and thereby obtains, alters or prevents authorized access to a wire or electronic communication while it is in storage in such a system.

115.    "Electronic Storage" is defined in the statute to be "any temporary, immediate storage of a wire or electronic communication incidental to the electronic transmission thereof."

116.    Google's new privacy policy intentionally exceeds its authorized access to consumers' electronic communications stored on Google's systems, thus violating the SECA.

117.    Google also intentionally places cookies on consumers' computers that access members' stored electronic communications without authorization, thus violating the SECA.

118.    Plaintiffs and the other Class members were, and continue to be, harmed by Google's violations, and are entitled to statutory, actual and compensatory damages, injunctive relief, punitive damages and reasonable attorneys' fees.

## COUNT III

## VIOLATIONS OF THE COMPUTER FRAUD ABUSE ACT
### 18 U.S.C. § 1030
### (For All Class Members)

119.   Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

120.   Google intentionally accessed a computer used for interstate commerce or communication, without authorization or by exceeding authorized access to such a computer, and by obtaining information from such a protected computer.

121.   Google knowingly caused the transmission of a program, information, code or command and as a result caused a loss to one or more persons during any one-year period of at least $5,000 in the aggregate.

122.   Plaintiffs, the Class, and the Android Subclass have also suffered a violation of the right of privacy as a result of Google's knowing actions.

123.   Google has thus violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

124.   Google's unlawful access to Plaintiffs' and the Class and Android Subclass members' computers and communications has caused irreparable injury.   Unless restrained and enjoined, Google may continue to commit such acts.   Plaintiffs' remedies at law are not adequate to compensate for these inflicted and threatened injuries, entitling Plaintiffs and the Class and Android Subclass to remedies including injunctive relief as provided by 18 U.S.C. § 1030(g).

## COUNT IV

## VIOLATION OF CALIFORNIA'S RIGHT OF PUBLICITY STATUTE
### Civil Code § 3344
### (For All Class Members)

125.   Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

126.   California's Right of Publicity Statute, California Civil Code § 3344, *et seq.*, protects persons from the unauthorized appropriation of the person's identity by another for commercial gain.

127. During the Class period, Google knowingly used Plaintiffs' and the Class' names, photographs, or likenesses for advertising, selling, or soliciting purposes.

128. Google did not have Plaintiffs' or the Class' consent to do so.

129. Plaintiffs received no compensation or other consideration for Google's use thereof.

130. Plaintiffs and the Class were harmed by Google's actions.

131. The advertisements were not used in conjunction with news, public affairs, a sports broadcast or account, or a political campaign.

132. Each incident is a separate and distinct violation of California Civil Code § 3344.

133. Plaintiffs and the Class therefore seek injunctive relief, and other such preliminary and other equitable or declaratory relief as may be appropriate.

134. Plaintiffs and the Class also seek remedy as provided for by California Civ. Code § 3344(a) in the amount equal to the greater of $750 per incident, or the actual damages suffered as a result of the unauthorized use, and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages, as well as punitive damages, attorneys' fees and costs, and any other relief as may be appropriate.

## COUNT V

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
#### Cal. Bus. & Prof. Code § 17200, *et seq.*
#### (For All Class Members)

135. Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

136. As described above, Google's nonconsensual use of Plaintiffs' and the Class' personal information violates the Federal Wiretap Act, the Stored Electronic Communications Act, and the Computer Fraud Abuse Act.

137. As described herein, Google's nonconsensual use of Plaintiffs' and the Class' names, photographs, and likenesses is also a violation of California's Right to Publicity Statute, Civil Code § 3344.

138.   These violations satisfy the "unlawful" prong of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*.

139.   Google also violated the "fraudulent" prong of the UCL by intentionally and knowingly misrepresenting that Plaintiffs and the Class have full control to prevent their appearance in advertising on Google's products.  Google did so with the intent of getting members to register for, and to use, its products and services, and to participate in advertisements even while Google knew there was no meaningful way to prevent one's name, photograph, likeness, or identity from being used to target advertising or appearing as an endorsement in advertisements.

140.   Moreover, Google intentionally misrepresented Plaintiffs' and the Class' ability to prevent use of his or her appearance and personal information in advertisements so Google could enjoy substantial profits by having users unwittingly appear in such advertisements.

141.   Plaintiffs and the Class justifiably relied upon those misrepresentations when deciding to sign up for and use Google's produces and services, and when using those services to run searches for their interests, exchange emails with friends, edit and share their pictures, stream videos, and search for directions.  Plaintiffs suffered damages of deprivation of money earned by the misrepresentations, in an amount to be proven at trial.

142.   Google also violated the fraudulent prong of the UCL by knowingly and intentionally failing to seek and acquire informed consent regarding the changes to its privacy policy.

143.   Google violated the "unfair" prong of the UCL by leading Plaintiffs and the Class to believe that they could opt out of advertising endorsements, encouraging Plaintiffs and the Class to make Google products indispensable to their lives, and then using Plaintiffs' and the Class' personal information in a manner in which Plaintiffs and the Class cannot effectively opt out.

144.   Google violated the "unfair" prong of the UCL by intentionally profiting from the nonconsensual endorsements extracted from Plaintiffs and the Class without sharing those profits with Plaintiffs and the Class.

