**GARDY & NOTIS, LLP**
Mark C. Gardy
James S. Notis
Kelly A. Noto
Charles A. Germershausen
560 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337

**GRANT & EISENHOFER P.A.**
James J. Sabella
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Sarah N. Westcot (State Bar No. 264916)
1990 North California Boulevard, Suite 940
Walnut Creek, California 94596
Tel:  925-300-4455
Fax:  925-407-2700

*Interim Lead Counsel for the Class*
*and Android Subclass*

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE, INC. PRIVACY POLICY LITIGATION | **CASE NO. 12-CV-01382 PSG**<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**COMPLAINT FOR DAMAGES, EQUITABLE, AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Robert B. DeMars, Lorena Barios, Nicholas Anderson, Matthew Villani, Scott McCullough, David Nisenbaum, Pedro Marti, and Allison C. Weiss ("Plaintiffs"), by and through their attorneys, bring this class action complaint on their own behalf and on behalf of all others similarly situated, to obtain an injunction, damages, costs of suit, and attorneys' fees from defendant Google, Inc. ("Google").  Plaintiffs complain and allege, upon knowledge as to themselves and their acts, and upon information and belief as to all other matters, as follows:

## <u>NATURE OF THE ACTION</u>

1.      This is a nationwide class action against Google on behalf of all persons and entities in the United States that acquired a Google account between August 19, 2004 and February 29, 2012, and continued to maintain that Google account on or after March 1, 2012, when Google's new privacy policy went into effect (the "Class").

2.      Plaintiffs also bring this nationwide class action against Google on behalf of a subclass of persons and entities in the United States that acquired a device powered by Android between August 19, 2004 and February 29, 2012, and continued to own that device on or after March 1, 2012 (the "Android Subclass").

3.      Google is a technology company that provides free web-based products to billions of consumers across the globe.  Over one billion consumers use Google's search engine, google.com, each week; over 350 million consumers use Google's web-based email service, Gmail; and Google's video sharing site, YouTube, streams over 4 billion videos per day to consumers.

4.      Google can offer these important, globally pervasive products free of charge to consumers due to its primary business model – advertising.  In 2011, Google's revenues were $37.91 billion, over 95% of which ($36.53 billion) came from advertising.

5.      Google's advertising revenues are dependent upon its ability to deliver highly relevant, targeted advertisements that are tailored to a consumer's interests and online habits.  In order to accomplish this, Google logs personalized information, browsing habits, and other demographic information about each consumer that uses its products.  Google can then use this

information to place advertisements that are tailored to each consumer while the consumer is using the Google product.

6. Although Google has always had access to this information, the information collected in one Google product was not previously commingled with information collected during the consumer's use of other Google products. Thus, Google did not, for instance, previously associate a consumer's Gmail account (and therefore his or her name and identity) with the consumer's Google search queries or the consumer's use of other Google products, like YouTube, Picasa, Maps, Docs, and Reader. Following Google's introduction of the unified privacy policy, Google now uses the content of a consumer's Gmail communications, as well as other communications and activities conducted on other Google products, to optimize search results and serve targeted advertisements when that consumer uses Google Search or other Google product that employs querying.

7. Indeed, Google previously maintained a separate privacy policy for each of its products, all of which confirmed that Google would use the consumer's personal information strictly in order to provide that particular product or service to the consumer, and that Google would not use it for any other purpose without the consumer's consent.

8. On March 1, 2012, however, Google announced that it had eliminated the majority of its separate privacy policies and created one, universal privacy policy that allowed Google to cross-pollinate consumers' personal information across Google products. As stated by Google:

> The main change is for consumers with Google Accounts…. Our new Privacy Policy makes clear that, if you're signed in, we may combine information you've provided from one service with information from other services. In short, we'll treat you as a single user across all our products, which will mean a simpler, more intuitive Google experience.

9. Google's new privacy policy thus violates Google's prior privacy policies, which deceived and misled consumers by stating that Google would not utilize information provided by a consumer in connection with his or her use of one product, with any other product, for any reason, without the consumer's consent. The new privacy policy commingles user data without consumers' consent, and it no longer allows consumers to keep information about them on one Google service separate from information gathered about the consumer by other Google services.

10.     It also violates consumers' privacy rights, allowing Google to take information from a consumer's Gmail account and Google+ account, which may have one expectation of privacy, and use it in a different context, such as to personalize results from the Google search engine, or to personalize advertisements viewed while the consumer is surfing the Internet, in which a consumer has an entirely different expectation of privacy.

11.     Similar cross-referencing of billions of consumers' personal information previously resulted in an October 13, 2011 Consent Order with the Federal Trade Commission ("FTC"), in which the FTC found that Google deceptively claimed it would seek the consent of consumers before using their information for a purpose other than for which it was collected, and that Google had misrepresented consumers' ability to exercise control over their information.  In announcing the Consent Order, Jon Leibowitz, Chairman of the FTC, stated, "when companies make privacy pledges, they need to honor them."

12.     Google's products and services have become a staple of society, and billions of consumers across the globe are affected by Google's new privacy policy.  On February 22, 2012, thirty-six Attorneys General wrote in an open letter stating, "This invasion of privacy will be costly for many users to escape.  For users who rely on Google products for their business – a use that Google has actively promoted – avoiding this information sharing may mean moving their entire business over to different platforms, reprinting any business cards or letterhead that contained Gmail addresses, re-training employees on web-based sharing and calendar services, and more."

13.     Also affected are consumers with mobile devices powered by Google's Android operating system.  Google's Android operating system has been incorporated into cell phones built by multiple companies, including Motorola, LG, HTC, and Samsung, as well as other portable devices such as tablet computers.  Consumers with these devices must have a Google account to fully realize the device's capabilities.  For instance, an Android-powered smartphone functions only as an ordinary cell phone if no Google account is associated with the device.

14.     Google has also misrepresented, and failed to disclose, its primary purpose for implementing its new privacy policy and its decision to consolidate user data – to monetize its

unauthorized use of consumers' personal information by garnering a larger market share of advertising revenue, for its own financial benefit.

15.     Google's display advertising revenue is second in the United States only to Facebook. Facebook garners a larger market share of display advertising revenue because consumers that use Facebook set up, manage, maintain, and populate personal profiles with very specific information about themselves.  This allows Facebook to deploy a more complete picture of the individual to most effectively target advertisers' messages only to qualified consumers, providing advertisers the best return on their investments, using information each consumer willingly supplies to Facebook.

16.     Unlike Facebook, a holistic view of each consumer was previously unavailable to Google.  Before implementing the new privacy policy, Google could not easily target consumers for advertising because Google used bits and pieces of anonymous information garnered from each discrete Google service, which had more than 70 distinct privacy policies.

17.     Thus, Google's new privacy policy is nothing more than Google's effort to garner a larger market share of advertising revenue by offering targeted advertising capabilities that compete with or surpass those offered by social networks, such as Facebook, where all of a consumer's personal information is available in one site.  Now, however, Google is not only capable of serving targeted advertisements that draw on a user's histories on various, previously segregated platforms, but it can even notify users that other Google users with whom they have interacted (for instance, a Gmail contact, or a blogger one has read) have stated a preference for a product or brand.  Of course, the users that have stated such a preference are not compensated for Google's use of that preference as an endorsement.  Google, however, extracts a profit by attracting more advertisers, given the strong persuasive power of the endorsement of friends and contacts.

18.     However, the profiles on social networking sites are created and managed by the consumers themselves, and the consumers have control over the personal information appended to their Facebook profiles.  Thus, a consumer's expectation of privacy on Facebook is much different than his or her expectation of privacy when using Google products, where Google collects and aggregates information about the consumer without the consumer's consent, and which likely

includes information that the individual would keep private, and choose not to post, even on Facebook.

19. Accordingly, contrary to Google's previous privacy policies, Google is now aggregating consumers' personal information without consumers' consent; has failed to provide a simple, effective opt-out mechanism; and Google's primary, undisclosed purpose for doing so is its own commercial advantage, private commercial gain, and financial benefit. Consumers are entitled to damages as a result.

## JURISDICTION AND VENUE

20. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal statutes, namely the Federal Wiretap Act, 18 U.S.C. § 2511, the Stored Communication Act, 18 U.S.C. § 2701, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because the aggregated claims of the individual Class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class action in which more than two-thirds of the proposed plaintiff Class, on the one hand, and defendant Google, on the other, are citizens of different states.

21. This Court has jurisdiction over Google because it maintains its principal headquarters in California; is registered to conduct business in California; has sufficient minimum contacts in California; or otherwise intentionally avails itself of the markets within California through the promotion, sale, marketing, and distribution of its products and services to render the exercise of jurisdiction by this Court proper and necessary. Moreover, Google's wrongful conduct (as described herein) emanates from California and foreseeably affects consumers in California. Most, if not all, of the events complained of below occurred in or emanated from Google's corporate headquarters located in Mountain View, California.

22. Venue is proper in this District under 28 U.S.C. § 1391(a) because Google resides in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

23. Venue is also proper in this Court because Google's User Agreement provides:

1
2
3

The laws of California, U.S.A., excluding California's conflict of laws rules, will apply to any disputes arising out of or relating to these terms or the Services. All claims arising out of or relating to these terms or the Services will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA, and you and Google consent to personal jurisdiction in those courts.

4

*Available at* http://www.google.com/intl/en/policies/terms/.