145.   Google's unfair, deceptive, and fraudulent practices originated from California. Decisions concerning Google's privacy policies and advertising decisions were made in California.

146.   Pursuant to Cal. Bus. § Prof. Code. § 17203, Plaintiffs and the Class seek an order of this Court permanently enjoining Google from continuing to engage in the unlawful, unfair and fraudulent conduct described herein.  Plaintiffs and the Class seek an order requiring Google to (1) immediately cease the unlawful practices stated in this Complaint; and (2) award Plaintiffs and the Class reasonable costs and attorneys' fees pursuant to Cal. Code of Civ. Proc. § 1021.5.

147.   Plaintiffs and the Class have a vested, monetary interest in the use of their personal information to target advertising and in their appearance in Google advertisements, and Google has deprived them of that interest.

148.   Plaintiffs and the Class each lost money to which they were entitled in the form of compensation for the use of their images and names, and in which they had a vested interest, by virtue of Google's conduct.  They are entitled to restitution of such sums.

## COUNT VI

### COMMON LAW INTRUSION UPON SECLUSION
#### (For the Class)

149.   Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

150.   Google invaded upon something secret, secluded or private pertaining to the Plaintiffs.

151.   Google's actions constitute an impermissible intrusion upon Plaintiffs' and the Class' seclusion or solitude, and/or their private affairs.

152.   Google's invasion would be highly offensive to a reasonable person.

153.   Google's invasion violates expectations of privacy that have been established by general social norms.

154.   Plaintiffs and the Class were damaged by such unauthorized actions.

Complaint

28

## COUNT VII

## COMMON LAW TRESPASS TO CHATTELS
### (For the Class)

155.   Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

156.   A trespass to chattel is committed by intentionally intermeddling with a chattel in the possession of another.

157.   A trespass to chattel is also be committed by fraud, through a misrepresentation to induce another to voluntarily dispossess himself of a chattel.

158.   Google has committed a trespass to chattels by intentionally intermeddling with Plaintiffs' personal information.

159.   In addition, Google has committed a trespass to chattels by misrepresenting the terms upon which it would use Plaintiffs' and the Class' personal information to induce Plaintiffs and the Class to voluntarily use Google's products.

160.   Plaintiffs and the Class were damaged by Google's actions.

## COUNT VIII

## UNJUST ENRICHMENT
### (For All Class Members)

161.   Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

162.   Plaintiffs and the Class conferred a benefit on Google without Plaintiffs' and the Class members' consent, namely, to access their wire or electronic communications over the Internet, aggregate them to create a personal profile for Google consumers, and using that information to increase its advertising revenue.

163.   Upon information and belief, Google realized such benefits through either sales to third parties and/or greater knowledge of its own consumers' behavior without their consent.

164.   Acceptance and retention of such benefit without Plaintiffs' and the Class members' consent is unjust and inequitable.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray the Court to enter judgment against Google and in favor of Plaintiffs, on behalf of themselves and the Class and Android Subclass members, and to award the following relief:

A.     Certifying this action as a nationwide class action (or in the alternative as a California class action), certifying Plaintiffs as representatives of the Class and the Android Subclass, and designating his counsel as counsel for the Class and Android Subclass;

B.     Tolling the statute of limitations pursuant to the discovery rule and the doctrine of fraudulent concealment;

C.     Awarding the Plaintiffs and each Class and Android Subclass member actual and compensatory damages for the acts complained of herein;

D.     Awarding the Plaintiffs and each Class and Subclass member treble damages for the acts complained of herein;

E.     Awarding the Plaintiffs and each Class and Subclass member costs and attorneys' fees, as allowed by law, and/or awarding counsel for the Class and Android Subclass attorneys' fees;

F.     Awarding the Plaintiffs and each Class and Android Subclass member statutory pre-judgment interest;

G.     For legal and equitable relief as this Court may deem just and proper; and

H.     Granting such other or further relief as may be appropriate under the circumstances.

1

**DEMAND FOR JURY TRIAL**

2    Plaintiffs demand a trial by jury as to all issues so triable.

3    Dated:  March 20, 2012                    LAW OFFICES OF MARTIN S. BAKST

4

5                                             By: _____
                                              Martin S. Bakst (65112)
6                                             15760 Ventura Boulevard, Sixteenth Floor
                                              Encino, California 91436
7                                             Telephone: 818-981-1400
                                              Facsimile: 818-981-5550
8

9                                             **GARDY & NOTIS, LLP**
                                              Mark C. Gardy
                                              James S. Notis
10                                            Jennifer Sarnelli (242510)
                                              Kelly A. Noto
11                                            560 Sylvan Avenue
                                              Englewood Cliffs, New Jersey 07632
12                                            Telephone: 201-567-7377
                                              Facsimile: 201-567-7337
13

14                                            **GRANT & EISENHOFER P.A.**
                                              James J. Sabella
15                                            485 Lexington Avenue, 29th Floor
                                              New York, New York 10017
16                                            Telephone: 646-722-8500
                                              Facsimile: 646-722-8501

17                                            *Attorneys for Plaintiffs*

18

19

20

21

22

23

24

25

26

27

28

Complaint                          31