5
6

## **THE PARTIES**

7
8
9
10
11
12

24.     Plaintiff Robert B. DeMars ("DeMars") is a California resident.  DeMars acquired his Gmail account in or about May of 2011, and continued to maintain his Gmail account on March 1, 2012.  He purchased his LG Optimus powered by Android, in or about May of 2011.  He continued to own that mobile device on or after March 1, 2012.  Like all members of the Class, Google aggregated DeMars' personal information without his consent.  Like all members of the Android Subclass, DeMars cannot prevent Google's aggregation of his personal information without purchasing a new mobile device that is not powered by Android.

13
14
15
16
17
18
19
20

25.     Plaintiff Lorena Barrios ("Barrios") is a California resident.  Barrios acquired her Gmail account in or about February of 2012, and continued to maintain her Gmail account on March 1, 2012.  She purchased her Verizon HTC powered by Android, in or about February of 2012.  She continued to own that mobile device on or after March 1, 2012.  Like all members of the Class, Google aggregated Barrios' personal information without her consent.  Like all members of the Android Subclass, Barrios cannot prevent Google's aggregation of her personal information without purchasing a new mobile device that is not powered by Android.

21
22
23
24
25
26
27

26.     Plaintiff Nicholas Anderson ("Anderson") is a California resident.  Anderson acquired his Gmail account in or about June of 2005, and continued to maintain his Gmail account on March 1, 2012.  He purchased a Samsung, Nexus S, powered by Android, in or about May of 2011, and continued to own that mobile device on or after March 1, 2012.  Like all members of the Class, Google aggregated Anderson's personal information without his consent.  Like all members of the Android Subclass, Anderson cannot prevent Google's aggregation of his personal information without purchasing a new mobile device that is not powered by Android.

28

27.     Plaintiff Matthew Villani ("Villani") is a New Jersey resident.  Villani acquired his Gmail account in 2007, and continued to maintain his Gmail account on March 1, 2012.  He purchased a Droid X, powered by Android, in or about September of 2010, and continued to own that mobile device on or after March 1, 2012.  Like all members of the Class, Google aggregated Villani's personal information without his consent.  Like all members of the Android Subclass, Villani cannot prevent Google's aggregation of his personal information without purchasing a new mobile device that is not powered by Android.

28.     Plaintiff Scott McCullough ("McCullough") is a New Jersey resident.  McCullough acquired his Gmail account in 2011, and continued to maintain his Gmail account on March 1, 2012.  He purchased a Casio G'zOne Commando mobile device, powered by Android, in or about July of 2011, and continued to own that mobile device on or after March 1, 2012.  Like all members of the Class, Google aggregated McCullough's personal information without his consent.  Like all members of the Android Subclass, McCullough cannot prevent Google's aggregation of his personal information without purchasing a new mobile device that is not powered by Android.

29.     Plaintiff David Nisenbaum ("Nisenbaum") is a New York resident.  Nisenbaum acquired his Gmail account in or about June of 2010, and continued to maintain his Gmail account on March 1, 2012.  He purchased his Android HTC mobile device in or about June of 2010, and continued to own that mobile device on or after March 1, 2012.  Like all members of the Class, Google aggregated Nisenbaum's personal information without his consent.  Like all members of the Android Subclass, Nisenbaum cannot prevent Google's aggregation of his personal information without purchasing a new mobile device that is not powered by Android.

30.     Plaintiff Pedro Marti ("Marti") is a New York resident.  Marti acquired his Gmail account on September 14, 2004, and a Google + account in 2011, and continued to maintain his Gmail and Google+ accounts on March 1, 2012.  He purchased an HTC G2, powered by Android, in or about January of 2011, and continued to own that mobile device on or after March 1, 2012.  Like all members of the Class, Google aggregated Marti's personal information without his consent.  Like

all members of the Android Subclass, Marti cannot prevent Google's aggregation of his personal information without purchasing a new mobile device that is not powered by Android.

31.     Plaintiff Allison C. Weiss ("Weiss") acquired her Gmail account in or about September of 2010, and continued to maintain her Gmail account on March 1, 2012.  She purchased her Samsung Galaxy mobile device in or about September of 2010, and continued to own that mobile device on or after March 1, 2012.  Like all members of the Class, Google aggregated Weiss' personal information without her consent.  Like all members of the Android Subclass, Weiss cannot prevent Google's aggregation of her personal information without purchasing a new mobile device that is not powered by Android.

32.     Google is a Delaware corporation with its principal place of business located at 1600 Amphitheatre Parkway, Mountain View, California 94043.  At all times relevant hereto, Google was a multinational, public and Internet search technologies corporation.  Google owns, services, and develops Internet-based services and products.  Google was first incorporated as a privately held company on September 4, 1998, with its initial public offering to follow on August 19, 2004.  Google consumers do not pay to use Google's services and products.  Instead, Google's primary business model is advertising, which constituted approximately 97% of Google's profits last year.

## PLAINTIFFS' CLASS ALLEGATIONS

33.     Plaintiffs seek to bring this case as a nationwide class action on behalf of themselves and all others similarly situated in the United States as members of the proposed Class, defined as follows:

> All persons and entities in the United States that acquired a Google account between August 19, 2004 and February 29, 2012, and continued to maintain that Google account on or after March 1, 2012, when Google's current privacy policy became effective.

34.     Alternatively, Plaintiffs seek to bring this case as a nationwide class action on behalf of themselves and all others similarly situated in the United States as members of the proposed Class as defined above with respect to all claims based on federal statutory rights and common law

1   principles, with such subclasses as the Court may determine are required by law with respect to all

2   claims based on state statutory rights.

3           35.     Plaintiffs also seek to represent a subclass of similarly situated individuals as

4   members of the Android Subclass, defined as follows:

5           All persons and entities in the United States that acquired a device powered by
        Android between August 19, 2004 and February 29, 2012, and continued to own that
6           device on or after March 1, 2012.

7           36.     Excluded from the Class and Android Subclass are all claims for wrongful death,

8   survivorship and/or personal injury by Class and Subclass members.  Also excluded from the Class

9   and Android Subclass is Google, any entity in which Google has a controlling interest, and its legal

10  representatives and successors.

11                                          **NUMEROSITY**

12          37.     The Class and Android Subclass are so numerous that joinder of all of its members is

13  impractical.  Upon information and belief, Google has provided millions of products and services to

14  consumers in the United States, and there are thousands of devices powered by Android.

15          38.     Although the precise number of Class and Android Subclass members, and their

16  addresses and/or email addresses, are unknown to Plaintiffs, that information is readily ascertainable

17  from Google's records.  Class and Android Subclass members may be notified on the pendency of

18  this action by mail, email, or Internet publication, supplemented (if deemed necessary or appropriate

19  by the Court) by published notice.

20                          **COMMON QUESTIONS OF LAW AND FACT**

21          39.     Common questions of law and fact exist as to all Class and Android Subclass

22  members.  These questions predominate over questions affecting only individual Class and Android

23  Subclass members.  These common legal and factual questions include but are not limited to the

24  following:

25          a.      Whether Google violated its previous privacy policy by merging data across products

26  and services without consumers' consent;

27

28

b.      Whether Google deceptively claimed that it would seek the consent of consumers before using their personal information for a purpose other than that for which it was collected;

c.      Whether Google misrepresented the ability of consumers to exercise control over their personal information;

d.      Whether Google misrepresented the extent of its compliance with the U.S.-EU Safe Harbor Framework by claiming that the company complied with the framework while violating the principles of Notice and Choice;

e.      Whether Google's new privacy policy deceptively claims that it does not sell personal information to advertisers when advertisers can, and in fact do, purchase targeting from Google that uses the consumer's personal information and Google profits as a result;

f.      Whether Google's new privacy policy allows Google to profit from the deceptive use of consumers' personal information through acquisition of a larger share of advertising revenue;

g.      Whether Google's opt-out practices for its new privacy policy are deceptive and misleading;

h.      Whether consumers can effectively opt-out of Google's new privacy policy;

i.      Whether Google should, alternatively, provide an opt-in measure for its new privacy policy;

j.      Whether Android users can effectively opt-out of Google's new privacy policy;

k.      Whether Android users are entitled to the cost of purchasing a new device or reimbursement for the purchase of their current Android device;

l.      Whether Google concealed or failed to disclose material information concerning its advertising practices and future plans for revenue growth;

m.      Whether Plaintiffs and the Class and Android Subclass are entitled to injunctive relief; and

n.      Whether Plaintiffs and the Class and Android Subclass are entitled to damages and attorneys' fees.

1

**TYPICALITY**

2          40.     Plaintiffs' claims are typical of the claims of the Class and the Android Subclass.

3     Plaintiffs and each member of the proposed Class acquired a Google account between August 19,

4     2004 and February 29, 2012, and continued to maintain that Google account after March 1, 2012.

5     Plaintiffs and each member of the Android Subclass acquired a device powered by Android between

6     August 19, 2004 and February 29, 2012, and continued to own that device after March 1, 2012.

7          41.     In connection with their respective use of Google products, Plaintiffs and each Class

8     and Android Subclass member were subject to the same disclosures and agreed to the same privacy

9     policy or terms and conditions existing at the time they began using Google products.

10         42.     Google has used Plaintiffs' and all Class and Android Subclass members' personal

11    information without their consent, inconsistent with Google's affirmative representations, and to

12    Google's financial benefit which was undisclosed.  Plaintiffs and all Class and Android Subclass

13    members have sustained damages as a result, including losses directly caused by Google's actions as

14    alleged herein.

15                    **ADEQUACY OF REPRESENTATION**

16         43.     Plaintiffs can and will fairly and adequately represent and protect the interests of the

17    Class and Android Subclass, and has no interests that conflict with or are antagonistic to the interests

18    of the Class or Android Subclass.  Plaintiffs have retained attorneys competent and experienced in

19    class action litigation.

20                           **SUPERIORITY**

21         44.     A class action is superior to any other available method for the fair and efficient

22    adjudication of this controversy, since, as demonstrated above, common questions of law and fact

23    overwhelmingly predominate over any individual questions that may arise.

24         45.     The prosecution of separate actions by individual members of the Class or Android

25    Subclass would create a risk of inconsistent or varying adjudications with respect to individual

26    members of the Class and Android Subclass which would establish incompatible standards of

27    conduct for Google, or adjudication with respect to individual members of the Class or Android

28

---

CONSOLIDATED CLASS ACTION COMPLAINT                                                12
CASE NO. 12-CV-01382 PSG

1   Subclass which would, as a practical matter, be dispositive of other members not parties to the

2   adjudications or substantially impair or impede their ability to protect their interests.

3          46.     Google has acted or refused to act on grounds generally applicable to all Class and

4   Android Subclass members, thereby making appropriate any final judgment with respect to the Class

5   and the Android Subclass as a whole.

6                                      **SUBSTANTIVE ALLEGATIONS**

7   **Google's Products and Business Model**

8          47.     Google is a technology company that provides free web products to consumers.

9   Google's products are globally pervasive and are staples of society.  A consumer must set up a

10  Google account to use many of Google's products.

11         48.     Google's well-known and globally utilized search engine is google.com.  It dominates

12  the search engine industry, representing over 65% of Internet searches in the United States.  Over

13  one billion consumers use google.com each week.  According to Alexa, a web statistics company,

14  google.com is the most heavily-trafficked website on the Internet.  On most google.com searches,

15  users will see targeted ads at the top and side of their search results.

16         49.     Gmail is Google's widely used web-based email service that has been available since

17  2004.  It allows consumers to send and receive emails, chat with other consumers through Google

18  Chat (Google's instant messaging service), and it stores consumers' email messages, contact lists,

19  calendar entries, and other information on Google's servers.  When viewing a message on Gmail,

20  targeted advertisements appear at the top of each message.

21         50.     Google+ is Google's web-based social network where a consumer can set up a

22  personal profile and share photos, links, videos and text with friends.  It was intended by Google to

23  compete with Facebook.  However, Google+ is not as widely used by consumers and is much less

24  popular than Facebook.  Google+ had 90 million users as of January 19, 2012.  Users must provide

25  their real name and gender when signing up.  Google suspends accounts that use pseudonyms.  Like

26  other Google products, targeted advertisements appear across Google+.

27

28

51.     YouTube is a video sharing site that Google purchased in 2006, where consumers can stream videos of interest to them.  According to Alexa, YouTube is the third most heavily-trafficked website on the Internet.  YouTube serves 4 billion videos to consumers per day.  Like other Google products, targeted advertisements appear across YouTube.

52.     Google Maps allows consumers to view satellite images of locations all over the world, plan routes for traveling by foot, car, or public transport, and has a GPS-like service that tracks the consumer's location.  Like other Google products, targeted advertisements appear across Google Maps.

53.     Google also offers dozens of other products and services.  Google Docs allows consumers to create and edit documents online while collaborating in real-time with other consumers.  Google Reader allows consumers to subscribe to, read, and share content.  Google Blogger is Google's weblog publishing tool that allows consumers to share text, photos, and video.  Picasa is Google's photo sharing tool that allows consumers to edit, post, and share digital photos.  Advertisements appear while consumers are using these products as well.

54.     Each Google product logs and keeps track of different information about the consumer, including:

- the consumer's first and last name;

- the consumer's home or other physical address (including street name and city or town);

- the consumer's current, physical location; the consumer's email address or other online contact information (such as a consumer's identifier or screen name);

- the consumer's IP address;

- the consumer's telephone number (including home and mobile telephone numbers);

- the consumer's list of contacts;

- the consumer's search history from Google's search engine;

- the consumer's web surfing history from cookies Google places on consumers' computers;

1    • and all of the consumer's posts on Google+.

2    55.    Indeed, every time a consumer uses a Google product, Google retains information

3    about that use.  Some of the information Google may possess includes the following categories

4    (provided by Google's website):

5    • Your location:  Google Maps, in both mobile and desktop applications, shows your

6        location on the map.  On the desktop, Google Maps obtains your location from your

7        web browser, through its geolocation feature.  On your mobile device, Google Maps

8        obtains your location through the device.

9    • Your search logs:  Google stores data about your Google searches, including the

10        search query, the time and date it was typed, the IP address and cookie of the

11        computer it was entered from, and its browser type and operating system.

12    • Your contacts: Google stores your Gmail contacts on its server.

13    • Your personal identifying information: Your name, home address, age, and likes and

14        dislikes can easily be obtained from your Google+ profile.

15    • Your email content:  Google scans the contents of the emails you send and receive on

16        Gmail to target contextually related advertisements while you are using Google's

17        Gmail product.

18    56.    Google uses this information to offer targeting advertising capabilities to fuel

19    Google's advertising revenues.   Indeed, Google earns more than 95% of its revenue from

20    advertising.  In 2011, Google's revenues were $37.91 billion, of which $36.53 billion came from

21    advertising.

22    57.    Google obtains its advertising revenue by:  (1) charging third parties to display

23    advertisements on Google's products while consumers are using them ("display advertising

24    revenue"); and (2) selling and serving advertisements on third-party websites using its AdSense and

25    AdMob products ("text and display advertising revenue").

26    58.    Google ranks first in search advertising revenue.   Google's display advertising

27    revenue is second in the United States only to Facebook.

28

59.     Facebook garners a larger market share of display advertising revenue because consumers that use Facebook set up, manage, maintain, and populate personal profiles with very specific information about themselves.  This allows Facebook to deploy a more complete picture of the individual to most effectively target advertisers' messages only to qualified consumers, providing advertisers the best return on their investments, using information each consumer willingly supplies to Facebook.

60.     Unlike Facebook, a holistic view of each consumer was not available to Google until it changed its privacy policy on March 1, 2012, and intended consumers were not easily identified by advertisers.   Google previously targeted its advertising using bits and pieces of anonymous information garnered from each discrete Google service that had more than 70 distinct privacy policies.

61.     James Whittaker, a former Google Engineering Director, described Facebook's advantage over Google when it came to profiting from user data.  On March 13, 2012, he wrote a public explanation of his resignation:

> It turns out that there was one place where the Google innovation machine faltered and that one place mattered a lot:  competing with Facebook…. Like the proverbial hare confident enough in its lead to risk a brief nap, Google awoke from its social dreaming to find its front runner status in ads threatened…. Google could still put ads in front of more people than Facebook, but Facebook knows so much more about those people.

> Advertisers and publishers cherish this kind of personal information, so much so that they are willing to put the Facebook brand before their own.   Exhibit A: www.facebook.com/nike, a company with the power and clout of Nike putting their own brand after Facebook's? No company has ever done that for Google and Google took it personally.

**Google's Prior Privacy Policies**

62.     Google previously maintained more than 70 separate privacy policies for its products.

63.     Google's previous privacy policies indicated, "When you sign up for a particular service that requires registration, we ask you to provide personal information.   If we use this information in a manner different than the purpose for which it was collected, then we will ask for your consent prior to such use."

64.     Additional statements in specific privacy policies further indicated that Google uses the consumer's personal information strictly in order to provide that particular product or service to the consumer, and that Google would not use it for any other purpose without the consumer's consent.  For example, Google's prior Gmail privacy policy indicated, "Gmail stores, processes and maintains your messages, contact lists and other data related to your account in order to provide the service to you."

65.     Accordingly, Google's previous privacy policies indicated that Google would not use the consumer's personal information for any purpose other than that for which it was intended – to set up a specific account for a specific Google product.

66.     In addition, Google has always maintained – and continues to maintain – that it will not sell or share with third parties a consumer's personally identifying information without the consumer's consent.

67.     All consumers that had a Google account and signed up to use Google products prior to March 1, 2012, when Google's new privacy policy took effect, were subject to these misrepresentations.

**Google's Prior Privacy Violations and Citations for Unfair and Deceptive Practices**

68.     Approximately two years ago, Google launched a social networking service called Google Buzz.  Two of Google Buzz's key features where "Rich fast sharing" (which combined a variety of social media sources such as Picasa and Twitter into a single news feed), and "Automatic friends lists" (consumers' Gmail contacts were automatically added to a consumer's Google Buzz account).    Thus, Google Buzz was Google's first attempt at cross-pollinating content across different Google products.  Google took information consumers provided for use within one Google product, Gmail, and used it to populate Google Buzz, a separate Google product.

69.     Google transferred this information despite the fact that, as described above, Google's prior privacy policies stated that Google would only use a consumer's Gmail information for the purpose of providing Gmail services, and would not use this information for any other purpose

1    without the consumer's consent.   Contrary to its terms of service, however, Google was using
2    consumers' Gmail information to populate Google Buzz.

3         70.    Such cross-referencing of data harmed all consumers by violating their expectation of
4    privacy in their emails; but was particularly harmful to clients of mental health professionals,
5    attorneys, and finance professionals, as well as to the professionals themselves, who must promise
6    confidentiality.

7         71.    Not only did Google cross-index this information between products without
8    consumers' consent, but Google did not adequately disclose that Google was automatically making
9    certain private information public through use of the Google Buzz product, and there was no clear
10   way for a consumer to opt out of Google Buzz or to make the information non-public.   Indeed,
11   options for controlling the privacy of this information were very difficult to locate and confusing to
12   consumers.

13        72.    These unfair and deceptive trade practices resulted in an October 13, 2011 Consent
14   Order between Google and the Federal Trade Commission ("FTC").   The FTC found that Google
15   "failed to disclose adequately that consumers' frequent email contacts would become public by
16   default."

17        73.    The FTC also found that controls for limiting disclosure of personal information were
18   "confusing and difficult to find…."

19        74.    Further, the "options for declining or leaving the social network were ineffective."

20        75.    Google had also failed "to give consumers notice and choice before using their
21   information for a purpose different from that for which it was collected."

22        76.    In announcing the Consent Order, Jon Leibowitz, Chairman of the FTC, stated,
23   "when companies make privacy pledges, they need to honor them."

24        77.    The FTC found that Google deceptively claimed that it would seek consumers'
25   consent before using their information for a purpose other than that for which it was collected;
26   Google misrepresented the consumers' ability to exercise control over their information; and Google

27

28

misrepresented the extent of its compliance with the U.S.-EU Safe Harbor Framework by claiming that the company complied with the framework while violating the principles of Notice and Consent.

78.     In addition to these findings, the Consent Order governs Google's current and future conduct.  Part I of the Consent Order prohibits Google from misrepresenting:  (a) the extent to which it "maintains and protects the privacy and confidentiality" of personal information; and (b) the extent to which it complies with the U.S.-EU Safe Harbor Framework.   Part II of the Consent Order requires Google to obtain "express affirmative consent" before "any new or additional sharing by [Google] of the Google user's identified information with any third party…."

79.     On March 1, 2012, Google changed its privacy policy, which, yet again, allows the commingling of user data between Google's products without consumers' consent or an effective ability to opt out.  It commingles data in the same manner that resulted in the Consent Order, and consumers of Google's products and services have been harmed as a result.

**Google's New Privacy Policy Violates Its Prior Privacy Policies**

80.     On March 1, 2012, Google announced that changes to its privacy policies had been made and that it had consolidated more than 60 of its privacy policies down to just one document.

81.     As stated by Google, "The main change is for users with Google Accounts…. Our new Privacy Policy makes clear that, if you're signed in, we may combine information you've provided from one service with information from other services.  In short, we'll treat you as a single user across all our products, which will mean a simpler, more intuitive Google experience."

82.     Thus, contrary to representations made in Google's prior privacy policies, Google's new privacy policy does not allow consumers to keep information about a consumer of one Google service separate from information gathered from other Google services.

83.     In the past, Google's search results depended on algorithms that built in a substantial element of guesswork because the search engine did not know the consumer's personal identity (including age and location) or preferences and habits.  For example, if – prior to implementation of the new privacy policy – a consumer had typed the term "Chelsea" into Google's search engine, the search engine may not have known whether to provide results for neighborhoods in Manhattan or

London.   At the same time, the advertising that was paired with the results may not have been accurate – should the consumer be targeted for advertisements for restaurants in Manhattan or London?

84.     However, with Google's new privacy policy, Google can cross-reference the information that it acquires about each individual consumer from that consumer's use of other Google products, such as Google Maps.   Thus, Google may learn from a consumer's prior use of Google Maps that he or she is located in Manhattan, and could then provide results – and advertising – that contain information about restaurants in Chelsea, Manhattan, capitalizing on information the consumer never directly gave to Google or requested to be used in conjunction with the search.

85.     Consumers are thus no longer able to keep the personal information they provided to Gmail, the Google email service, for simply that service.   Instead, Google combines information from the consumer's Gmail account with other Google services, such as Google+, Google's social network service.   In addition, the information the consumer supplies to products such as Google+ is now available to all of the products that consumer's Gmail contacts use.

86.     For example, if a consumer conducts a Google search for restaurants in Munich, the search results will not only provide answers from the web, but will provide information drawn from the consumer's – as well as the consumer's friends and contact's – Google accounts (such as Google+).   The result:   the consumer will get web search results from Google, but will also get personal search results that show posts, blogs, or photos that not only the consumer, but that the consumer's friends and Gmail contacts have shared about Munich across all other Google products. This capacity attracts advertisers, for instance hotels and restaurants in Munich, because personalized recommendations or assessments from friends and personal contacts have substantially more persuasive power than generic advertisements.   In this way, Google converts benign, non-commercial content – one user's account of a fantastic stay at a Munich hotel, for instance – into an endorsement with commercial value (to Google).

87.     In addition, Google now associates your search history with your Gmail and Google+ accounts and, therefore, builds detailed and accurate targeting segments for advertising purposes.

1  Thus, Google now uses the consumer's actual gender and age to target that consumer for advertising,

2  rather than its prior use of an anonymous profile created by algorithms that use web browsing history

3  to target a consumer based upon a guess that the consumer is, for example, a female age 30-45.

4      88.    Another example: instead of selling automobile advertisements to consumers Google

5  marks as an "auto intender" merely based upon web-surfing and search history (which may include a

6  12 year old boy that can't drive or purchase a vehicle), Google can now scan a consumer's emails

7  and Google+ account, confirm that the consumer is of driving age, and see that the consumer sent an

8  email or blogged about shopping for a Mercedes-Benz. Thus, Google could now scan the Google+

9  accounts of the consumer's Gmail contacts and display a Mercedes-Benz advertisement to the

10  consumer that shows one of the consumer's Gmail contacts with his or her Mercedes-Benz vehicle.

11  Google could also allow BMW to advertise its vehicles to that consumer, specifically trumpeting

12  reviews that say BMW is better than Mercedes-Benz (for which BMW, in this example, would pay a

13  premium). Thus, Google provides its advertisers with data that is specific, verified, and reliable, and

14  advertisements can be personalized to each consumer's specific preferences, including implied

15  endorsements from their friends on Google+, Gmail contacts, writers of Google Blogger posts that

16  the consumer has read, and other individual users.

17      89.    Marketers could also tap into a consumer's YouTube browsing history when targeting

18  search advertisements on google.com, and recommend golfing instruction videos and advertisements

19  for golf courses and golf vacations to a signed-in YouTube, Gmail, or Google+ consumer who

20  recently searched for "golf" on google.com.

21      90.    Further, when the consumer is not signed in to a Google account, Google continues to

22  aggregate data in an anonymous profile and customize each consumer's searches. Google stores up

23  to 180 days of signed-out search activity, including queries and results you click in a cookie on a

24  consumer's browser. Now, when a consumer logs back into his or her Google account, that

25  anonymous profile information can then be appended to that consumer's account, at which point that

26  anonymous information could be used to customize results for that consumer on that computer, or

27  any other computer where the consumer is logged into a Google account.

28

91.     All of this is designed to fuel advertising revenue.  By providing search results that are tailored to the consumer, Google can keep consumers engaged and, therefore, using its products and services for longer periods of time.  If consumers are using its products longer, Google can sell more advertising space because the advertising displays have more time to rotate.

92.     Google can also use this information to tailor the advertising to its intended user – if the consumer is located in Manhattan, it can advertise restaurants located in Manhattan – optimizing marketing for its advertisers, resulting in Google's ability to charge more for advertisements.

93.     Thus, by commingling data across Google products and optimizing search results, Google can:  (1) keep consumers engaged longer, and longer engagement allows Google to sell and deliver more advertisements (engagement creates inventory); and (2) display advertising that is specifically targeted to intended users, rather than the masses (which raises the likelihood that the consumer will click on the advertisement).  Google can, therefore, sell more advertisements *and* command a higher price for them, by delivering more intended users to its advertisers.

94.     Thus, as long as the consumer is signed in to any Google account, such as Gmail or Google+, Google will now aggregate all of the consumer's activity under one profile on any other Google product he or she utilizes.  It will merge data from each of its platforms and services (including Android devices), aggregating the content of the emails the consumer drafts, the content of emails the consumer receives, the searches the consumer conducts on google.com, the locations the consumer searches using Google Maps, the articles the consumer reads and pictures the consumer uploads to Google+; it is all combined to create a detailed profile of the consumer.  The consumer's name and personal information are associated with the Gmail or Google+ account (because the consumer provides that information to Google when he or she originally creates those accounts) and the consumer's identity is now associated with the whole spectrum of the consumer's Internet activity.  Google can now use that spectrum to sell advertisers the ability to target specific, intended consumers, rather than the masses.

95.     Google's current ability to create a clear, well-rounded picture of the consumer – as opposed to its previous privacy policy that created largely anonymous puzzle pieces that could not

be linked together (and were not always accurate) – is unquestionably invasive, and is being done in violation of its previous privacy policies pursuant to which the Class and Android Subclass agreed to utilize Google's products, and without the consumer's consent.  Indeed, the new unified privacy policy is emblematic of what former Google executive James Whittaker has called Google's recent shift from an "innovation factory" to "advertising company."

96.    Not only has Google done so without each consumer's consent; it has not provided consumers with an easy, efficient, or effective way to opt-out.  While Google has made it very easy to universally merge data across product lines, it has not made it easy to opt out – consumers must manage their privacy settings for each Google product they use; a universal opt-out function is not available.  Google product users have the ability to minimize the accessibility of some of their data, but there are significant obstacles to doing so, and complete privacy cannot be accomplished.

97.    Perhaps the 36 Attorneys General that on February 22, 2012 sent a letter to Google, opposing implementation of its new privacy policy, best capture Google's disingenuousness:

> Your company claims that users of Google products will want their personal information shared in this way because doing so will enable your company to provide them with a "simple product experience that does what you need, when you want it to," among many other asserted benefits.  If that were truly the case, consumers would not only decline to opt out of the new privacy policy, but would freely opt *in* if given the opportunity.  Indeed, an "opt-in" option would better serve current users of Google products by enabling them to avoid subjecting themselves to the dramatically different privacy policy without their affirmative consent.  Unfortunately, Google has not only failed to provide an "opt-in" option, but has failed to provide meaningful "opt-out" options as well.

*available at* http://epic.org/privacy/google/20120222-Google-Privacy-Policy-Final.pdf.

98.    Further, studies show that an overwhelming number of consumers do not want to receive advertisements targeted based on behavior, or search results based on their prior activity.

99.    According to a March 9, 2012 study released by the Pew Internet & American Life Project, 800 Web users were asked how they would feel about a search engine remembering their prior queries and using that data to personalize future results.  Seventy-three percent of the respondents said they "would not be okay with it" because they felt it was an invasion of privacy.

100.   The study also asked 1,700 Web users how they felt about receiving targeted advertisements.  Sixty-eight percent of respondents were "not okay with it" because they do not want to be tracked and profiled.  Only 28% said they were "okay with it" because they received ads and information relevant to their interests.

101.   These results are consistent with a study released in September of 2009 by professors at the University of Pennsylvania's Annenberg School for Communication and the University of California, Berkeley School of Law, which found that two out of three Web users do not want customized ads.

102.   Despite consumers' opinions to the contrary, Google's new privacy policy makes it much easier for Google to track its product users' activity for the purpose of serving up personalized advertisements.

103.   Furthermore, consumers of devices powered by Google's Android platform are automatically, and permanently, "logged in" for purposes of aggregation of their personal information.  They have no way to opt-out, and cannot avoid this unauthorized invasion of privacy unless they replace their Google Android device with a non-Android device, which would cost hundreds of dollars.

104.   As the 36 Attorney Generals put it in their February 22, 2012 letter to Google objecting to Google's new privacy policy:

> Even more troubling, this invasion of privacy is virtually impossible to escape for the nation's Android-powered smartphone users, who comprise nearly 50% of the national smartphone market.  For these consumers, avoiding Google's privacy policy change may mean buying an entirely new phone at great personal expense.  No doubt many of these consumers bought an Android-powered phone in reliance on Google's existing privacy policy, which touted to these consumers that "We will not reduce your rights under this Privacy Policy without your explicit consent."  That promise appears not to be honored by the new privacy policy.  Given the way the new privacy policy is being implemented, i.e., without genuine opt-put options and without pre-purchase notice to users of Android-powered smartphones, it seems these users can only register non-consent by abandoning their phones altogether.

*available at* http://epic.org/privacy/google/20120222-Google-Privacy-Policy-Final.pdf.

105.   Thus, Google's increased optimization comes at a significant cost to privacy and consumers' rights.  What a consumer may discuss with friends on Gmail may be different than that

which he or she would search on a computer at work.  By commingling data (including searches, locations, and email contacts), and tying it to a specific Gmail account or Google+ account (and therefore a specific consumer), the consumer's personal information is no longer tied to the account; it is tied to an overarching profile in that person's name, that is regularly supplemented through use of or interaction with Google products.  That person no longer remains anonymous where he or she intended to remain anonymous.  The various portions of each person's life are no longer separate and treated in accordance with the expectation of privacy associated with each of them; they are no longer pieces to an impossible puzzle; they are pieces that can be, and as of March 1, 2012 have been, linked to create a clear picture of that consumer.

**Google Misrepresented and Failed to Disclose The Primary Purpose of Its New Privacy Policy**

106.    In addition to the foregoing, Google has consistently misrepresented, and failed to disclose, its primary purpose for implementing its new privacy policy – to monetize its unauthorized use of consumers' personal information by garnering a larger market share of advertising revenue, for its own financial benefit.

107.    Prior to formal implementation of the new privacy policy, on January 30, 2012, Google sent a letter to eight members of Congress, including Cliff Stearns, Joe Barton, Marsha Blackburn, G.K. Butterfield, Henry Waxman, Edward Markey, Diana DeGette, and Jackie Speier. Google's letter offered two explanations for Google's new privacy policy.  First, Google said that it was adopted for simplicity, because it merges over 60 privacy policies into one comprehensive document.   Second, Google said that the new privacy policy was designed to improve user experiences across Google services.  For example, the letter explains the benefits of using recent Google search terms to identify relevant videos on YouTube.

108.    Thereafter, between January and March of 2012, Google unveiled an ambitious advertising campaign to relieve concerns over its new privacy policy.  The campaign, entitled "Good to Know," showcases the benefits of consolidating user data and the security features Google offers.

109. Google made similar representations on company blogs and explanatory webpages. Google's message has been consistent: Google created the new privacy policy for the sake of simplicity and it would improve users' experiences.

110. Google's stated purposes for implementing its new privacy policy are highly misleading. They fail to mention, let alone highlight, Google's true goal: consolidating user data for advertising purposes.

111. Google has also misled consumers by repeatedly representing that it does not sell its users' data. However, advertisers spend money to market their products with Google *specifically because* Google has user data and can display targeted advertisements to consumers. User data is pivotal to the success of Google's advertising programs. The more user data Google has, the larger the market share of advertising revenue Google will acquire, and the higher the premium Google can charge for the advertising – both of which lead to increased revenue.

112. Writers, technology experts, consumer advocacy groups, politicians, and even current as well as former Google employees recognize that the new privacy policy is actually intended to increase Google's advertising revenue.

113. After Google announced its intended changes to its privacy policy, On January 25, 2012, USA Today published an article called "Consumers in the middle of Google-Facebook battle." The article explains:

> Google signaled its intent to begin correlating data about its users' activities across all of its most popular services and across multiple devices. The goal: to deliver those richer behavior profiles to advertisers…. The global online advertising market is expected to swell to $132 billion by 2015, up from $80 billion this year, according to eMarketer. Google and Facebook are putting their abilities to index individuals' online activity and behaviors into high gear to tap into this market, analysts say.

114. Also on January 25, 2012, BBC News published an article called, "Backlash over Google move to change privacy settings." The article identified advertising as an objective of the privacy policy change. It explained, "Google said the update would offer more relevant searches. But critics say it has more to do with the data battle the search giant is waging with rival Facebook."

115. On January 28, 2012, the Altimeter Group, an Internet consulting company, posted a blog article called "Google's New Privacy Policy Critical to Competition with Facebook." Rebecca Lieb, an analyst, wrote that "Google needs a 360 degree view of the consumer now more than ever. Why? Because Facebook's already got it. Or is at least a lot closer to having it than Google is if all Google's information is separately warehoused. Facebook is currently better positioned than Google" to know what users are doing as they surf the Internet.

116. On February 22, 2012, a consumer advocacy group called the Center for Digital Democracy petitioned the FTC, stating that the consolidation of user data "has nothing to do with making it 'easier' or 'more convenient' [to use Google services].… In particular, Google fails to inform its users that the new privacy regime is based on its own business imperatives:  to address competition from Facebook[;] to finely profile and target through audience buying…."

117. Also on February 22, 2012, thirty-six Attorneys General sent an open letter to Larry Page, Google's CEO.  The letter expressed concerns over Google's new privacy policy and casts doubt on Google's explanation to Congress.  It says:

> Your company claims that users of Google products will want their personal information shared in this way because doing so will enable your company to provide them with a 'simple product experience that does what you need, when you want it to,' among other asserted benefits.  If that were truly the case, consumers would not only decline to opt out of the new privacy policy, but would freely opt *in* if given the opportunity…. Unfortunately, Google has not only failed to provide an 'opt-in' option, but has failed to provide meaningful 'opt-out' options as well.

118. James Whittaker, a former Google Engineer Director who worked on the Google+ project and resigned from Google two days after the new privacy policy was implemented, stated, "The Google I was passionate about was a technology company that empowered its employees to innovate.  The Google I left was an advertising company with a single corporate-managed focus."

119. Google's top advertising executive, Susan Wojcicki, has described how Google's new privacy policy will raise Google's advertising revenues.  Mr. Wojcicki stated at a Search Marketing Expo conference that Google's biggest innovations over the next several years will be in personalized search results and advertisements.  She also stated that Google+ was the gateway to "the next generation of Google products," which will be "different because our users are logged in

and are telling us something about themselves."   At the conference, Wojcicki described how different users typing in the same "best vacations" search would get different results – her results would be more family friendly, because Google would have been able to aggregate information about her and determined that she had a family.  This is the precise, controversial conclusion that Google's new privacy policy allows Google to make by analyzing a consumer's combined usage data.

120.   She also stated that she hopes Google will reach a point where it provides only advertisements that consumers "want to see."  She did not mention the windfall of profits Google will achieve by using the consumer's personal information to deliver such targeted advertising, without the consumer's consent.

121.   Indeed, as a result of the privacy policy change, Google can now compete more effectively with Facebook for display advertising revenue, and is expected to surpass Facebook's display advertising revenue by 2013.

## TOLLING OF THE STATUTE OF LIMITATIONS

122.   There is no way to categorically opt out of Google's new privacy policy.   The existing means of opting out are limited, partial, and not readily ascertainable.  A user would have to abstain from using Google products to effectively prevent Google from conducting the invasive and injurious actions complained of herein.  Accordingly, exercising reasonable care, Plaintiffs, the Class members, and the Android Subclass members cannot effectively opt-out of Google's new privacy policy.

123.   By reason of the foregoing, the claims of Plaintiffs and other Class and Android Subclass members are timely under any applicable statute of limitations (as tolled by the filing of this class action petition) pursuant to the discovery rule and the doctrine of fraudulent concealment.

124.   Google has been aware of the deceptive nature of its prior privacy policies for several years.

125.   Despite this knowledge and awareness, Google continues to aggregate consumers' personal data without their consent and a meaningful ability to opt-out.

126.   Google's failure to obtain consumers' consent, failure to provide a meaningful opt-out mechanism, and failure to disclose its primary purpose was and is willful, wanton, malicious, outrageous, and was and continues to be undertaken in deliberate disregard of, or with reckless indifference to, the rights and interests of Plaintiffs and the Class and Android Subclass members.

### COUNT I

### VIOLATIONS OF THE FEDERAL WIRETAP ACT

### 18 U.S.C. § 2511

### (For All Class members)

127.   Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

128.   The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, prohibits the willful interception of any wire, oral or electronic communication.

129.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

130.   Google is intercepting and aggregating the personal information of Plaintiffs, and all others similarly situated, and is placing cookies on its user's computers that intercept records of Google users' Internet communications even after the user has logged out of his or her Google accounts.

131.   Neither Plaintiffs nor members of the Class or Android Subclass consented, nor were they aware that Google was violating its own privacy policy, and tracking and aggregating consumers' Internet use across Google platforms, creating a single profile of each consumer that aggregates all information about the consumer across Google platforms – even after logging off of Google accounts – and then appending the aggregated information to consumers' Google accounts when they log back in.

132.   The data Google is intercepting and aggregating are "communications" within the meaning of the Wiretap Act.

133.    Google intentionally and willfully intercepts the electronic communications of its consumers and intentionally and willfully aggregates consumers' personal information for its own financial benefit.

134.    Plaintiffs are persons whose electronic communications were intercepted within the meaning of Section 2520.

135.    Section 2520 provides for preliminary, equitable and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 a day for each day of violation, actual and punitive damages, reasonable attorneys' fees, and disgorgement of any profits earned by Google as a result of the above-described violations.

## COUNT II

## VIOLATIONS OF THE STORED ELECTRONIC COMMUNICATIONS ACT

## 18 U.S.C. § 2701

### (For All Class Members)

136.    Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

137.    The Stored Electronic Communications Act ("SECA") provides a cause of action against a person who intentionally accesses without authorization a facility through which an electronic communication service is provided, or who intentionally exceeds an authorization to access that facility and thereby obtains, alters or prevents authorized access to a wire or electronic communication while it is in storage in such a system.

138.    "Electronic Storage" is defined in the statute to be "any temporary, immediate storage of a wire or electronic communication incidental to the electronic transmission thereof."

139.    Google's new privacy policy intentionally exceeds its authorized access to consumers' electronic communications stored on Google's systems, thus violating the SECA.

140.    Google also intentionally places cookies on consumers' computers that access members' stored electronic communications without authorization, thus violating the SECA.

1   141.   Plaintiffs and the other Class members were, and continue to be, harmed by Google's

2   violations, and are entitled to statutory, actual and compensatory damages, injunctive relief, punitive

3   damages and reasonable attorneys' fees.

### COUNT III

### VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT

### 18 U.S.C. § 1030

**(For All Class Members)**

8   142.   Plaintiffs reallege and incorporate by reference each and every allegation set forth

9   above as though fully set forth herein.

10   143.   Google intentionally accessed a computer used for interstate commerce or

11   communication without authorization or exceeding authorized access to such computer, and obtained

12   information from such protected computer.

13   144.   Google knowingly caused the transmission of a program, information, code or

14   command and as a result caused a loss to one or more persons during any one-year period of at least

15   $5,000 in the aggregate.

16   145.   Plaintiffs, the Class, and the Android Subclass have also suffered a violation of the

17   right of privacy as a result of Google's knowing actions.

18   146.   Google has thus violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

19   147.   Google's unlawful access to Plaintiffs' and the Class and Android Subclass members'

20   computers and communications has caused irreparable injury.   Unless restrained and enjoined,

21   Google may continue to commit such acts.   Plaintiffs' remedies at law are not adequate to

22   compensate for these inflicted and threatened injuries, entitling Plaintiffs and the Class and Android

23   Subclass to remedies including injunctive relief as provided by 18 U.S.C. § 1030(g).

**COUNT IV**

**VIOLATION OF CALIFORNIA'S RIGHT OF PUBLICITY STATUTE**

**Civil Code § 3344**

**(For All Class Members)**

148.    Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

149.    California's Right of Publicity statute, Cal. Civ. Code § 3344, protects persons from the unauthorized misappropriation of the person's identity by another for commercial gain.

150.    During the Class Period, Google knowingly used Plaintiffs' and the Class' names, photographs, or likenesses for advertising, selling, or soliciting purposes.

151.    Google did not have Plaintiffs' or the Class' consent to do so.

152.    Although Plaintiffs' and the Class' names, images, and likenesses possess pecuniary value by virtue of enhancing the value of targeted advertising, Plaintiffs received no compensation or other consideration for Google's use thereof.

153.    Plaintiffs and the Class were harmed by Google's actions.

154.    The advertisements that misappropriated Plaintiffs' and the Class' names, photographs, and likenesses were not used in conjunction with news, public affairs, sports broadcasts or accounts, or political campaigns.

155.    Each incident is a separate and distinct violation of California Civil Code § 3344.

156.    Plaintiffs and the Class therefore seek injunctive relief, and other such preliminary and other equitable or declaratory relief as may be appropriate.

157.    Plaintiffs and the Class also seek remedy as provided by California Civil Code § 3344(a) in an amount equal to the greater of $750 per incident, or the actual damages suffered as a result of the unauthorized use, and any profits derived by Google from that unauthorized use and are not taken into account in computing the actual damages, as well as punitive damages, attorneys' fees and costs, and any other relief as may be appropriate.

**COUNT V**

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**

**Cal. Bus. & Prof. Code § 17200,** *et seq.*

**(For All Class Members)**

158.   Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

159.   As described above, Google's nonconsensual use of Plaintiffs' and the Class' personal information violates the Federal Wiretap Act, the Stored Electronic Communications Act, and the Computer Fraud and Abuse Act.

160.   As described herein, Google's nonconsensual, unauthorized use of Plaintiffs' and the Class' names, photographs, and likenesses is also a violation of California's Right of Publicity statute, Civil Code § 3344.

161.   These violations satisfy the "unlawful" prong of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*

162.   Google also violation the "fraudulent" prong of the UCL by intentionally and knowingly misrepresenting that Plaintiffs and the Class have full control to prevent their appearance in advertising on Google's products.  Google did so with the intent of inducing members to register for, and to use, its products and services, and to participate in advertisements even while Google knew there was no meaningful way to prevent one's name, photograph, likeness, or identity from being used in advertising or appearing as an endorsement in advertisements.

163.   Moreover, Google intentionally misrepresented Plaintiffs' and the Class' ability to prevent use of his or her appearance and personal information in advertisements so Google could enjoy substantial profits by having users unwittingly appear in such advertisements.

164.   Plaintiffs and the Class justifiably relied upon those misrepresentations when deciding to sign up for and use Google's products and services, and when using those services to run searches for their interests, exchange emails with contacts, edit and share their pictures, stream

videos, and search for directions, among other things.  Plaintiffs and the Class suffered damages of deprivation of money earned by the misrepresentations, in an amount to be proven at trial.

165.    Google violated the "unfair" prong of the UCL by leading Plaintiffs and the Class to believe that they could opt out of advertising endorsements, encouraging Plaintiffs and the Class to make Google products indispensable to their lives, and then using Plaintiffs' and the Class' personal information in a manner in which Plaintiffs and the Class cannot effectively opt out.

166.    Google violated the "unfair" prong of the UCL further by intentionally profiting from the nonconsensual, unauthorized endorsements extracted from Plaintiffs and the Class without sharing those profits with Plaintiffs and the Class.

167.    Google's unfair, deceptive, and fraudulent practices originated from California.  In addition, decisions concerning Google's privacy policies and advertising decisions were made in California.

168.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and the Class seek an order from this Court permanently enjoining Google from continuing to engage in the unlawful, unfair, and fraudulent conduct described herein.  Plaintiffs and the Class seek an order requiring Google to (1) immediately cease the unlawful practices described in this Complaint; and (2) award Plaintiffs and the Class reasonable costs and attorneys' fees pursuant to Cal. Code of Civ. Proc. § 1021.5.

169.    Plaintiffs and the Class have vested, monetary interests in the use of their personal information to target advertising and in their appearance or representation in Google advertisements, and Google has deprived them of these interests.

170.    Plaintiffs and the members of the Class have each lost money to which they were entitled in the form of compensation for the use of their images, names, and likenesses, in which they had a vested interest, by virtue of Google's conduct.  They are entitled to restitution of such sums.

## COUNT VI

## VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT

### Civil Code § 1750, *et seq.*

#### (For the Android Subclass)

171.    Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

172.    As described above, Google intentionally misrepresented the ability of Plaintiffs and the Class to prevent use of their personal and proprietary data in advertisements to induce Plaintiffs' and the Class' dependence on Google products and services, even while Google knew there was no simple and effective way for users to prevent such data from being used in connection with advertising, so Google could enjoy substantial profits by selling targeted advertisements.

173.    Google thereby violated Cal. Civ. Code § 1770(a)(9), (14), and (16).

174.    Further, as described above, Google intentionally misrepresented in advertisements making use of Google users' personal and proprietary data, including such users' names, photographs, and likenesses, that the advertised goods and/or services have sponsorship, approval, or characteristics which they do not have insofar as such users' endorsements were unauthorized in violation of Cal. Civ. Code § 1770(a)(5).

175.    Google also knowingly and intentionally misrepresented the reasons for which it consolidated user data.

176.    Plaintiffs and the members of the Android Subclass have suffered harm as a result of these violations of the CLRA because they have been deprived of money earned by the misrepresentations, in an amount to be proven at trial.

177.    Plaintiffs and the members of the Android Subclass are "consumers" within the meaning of Cal. Civ. Code § 1761(d) insofar as Plaintiffs and the members of the Android Subclass acquired, by purchase or lease, Android-powered devices.

178.    On March 29, 2012, prior to the filing of this Complaint, a CLRA notice letter was served on Google which complies in all respects with Cal. Civ. Code § 1782(a).  Former named

Plaintiff Nicholas Anderson sent Google a letter via certified mail, return receipt requested, advising Google that it is in violation of the CLRA and demanding that it cease and desist from such violation, and make full restitution by refunding the monies received therefrom.  Google was further advised that in the event that the relief requested has not been provided within thirty (30) days, Anderson would amend his complaint to include a request for monetary damages pursuant to the CLRA.  That period of thirty (30) days having passed, Plaintiffs and the Class now include such a request.  A true and correct copy of Anderson's CLRA letter is attached hereto as Exhibit A.

## COUNT VII

## BREACH OF CONTRACT

### (For All Class Members)

179.    Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

180.    Prior to March 1, 2012, Google's privacy policies stated, "When you sign up for a particular service that requires registration, we ask you to provide personal information.  If we use this information in a manner different than the purpose for which it was collected, then we will ask for your consent prior to such use."  However, "the purpose for which [user data] was collected" was to create and manage users' accounts.  It was not provided for tracking or advertising, and no users of Google services agreed to have Google consolidate their data across over sixty independent services for advertising purposes.  Plaintiffs and the Class did not consent to the change in the privacy policies introduced on March 1, 2012 because there is no simple, effective way to provide consent or to opt out.

181.    Between July 1, 2004 and March 11, 2009, Google's privacy policies stated that, while there may be changes to those policies, "we expect most such changes to be minor."  Eliminating the individual privacy policies of nearly every Google service is not minor.  Consolidating user data across nearly every Google service is not minor.

182.    Google breached its contract with Plaintiffs and the Class by consolidating and sharing user data across dozens of its services for advertising purposes without first obtaining user consent.

183.    Google further breached its contract with Plaintiffs and the Class by failing to provide a simple and effective means of opting out of the consolidated privacy policy and Google's practice of consolidating user data across dozens of services.

184.    Google also breached its contract with Plaintiffs and the Class by enacting a major change in its privacy policies when it eliminated them entirely in favor of a single, unified policy with terms substantially different than those in effect when Plaintiffs and the Class initially acquired Google accounts, prior to March 1, 2012.

185.    Plaintiffs and the Class have suffered and will continue to suffer damages including, without limitation, loss of their personal information, deprivation of money earned by the misuse of such information by Google, and, with respect to the Android Subclass, the cost of purchasing a new phone or other device, all of which have ascertainable value to be proven at trial.

## COUNT VIII

## COMMON LAW INTRUSION UPON SECLUSION

### (For All Class Members)

186.    Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

187.    Google invaded upon something secret, secluded or private pertaining to the Plaintiffs and the Class, including without limitation contents of Gmail accounts, web search and web surfing histories, and other information in which Plaintiffs and the Class have a reasonable expectation of privacy.

188.    Google's actions constitute an impermissible intrusion upon Plaintiffs' and the Class' seclusion or solitude, and/or their private affairs.

189.    Google's invasion would be highly offensive to a reasonable person.

190.    Google's invasion violates expectations of privacy that have been established by general social norms.

191.    Plaintiffs and the Class were damaged by such unauthorized actions.

**COUNT IX**

**COMMON LAW TRESPASS TO CHATTELS**

**(For All Class Members)**

192.    Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

193.    A trespass to chattels is committed by intentionally intermeddling with a chattel in the possession of another.

194.    A trespass to chattels is also committed by fraud, through a misrepresentation made to induce another to voluntarily dispossess himself of a chattel.

195.    Google has committed a trespass to chattels by intentionally intermeddling with Plaintiffs' and the Class' personal information, including without limitation contents of Gmail accounts.

196.    In addition, Google has committed a trespass to chattels by misrepresenting the terms upon which it would use Plaintiffs' and the Class' personal information to induce Plaintiffs and the Class to voluntarily use Google's products.

197.    Plaintiffs and the Class were damaged by Google's actions.

**COUNT X**

**COMMON LAW COMMERCIAL MISAPPROPRIATION**

**(For All Class Members)**

198.    Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

199.    A common law claim for commercial misappropriation protects persons from the unauthorized appropriation of the person's identity by another for commercial gain.

200.     During the Class period, Google knowingly used Plaintiffs' and the Class' names, photographs, or likenesses for advertising, selling, or soliciting purposes.

201.     Google did not have Plaintiffs' or the Class' consent to do so.

202.     Plaintiffs and the Class received no compensation or other consideration for Google's use thereof.

203.     Plaintiffs and the Class were harmed by Google's actions.

204.     Plaintiffs and the Class therefore seek injunctive relief, and other such preliminary and other equitable or declaratory relief as may be appropriate.

205.     Plaintiffs and the Class also seek actual damages suffered as a result of the unauthorized use, disgorgement of all profits from the unauthorized use that are attributable to the unauthorized use, punitive damages, attorneys fees and costs, and any other relief as may be appropriate.

## COUNT XI

## VIOLATION OF CONSUMER PROTECTION LAWS OF THE VARIOUS STATES

### (For All Class Members)

206.     Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

207.     By consolidating user data across its various services for advertising purposes, while representing that the change was made for other reasons, and without obtaining the consent of any Google user, Google has engaged in unfair competition or unlawful, unfair, misleading, unconscionable, or deceptive acts in violation of the state consumer protection statutes listed below.

208.     Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ala. Code § 8.19-1, *et seq*.

209.     Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. Ann. § 45.50.471, *et seq*.

210.     Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. Code § 44-1522, *et seq*.

211.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code Ann. § 4-88-107, *et seq.*

212.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-101, *et seq.*

213.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*

214.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Del. Code Ann. tit. 6, § 2511, *et seq.*

215.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*

216.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. Ann. § 501.201, *et seq.*

217.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Code Ann. § 10-1-392, *et seq.*

218.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*

219.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code Ann. § 48-601, *et seq.*

220.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1, *et seq.*

221.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 34-5-0.5-1, *et seq.*

222.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code § 714.16, *et seq.*

223.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. Ann. § 50-623, *et seq.*

224.    Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. Ann. § 367.110, *et seq.*

225.    Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. Ann. § 51:1404, *et seq.*

226.    Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Me. Rev. Stat. tit. 5, § 205-A, *et seq.*

227.    Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Code Ann., Com. Law § 13-101, *et seq.*

228.    Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A, § 1, *et seq.*

229.    Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws § 445.901, *et seq.*

230.    Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 8.31, *et seq.*

231.    Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Miss. Code Ann. § 75-24-3, *et seq.*

232.    Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Mo. Rev. Stat. § 407.010, *et seq.*

233.    Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code Ann. § 30-14-101, *et seq.*

234.    Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*

235.    Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*

236.    Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*

237.     Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*

238.     Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

239.     Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*

240.     Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*

241.     Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*

242.     Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Okla. Stat. tit. 15, § 751, *et seq.*

243.     Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*

244.     Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Cons. Stat. § 201-1, *et seq.*

245.     Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws § 6-13.1-1, *et seq.*

246.     Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq.*

247.     Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq.*

248.     Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code Ann. § 47-18-101, *et seq.*

249.     Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*

250.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-11-1, *et seq.*

251.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

252.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code Ann. § 59.1-196, *et seq.*

253.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*

254.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*

255.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq.*

256.   Google has engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. Ann. § 40-12-101, *et seq.*

257.   The acts, practices, misrepresentations and omissions by Google described hereinabove, occurring in the course of conduct involve trade or commerce, constitute unfair methods or competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes, because each of these statutes generally prohibits deceptive conduct in consumer transactions, including marketing practices, and Google violated each of these statutes by repeatedly representing that consolidating user data was for purposes other than advertising and by providing no simple and effective means to opt out of the new privacy policy.

258.   Google's acts, practices, misrepresentations and omissions were generally directed at the consuming public in that the entire scope of Google's activities complained of herein consisted of invading consumers' privacy and obtaining information from, and about, consumers, in addition to delivering revenue-generating targeted advertisements to consumers.   Thus, Google's activities are consumer-oriented because their fundamental nature is to obtain information from consumers and to use that information in a manner that is contrary to representations in Google's prior privacy

policies, without consumers' consent or an effective ability to opt-out; to profile consumers; to serve targeted advertisements during consumers' use of Google's products and services; and to generate a larger market share of advertising revenue.

259.   Google's conduct was materially misleading in that:  (a) consumers reasonably expected that the personal information they provided to Google to set up and utilize Google's products and services would remain within the product and service the consumer was using, consistent with the representations in Google's prior privacy policies; (b) that Google would not commingle consumers' personal information between products and services, consistent with the representations in Google's prior privacy policies; (c) Google would not use consumers' personal information for any other purpose without consumers' prior consent, consistent with Google's prior privacy policies; and (d) that Google's primary purpose for its new privacy policy was to benefit consumers when, in fact, it was to surreptitiously take and misuse consumers' personal information, which was of value to those consumers and which had commercial value to Google, to generate a larger market share of advertising revenue for Google, so that Google can compete more aggressively with social networking sites such as Facebook.

260.   These unfair and deceptive trade acts and practices have directly, foreseeably, and proximately caused damages and injury to Plaintiffs and other Class members.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray the Court to enter judgment against Google and in favor of Plaintiffs, on behalf of themselves and the Class and Android Subclass members, and to award the following relief:

A.   Certifying this action as a nationwide class action, certifying Plaintiffs as representatives of the Class and the Android Subclass, and designating their counsel as counsel for the Class and Android Subclass;

B.   Tolling the statute of limitations pursuant to the discovery rule and the doctrine of fraudulent concealment;

1         C.     Awarding the Plaintiffs and each Class and Android Subclass member actual and

2 compensatory damages for the acts complained of herein;

3         D.     Awarding the Plaintiffs and each Class and Subclass member treble damages for the

4 acts complained of herein;

5         E.     Awarding the Plaintiffs and each Class and Subclass member costs and attorneys'

6 fees, as allowed by law, and/or awarding counsel for the Class and Android Subclass attorneys' fees;

7         F.     Awarding the Plaintiffs and each Class and Android Subclass member statutory pre-

8 judgment interest;

9         G.     For legal and equitable relief as this Court may deem just and proper; and

10         H.     Granting such other or further relief as may be appropriate under the circumstances.

11 **DEMAND FOR JURY TRIAL**

12      Plaintiffs demand a trial by jury as to all issues so triable.

13 Dated: June 8, 2012                 **BURSOR & FISHER, P.A.**

14                    By:        */s/ L. Timothy Fisher*

15                 L. Timothy Fisher (State Bar No. 191626)
Sarah N. Westcot (State Bar No. 264916)

16                 1990 North California Boulevard, Suite 940
Walnut Creek, California 94596

17                 Tel: 925-300-4455
Fax: 925-407-2700

18

19                 **GARDY & NOTIS, LLP**
Mark C. Gardy

20                 James S. Notis
Kelly A. Noto

21                 Charles A. Germershausen
560 Sylvan Avenue

22                 Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377

23                 Fax: 201-567-7337

24                 **GRANT & EISENHOFER P.A.**
James J. Sabella

25                 485 Lexington Avenue, 29th Floor
New York, New York 10017

26                 Tel: 646-722-8500
Fax: 646-722-8501

27                 *Interim Lead Counsel for the Class*
*and Android Subclass*

28

**CARELLA, BYRNE, CECCHI**
**OLSTEIN, BRODY & AGNELLO**
James E. Cecchi
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: 973-994-1700
Fax: 973-994-1744

**LAW OFFICES OF**
**RICHARD S. SCHIFFRIN LLC**
Richard S. Schiffrin
P.O. Box 2258
West Chester, Pennsylvania 19380
Tel: 610-203-7154

**JAMES SCHWARTZ & ASSOCIATES PC**
Michael Schwartz
1500 Walnut Street, 21st Floor
Philadelphia, Pennsylvania 19102
Tel:  215-751-9865
Fax: 215-751-0658

**LAW OFFICES OF MARTIN S. BAKST**
Martin S. Bakst (65112)
15760 Ventura Boulevard, Sixteenth Floor
Encino, California 91436
Tel: 818-981-1400
Fax: 818-981-5550

*Of Counsel for the Class and Android Subclass*

**EXHIBIT A**

# BURSOR & FISHER
P.A.

1990 N. CALIFORNIA BLVD
WALNUT CREEK, CA 94596
www.bursor.com

SARAH N. WESTCOT
TEL: 925.300.4455
FAX: 925.407.2700
swestcot@bursor.com

March 29, 2012

***Via Certified Mail – Return Receipt Requested***

Google Inc.
1600 Amphitheatre Parkway
Mountain View, CA  94043

Re:     *Demand Letter Pursuant to California Civil Code § 1782*

To Whom It May Concern:

This letter serves as a preliminary notice and demand for corrective action by Google Inc. ("Google") pursuant to the provisions of California Civil Code § 1782, on behalf of our client, Nicholas Anderson, and all other persons similarly situated.

On March 1, 2012, Google implemented a new Privacy Policy that allows it to consolidate user data across dozens of Google services, including Google Search, Gmail, YouTube, Google+, and AdSense.  For example, from within Youtube, Google can now access users' search histories from Google Search, browsing habits from AdSense, and social networking data from Google+.  Previously, Google did not consolidate its user data across its services.  Each service kept its own records of users' activities.  Users expected this level of privacy when they signed up for Google services prior to March 1, 2012.

Google has engaged in a uniform marketing and advertising program representing that its new Privacy Policy — and the decision to consolidate user data — was implemented for the sake of simplicity and to improve users' experiences on Google services.  These representations were prominently displayed on Google's Official Blog, Google's Good to Know advertising campaign, and in an open letter to eight Congressional representatives.

However, Google misled consumers because it failed to highlight its true goal: consolidating user data for advertising purposes.  Writers, technology experts, and even a former Google Engineering Director recognize that the new Privacy Policy is intended to help Google place targeted advertisements.  Advertisers are willing to pay a premium to advertise with Google because it has this user data.

Google's previous privacy policies prohibit the consolidation of user data.  Users did not agree to have Google consolidate their user data for advertising.  Users did not agree to share this information across Google's dozens of different services.  There is no simple and effective way to opt out; users must manage their privacy settings in each Google service.

BURSOR&FISHER
P.A.

If a computer user disagrees with Google's new Privacy Policy, the remedy is to stop using his or her Google Account.  But terminating a Google Account is time-consuming, inconvenient, and costly.  Users may have Google Accounts for email, advertising, webpage analytics, or other purposes.  A loss of a Google Account means a loss of business, advertising, and opportunity.

Users with Android phones are in the worst position.  Google connectivity is heavily integrated into these devices.  Google connectivity is used for email, chat, and purchasing content.  If an Android user disagrees with the change, the only remedy is to discard the phone or cease using smartphone functionality.

Nicholas Anderson is a citizen of the State of California and is a consumer as defined in California Civil Code §1761(d) in that he purchased an Android phone and has a Google account "for personal, family or household purposes."  At the time of purchase, Mr. Anderson was familiar with Google's existing privacy policies, and he relied on such misrepresentations in deciding to purchase his Android phone.

Mr. Anderson would not have purchased an Android phone if he had known that Google would breach its existing privacy policies by consolidating his user data.  Mr. Anderson suffered a loss of money as a result of Google's misrepresentation in the amount of the purchase price of his Android phone.

By misrepresenting its existing privacy policies and misrepresenting the reasons for consolidating user data, Google has violated numerous provisions of California law including the Consumers Legal Remedies Act, Civil Code § 1770, including but not limited to subsections (a)(9), (14), and (16).

We hereby demand that Google immediately (1) abide by the terms of its privacy policies prior to March 1, 2012; (2) remove consolidated user data from its possession; (3) adequately disclose that advertising considerations were a material factor in Google's decision to consolidate user data; (4) cease using consolidated user data to deliver targeted advertisements; and (5) agree that it will only consolidate user data on a purely opt-in basis.

It is further demanded that Google preserve all documents and other evidence which refer or relate to any of the above-described practices including, but not limited to, the following:

1.   All documents concerning the development and implementation of consolidating user data;

2.   All communications with advertisers and marketing affiliates concerning the potential uses of consolidated user data;

3.   All documents comparing Google's user data to the data held by its competitors, including Facebook; and

4.   All communications with customers concerning complaints or comments relating to consolidated user data.

BURSOR&FISHER
P.A.

 

 

Please comply with this demand within 30 days from receipt of this letter.  If the relief requested has not been provided within 30 days from receipt of this letter, Plaintiff will amend the Complaint to include a request for monetary damages pursuant to the CLRA.

We are willing to negotiate with Google to attempt to resolve the demands asserted in this letter.  If Google wishes to enter into such discussions, please contact me immediately.

If Google contends that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents immediately upon receipt of this letter, but in no event later than 30 days from the date of receipt.

Very truly yours,

Sarah N. Westcot