DURIE TANGRI LLP
MICHAEL H. PAGE (SBN 154913)
mpage@durietangri.com
JOSHUA H. LERNER (SBN 220755)
jlerner@durietangri.com
SONALI D. MAITRA (SBN 254896)
smaitra@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:     415-362-6666
Facsimile:     415-236-6300

Attorneys for Defendant
GOOGLE INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE, INC. PRIVACY POLICY LITIGATION | Case No. 5:12-cv-01382-PSG<br><br>**CONSOLIDATED CLASS ACTION**<br><br>**DEFENDANT GOOGLE INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Date:    To be set by Court<br>Time:    To be set by Court<br>Ctrm:   5 - 4th Floor<br>Judge:  Honorable Paul Singh Grewal |

1

## NOTICE OF MOTION AND MOTION

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE THAT on a date to be set by the Court pursuant to its Order of January

4

24, 2014, in Courtroom 5 of the above-entitled court, located at 280 South 1st Street, San Jose, CA

5

95113, Defendant Google Inc. ("Google" or "Defendant") by its attorneys Durie Tangri LLP, will move

6

and hereby moves, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, for

7

an order dismissing Plaintiffs' Consolidated Second Amended Class Action Complaint (the "CSAC")

8

against Google with prejudice.

9

This Motion is based upon this Notice of Motion and Memorandum of Points and Authorities in

10

support thereof, the Request for Judicial Notice and Declaration of Silas Reyes filed herewith, the CSAC

11

and other pleadings on file in this matter, the arguments of counsel, and all other material which may

12

properly come before the Court at or before the hearing on this Motion.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOOGLE INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED
SECOND AMENDED CLASS ACTION COMPLAINT / CASE NO. 5:12-CV-01382-PSG

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION AND FACTUAL SUMMARY..........................................................................1

II.   ARGUMENT ..........................................................................................................................4

    A.    Plaintiffs Cannot Establish Article III Standing ..............................................................4

        1.    Mr. Nisenbaum's Phone Replacement Cannot Establish Standing ........................6

        2.    Battery Life ...........................................................................................................7

        3.    Personal Information and Communications............................................................8

    B.    Plaintiffs State no Statutory Claim That Can Evade Article III.........................................9

        1.    Mr. Nisenbaum's CLRA Claim Fails ....................................................................9

    C.    Plaintiffs' Other Claims Fail on the Merits......................................................................14

        1.    Breach of Contract ..............................................................................................14

        2.    Intrusion on Seclusion.........................................................................................16

        3.    Section 17200 ......................................................................................................17

    D.    Additional Claims Pled Solely for Appellate Preservation..............................................19

III.  CONCLUSION......................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Birdsong v. Apple, Inc.*,
590 F.3d 955 (9th Cir. 2009) ........................................................................................................5

*Chandler v. State Farm Mut. Auto. Ins. Co.*,
598 F.3d 1115 (9th Cir. 2010) .....................................................................................................4

*Claridge v. RockYou, Inc.*,
785 F. Supp. 2d 855 (N.D. Cal. 2011) ......................................................................................18

*Del Vecchio v. Amazon.com Inc.*,
Case No. C11-366-RSL, 2011 WL 6325910 (W.D. Wash. Dec. 1, 2011) ...................................5

*Ferrington v. McAfee, Inc.*,
Case No. 10-CV-01455-LHK, 2010 WL 3910169 (N.D. Cal. Oct. 5, 2010) ..............................13

*Folgelstrom v. Lamps Plus, Inc.*,
195 Cal. App. 4th 986 (2011) ....................................................................................................17

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167, 120 S. Ct. 693 (2000) .......................................................................................5, 8

*Hernandez v. Hillsides, Inc.*,
48 Cal. Rptr. 3d 780 (2006),
*rev'd on other grounds*, 47 Cal. 4th 272 (2009) .......................................................................16

*Hernandez v. Path, Inc.*,
Case No. 12-CV-01515 YGR, 2012 WL 5194120 (N.D. Cal. Oct. 19, 2012) ...........................14

*Hill v. Nat'l Collegiate Athletic Ass'n*,
7 Cal. 4th 1 (1994) ....................................................................................................................16

*In re Facebook Privacy Litigation*,
791 F. Supp. 2d 705 (N.D. Cal. 2011) ......................................................................................18

*In re iPhone Application Litig.*,
Case No. 11-MD-02250-LHK, 2011 WL 4403963 (N.D. Cal. Sept. 20, 2011) ...............5, 12, 13

*In re Jetblue Airways Corp. Privacy Litig.*,
379 F. Supp. 2d 299 (E.D.N.Y. 2005) .......................................................................................18

*Kwikset Corp. v. Superior Court (Benson)*,
51 Cal 4th 310 (2011) ................................................................................................................18

*LaCourt v. Specific Media, Inc.*,
Case No. SACV 10-1256-GW, 2011 WL 1661532 (C.D. Cal. Apr. 28, 2011) ............................5

*Lujan v. Defenders of Wildlife*,
504 U.S. 555, 112 S. Ct. 2130 (1992) .........................................................................................4

GOOGLE INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED
SECOND AMENDED CLASS ACTION COMPLAINT / CASE NO. 5:12-CV-01382-PSG

*Ruiz v. Gap, Inc.*,
   540 F. Supp. 2d 1121 (N.D. Cal. 2008) ................................................................18

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83, 118 S. Ct. 1003 (1998) ...................................................................4

*Thompson v. Home Depot, Inc.*,
   No. 07cv1058 IEG, 2007 WL 2746603 (S.D. Cal. Sept. 18, 2007).......................18

*Warth v. Seldin*,
   422 U.S. 490, 95 S. Ct. 2197 (1975) ..............................................................5, 7

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) ....................................................................4

**Statutes**

Cal. Bus. & Prof. Code § 17200 ...........................................................................17

Cal. Bus. & Prof. Code § 17204 ...........................................................................17

Cal. Civ. Code § 1770 .........................................................................................13

Cal. Civ. Code § 1780(a) .....................................................................................12

**Rules**

Fed. R. Civ. P. 8 ................................................................................................19

Fed. R. Civ. P. 9(b) .......................................................................................9, 12, 17

Fed. R. Civ. P. 12 .............................................................................................. i, 8

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION AND FACTUAL SUMMARY

Plaintiffs' Consolidated Second Amended Complaint ("CSAC") perpetuates the tactics this Court repeatedly has rejected in each of the previous iterations:  quote, out of context, unidentified documents that have nothing to do with the Plaintiffs or the claims; add scores of pages describing (or purporting to describe) multiple lawsuits, publications, and regulatory events entirely unrelated to this case; and then toss whatever claims might sound good against the wall.

The original claim in this case—that Google's new, consolidated privacy policy breaches Google's prior individual privacy policies—is but a dim memory.  This Court has twice correctly dismissed that claim, because once one actually reads the contracts at issue, instead of Plaintiffs' gross misparaphrasing of those documents, there is no breach.  ECF Nos. 45 (Order dismissing Consolidated Complaint); 67 (Order dismissing Consolidated First Amended Complaint) ("Order 1" and "Order 2" respectively).  The current complaint contains not a whisper of those claims.

Instead, the CSAC is my grandfather's proverbial axe:  it's the original, but I've replaced the handle three times and the head twice.  The CSAC now rests on an entirely different document, never mentioned in any prior version of this case, which Plaintiffs identify only as "the Android-powered device privacy policy," (CSAC ¶ 81) and then purport to quote but do not provide.  Neither do they allege that Plaintiff Nisenbaum ever obtained that policy, if or when he first read it, if and how he allegedly came to rely upon it in purchasing his phone, or how he purports to have become a party to it.

There is a good reason for those omissions.  Mr. Nisenbaum cannot allege any of these necessary facts.  The document on which Plaintiffs now rely was an October 2008 document, released with and applicable only to the earliest Android phones (such as the HTC G1), entitled "Google Privacy Policy for Android-powered phones."  Request for Judicial Notice ("RJN"), Ex. A (hereafter "2008 Android Policy").  It was a short-lived agreement designed to supplement the then-existing product specific privacy policies for each of Google's individual products (such as Gmail, YouTube, Maps, Search, and the like).  As the document itself states in its opening sentence:

> **The Google Privacy Policy and our various product-specific**
> **privacy notices describe how we treat personal information when you**
> **use Google products and services, including any Google products on**

**your Android-powered phone.**  In addition, this document describes our privacy policies specifically for Android-Powered phones.

*Id.* at 1 (emphasis added).

Moreover, although Plaintiffs neglect to mention it, the document goes on to *expressly* incorporate by reference the privacy policies for specific Google products, including Gmail:  the *very same* privacy policy this Court has already held bars Plaintiffs' claims:

> You may use this Android-powered phone to access certain Google products and services, such as Gmail, Google Talk, YouTube, and Google Gears.  Each service's privacy policy describes how we treat your personal information when you use that specific service:
>
> Gmail Privacy Policy – http//mail.google.com/mail/help/privacy.html

*Id.* at 2.

In other words, the latest document Plaintiffs toss up expressly has **nothing** to do with how Google treats any information provided via any of the various products at issue here:  as the Court is by now well aware, and as the 2008 Android Policy itself made clear, each of those products was governed by either the general Google Privacy Policy or its own product-specific policies, which have now been unified into a single policy (which, we remind the Court, was the original, now-abandoned gravamen of this case).  *See* Request for Judicial Notice and Exhibits thereto, ECF No. 54.

Plaintiffs, in short, are again looking at the wrong document, and appear to be deliberately obfuscating that fact.  As Google has repeatedly briefed and submitted in this case, the rules governing data collected by each of Google's other products were and are governed by the Privacy Policies previously submitted to the Court.[1]  Moreover, even if the 2008 Android Policy were relevant, the document does not say what Plaintiffs say it says:  it says just the opposite, explaining (in text omitted by Plaintiffs) that Android device details *will* be associated with Google Accounts:  "Each phone is assigned one or more unique identification numbers.  These identification numbers **are associated with your Google Account and the IMEI number, mobile country code, and mobile network code of your phone** (which is also stored by your wireless operator), and allow your device to sync your Google email, contacts, and other Google services."  RJN, Ex. A at 1 (emphasis added).

---

[1] ECF No. 54.

2

GOOGLE INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT / CASE NO. 5:12-CV-01382-PSG

But Plaintiffs (and more specifically, Mr. Nisenbaum, who is the only plaintiff representing the "Android Device Switch Subclass") have a much more fundamental problem.  The 2008 Android Policy he now quotes without identifying was created and promulgated in October 2008, as an additional privacy policy for the original HTC G1 phone.  But it was short-lived:  When Google prepared to release the Nexus One Android phone in early 2010, it also retired the 2008 Android Policy, and instead simply incorporated certain Android-specific terms into the existing Mobile Privacy Policy.  That change took effect in the December 1, 2009 version of the Mobile Privacy Policy, which replaced the 2008 Android Policy on January 29, 2010, and added the following italicized language to the Mobile Privacy Policy:

> Most of the other information we collect for mobile, such as your device and hardware IDs and device type, the request type, your carrier, your carrier user ID, the content of your request, and basic usage stats about your device and use of Google's products and services does not by itself identify you to Google, though it may be unique or consist of or contain information that you consider personal.  ***However, if you use an Android-powered device, Google will associate your device id with your Google Account in order to provide services, such as sync functionality for your Google email and contacts.***

RJN, Ex. B; Declaration of Silas Reyes ("Reyes Decl."), ¶ 2.[2]

In short, the Android Policy applied only to purchasers of Android phones between October 2008 and January 29, 2010.[3]  But Mr. Nisenbaum, by his own pleading, asserts that he purchased an HTC Android device (the Complaint persists in avoiding identifying either the device or the carrier)[4] in June 2010.  He was thus never a party to Plaintiffs' centerpiece *du jour*, and cannot plead that its claims apply to him.  The terms of the agreement to which he *was* a party provide exactly the opposite:  that Google

---

[2] Judicial notice of the contracts Plaintiffs quote and rely upon, as well as the other relevant public policy documents, are properly subject to judicial notice under the incorporation doctrine.  *See* RJN filed concurrently herewith.  Mr. Reyes's testimony as to the exact dates on which those documents were published is admittedly beyond the four corners of the CSAC, but is offered to establish that Plaintiffs' failure to identify the documents and plead the relevant facts cannot be cured by amendment.

[3] Whether, as Plaintiffs claim, that agreement remained "in effect through February 29, 2012" (CSAC ¶ 81) for such purchasers is debatable, as it was repeatedly superseded by later policies.  But it is also irrelevant.  As no Plaintiff claims to have purchased an Android device between October 2008 and January 2010, no Plaintiff was ever a party to that agreement to begin with.

[4] Curiously, most of the *other* Plaintiffs, who are *not* claiming to represent the Android Device Switch Class, identify the particular Android devices they purchased and their carriers in the Complaint.  *See* CSAC ¶¶ 29-31.  Plaintiffs have recently confirmed to undersigned counsel that Mr. Nisenbaum purchased an HTC Droid Incredible from Verizon in June 2010, long after the 2008 Android Policy was retired.  Google has confirmed that, as of June 2010, that device would have linked to and displayed the Google Mobile Policy (RJN, Ex. B), not the former 2008 Android Policy.

1    *will* associate basic Android phone-identifying information with his Android account, and that his use of

2    Gmail is governed by the Gmail Privacy Policy this Court has already found fatal to Plaintiffs' claims.

3         And in fact, Mr. Nisenbaum pleads no facts that would establish his claim even if he had owned a

4    pre-2010 Android phone and been a party to the 2008 Android Policy.  Although the CSAC artfully

5    pleads that he "ceased using his Android device . . . in substantial part because of his concern for the

6    privacy of his personal information," (CSAC ¶ 17) nowhere does Mr. Nisenbaum (or anyone else) plead

7    that he ever *saw* the 2008 Android Policy, or read it, or relied on anything in it in deciding to purchase

8    his phone, or even *to this day* has ever seen that document.[5]  It has nothing to do with Mr. Nisenbaum,

9    and he pleads no facts to the contrary.  That document, in short, has absolutely nothing to do with this

10   case.

11        Which leaves Plaintiffs right where they were the last time around.  The only credible claim of

12   harm sufficient to establish Article III standing is the alleged cost of replacing Mr. Nisenbaum's phone,

13   and that claim fails because it is based on alleged promises in an agreement to which he was never a

14   party.  The remaining claims of harm—copying of personal information, use of battery life, invasion of

15   privacy—fail this time for the myriad reasons they failed the previous times, as detailed herein.[6]  There is

16   no cognizable claim stated, and thus the CSAC should be dismissed, this time with prejudice.

17   **II.    ARGUMENT**

18        **A.    Plaintiffs Cannot Establish Article III Standing**

19        As this Court held in dismissing the last two iterations of this case, a complaint must be dismissed

20   for lack of subject matter jurisdiction where the plaintiff lacks Article III standing.  *Lujan v. Defenders of*

21   *Wildlife*, 504 U.S. 555, 559-60, 112 S. Ct. 2130, 2136-37 (1992); *Steel Co. v. Citizens for a Better Env't*,

22   523 U.S. 83, 109-10, 118 S. Ct. 1003, 1020 (1998); *White v. Lee*, 227 F.3d 1214, 1242-43 (9th Cir.

23   2000).  The plaintiff bears the burden of establishing standing.  *Chandler v. State Farm Mut. Auto. Ins.*

24   *Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).  To do so, plaintiff "must show (1) it has suffered an 'injury in

25

26   [5] It is exceedingly unlikely he has outside the context of this lawsuit:  by the time he purchased his
     phone, it was long out of date, and the only public copy we have located, on the Internet Archive's
27   Wayback Machine, indicates a last appearance on October 2, 2009.  RJN, Ex. A at 1.

28   [6] Although the Court previously accepted the battery life claim for pleadings purposes, the revised claims
     of the current complaint remove whatever nexus there may previously have been between battery
     consumption and the claimed causes of action.

fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81, 120 S. Ct. 693, 704 (2000).  The CSAC, like its predecessors, fails to satisfy these bedrock requirements.

It is hornbook law that no matter what the cause of action, the plaintiff "must allege specific, concrete facts demonstrating that the challenged practices harm him[.]"  *Warth v. Seldin*, 422 U.S. 490, 508, 95 S. Ct. 2197, 2207 (1975).  In a putative class action, the named plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."  *Id*. 422 U.S. at 502, 95 S. Ct. at 2207.  The Ninth Circuit and courts in this District have repeatedly dismissed complaints with similarly deficient allegations.  *See*, *e.g.*, *Birdsong v. Apple, Inc.*, 590 F.3d 955, 960-61 (9th Cir. 2009) (plaintiffs lacked standing where complaint alleged potential harm to others but did not specifically allege plaintiffs themselves were affected); *In re iPhone Application Litig.*, Case No. 11-MD-02250-LHK, 2011 WL 4403963, at *6-7 (N.D. Cal. Sept. 20, 2011) ("*In re iPhone*") (dismissing for lack of standing where plaintiffs failed to allege injury to themselves); *Del Vecchio v. Amazon.com Inc.*, Case No. C11-366-RSL, 2011 WL 6325910, at *3 (W.D. Wash. Dec. 1, 2011) ("While it may be theoretically possible that Plaintiffs' information could lose value as a result of its collection and use by Defendant, Plaintiffs do not plead any facts from which the Court can reasonably infer that such devaluation occurred in this case."); *LaCourt v. Specific Media, Inc.*, Case No. SACV 10-1256-GW, 2011 WL 1661532, at *3-5 (C.D. Cal. Apr. 28, 2011) (finding no standing where "the Complaint does not identify a single individual who was foreclosed from entering into a 'value-for-value exchange' as a result of [defendant's] alleged conduct."  *Id*. at *5).

For purposes of assessing Plaintiffs' standing, the question is not "what sort of harms to class members can we imagine?"  Rather, the named Plaintiffs much allege that they have **personally** suffered cognizable harm.  As this Court explained in its prior Order:

> Put another way, a plaintiff must do more than point to the dollars in a defendant's pocket; he must sufficient [sic] allege that in the process he lost dollars of his own. Plaintiffs' allegations certainly plead that Google made money using information about them for which they were provided

5

1           no compensation beyond free access to Google's services.  But an
          allegation that Google profited is not enough equivalent to an allegation
2           that such profiteering deprived Plaintiffs' of economic value from that
          same information.

3

4 Order 2 at 9-10.

5       Plaintiffs return with the same allegations of injury as before.  But only two of those survived the

6 prior rounds of briefing, and Plaintiffs' radical reshaping of their complaint—rewritten to avoid the

7 merits-based dismissals of their theories in prior complaints—has in the process cut the legs out from

8 under both remaining theories of harm.  The two surviving claims of injury-in-fact—that Mr. Nisenbaum

9 had to purchase a new phone, and that Plaintiffs' battery life has been depleted—both fail under

10 Plaintiffs' new liability theories.  The remaining theories are unchanged, and fail anew for the same

11 reasons they failed last time.

12         **1.**        **Mr. Nisenbaum's Phone Replacement Cannot Establish Standing**

13       Plaintiffs' primary theory of injury-in-fact (which would in any event afford standing only to the

14 Android Device Switch Subclass) is a CLRA claim that Mr. Nisenbaum was somehow misled into

15 purchasing an Android device by representations contained in the 2008 Android Policy, and that the

16 alleged changes in the March 2012 Privacy Policy forced him to replace his phone rather than suffer the

17 commingling of his information.  Put aside the various substantive problems of that claim, discussed in

18 detail below—that Mr. Nisenbaum does not allege ever having seen, much less relied on, any

19 representations in the 2008 Android Policy in making his purchasing decision, that none of the

20 statements in that document were actually false or misleading, and that Mr. Nisenbaum failed to mitigate

21 his damages by replacing the free Apps rather than the phone.  The central problem with Mr.

22 Nisenbaum's claim of injury is that, even if there were a valid "Android Device Switch Subclass," *Mr.*

23 *Nisenbaum isn't a member of it.*

24       Mr. Nisenbaum's last complaint was based on the alleged breach of promises contained in earlier

25 Google product-specific privacy policies:  policies to which Mr. Nisenbaum was at least a party.  The

26 Court found that, for pleadings purposes, Mr. Nisenbaum's allegations survived Article III scrutiny, but

27 then dismissed those contract-based claims on the merits.  Order 2 at 17.  Now, Mr. Nisenbaum attempts

28 a claim based on an entirely different alleged promise in a different document, the outdated 2008

1    Android Policy.  But unlike in the prior complaints, Mr. Nisenbaum was never a party to that alleged

2    agreement, as it applied only until January 2010, and Mr. Nisenbaum didn't purchase his device until

3    June 2010.  Simply put, even if there were an Android Device Switch Subclass with a colorable claim,

4    Mr. Nisenbaum isn't a member of that class, and cannot bring claims on its behalf.  In a putative class

5    action, the named plaintiffs "must allege and show that they **personally** have been injured, not that injury

6    has been suffered by other, unidentified members of the class to which they belong and which they

7    purport to represent."  *Warth v. Seldin*, 422 U.S. at 502, 95 S. Ct. at 2207 (emphasis added).  Mr.

8    Nisenbaum's claims of injury no longer suffice to get Plaintiffs over the Kilimanjaro of Article III

9    standing, because—unlike in prior versions of this complaint—Mr. Nisenbaum isn't a member of the

10   alleged class.

11                  **2.      Battery Life**

12          Similarly, Plaintiffs' revised theories have undercut their other surviving claim of Article III

13   injury-in-fact:  increased battery usage.  As this Court recognized previously, the "depleted battery life"

14   trope has become a mainstay of privacy actions, and courts have split based on the frequency and degree

15   of alleged use of resources:

16                      With respect to Plaintiffs' injury claims based on battery and
                    bandwidth consumption, courts have found that the unauthorized use of
17                  system resources can suffice to establish a cognizable injury.  For example,
                    in *Goodman*, the court found standing based upon battery discharge where
18                  the application at issue sent fine location data every three hours or
                    whenever the device's screen was refreshed. Similarly, in *In re iPhone*
19                  *Application Litigation*, the court found standing where the device
                    systematically collected and transmitted location information. In *In re*
20                  *Google Android User Privacy Litigation,* the plaintiffs did not clearly
                    allege how frequently Google collected geolocation data from a phone, but
21                  did allege that collecting relocation data was particularly battery intensive,
                    that their batteries discharged more quickly[,] and that their services were
22                  interrupted.  This latter allegation was deemed sufficient to establish
                    standing.  At the same time, in *Hernandez v. Path, Inc.*, the court found
23                  that any harm from the use of phone resources in an app's uploading a
                    user's address book a single time upon first running the app was *de*
24                  *minimis* and thus insufficient to establish injury.

25   Order 2 at 12-13 (internal citations and footnotes omitted).  This Court then found Plaintiffs' allegations

26   "more than *de minimis*" because they were based on the repeated downloading of Apps in reliance on the

27   App privacy policies in place at the time.  Once again, this Court then proceeded to dismiss those claims

28   on the merits.

1    Those contract claims are now gone.  In their place, Plaintiffs now rely on a claim that Google

2    Play has improperly transmitted a few bytes of their "personal" information (name, email address, and

3    zip code) to the sellers of each App they purchased.[7]  The merits (or lack thereof) of that claim are

4    addressed below.  But for Article III purposes it is crucial to note that—however inaccurate the

5    allegation—the claim in the CSAC is *not* that *any* Plaintiff's phone was required to transmit *any*

6    information whatsoever, but rather that the *Google Play system* improperly passed on the user's

7    information to App developers.  *See*, *e.g.*, CSAC ¶ 67 ("Google also causes certain personal

8    information . . . to be disclosed to the developer of the application downloaded."); ¶ 174 ("Google's

9    surreptitious transmission . . . .").  That allegation, even if true, has absolutely nothing to do with battery

10   life:  the power consumption in downloading the Apps Plaintiffs chose to download is the same

11   regardless whether Google subsequently sent the developer information concerning the user (or anything

12   else).  There is simply no nexus between the claimed violation (Google Play disclosing account

13   information to developers) and the claimed injury (battery use).[8]  *Friends of the Earth*, 528 U.S. at 180-

14   81 (alleged injury must be "fairly traceable to the challenged action of the defendant").

### 3.    Personal Information and Communications

16   Finally, Plaintiffs reprise their previously-rejected claims of injury-in-fact based on access to or

17   disclosure of "personal information."  CSAC ¶¶ 175-193.  As this Court observed in dismissing the same

18   claims in December 2012:

19   > [N]othing in the precedent of the Ninth Circuit or other appellate courts
> confers standing on a party that has brought statutory or common law
20   > claims based on nothing more than the unauthorized disclosure of personal
> information, let alone an unauthorized disclosure by a defendant to itself.

21   ───────────────────────────────

22   [7] Plaintiffs again mischaracterize the press reports which appear to be their sole Rule 11 source for this allegation, mistakenly alleging transmission to all App developers.  In fact, the report was that App

23   *sellers* could, if they chose to, *access* that information.  There is no allegation that any Plaintiff's information was in fact accessed.

24   [8] We note, moreover, that despite the ubiquity of "battery use" claims, they have never been tested:  each iteration of which we are aware has been considered in the context of Rule 12 motions in cases that were

25   either dismissed or settled, and—just as in the instant case—none has contained any factual allegations or basis underlying the bare assertion that some quantum of phone use actually results in material added

26   costs recharging the device.  But the science is to the contrary:  in fact, a cell phone plugged into its charger overnight draws nearly as much power *after* it is fully charged as when it is charging.  *See*, *e.g.*,

27   http://www.slate.com/articles/health_and_science/the_green_lantern/2009/10/you_charged_me_all_night _long.html, discussing the results of a Lawrence Livermore Labs study reported at

28   http://standby.lbl.gov/summary-table.html, finding that a fully charged phone continues to draw fully two-thirds as much power as one that is charging.

───────────────────────────────

1   Order 1 at 10 and cases collected there.  The law has not changed in the interim:  unauthorized

2   acquisition or disclosure of personal information does not confer Article III standing.  *Id.*  This Court

3   should again dismiss Plaintiffs' claims for lack of Article III standing.

4          **B.      Plaintiffs State no Statutory Claim That Can Evade Article III**

5          In an effort to avoid Article III dismissal, Plaintiffs' previous consolidated complaints included

6   several statutory claims (Stored Communications Act, Wiretap Act, Right of Publicity and the like).

7   Plaintiffs have now abandoned all but one of those claims, but continue to attempt to state a claim under

8   the Consumer Legal Remedies Act ("CLRA").  However, although the heading hasn't changed, the

9   underlying claim is entirely different.  The last complaint attempted a CLRA claim based on alleged

10  possible use of Plaintiffs' images in advertising in violation of prior privacy policies.  ECF No. 50.  This

11  Court dismissed that claim on Rule 9(b) grounds.  Order 2 at 30.  The CSAC attempts a totally different

12  CLRA claim, by only Mr. Nisenbaum, on behalf only of the Android Device Switch Subclass.  That new

13  claim fares even worse.

14                **1.      Mr. Nisenbaum's CLRA Claim Fails**

15         Plaintiffs' new CLRA claim is nothing short of byzantine.  It is based on the theory that Google

16  drafted its 2008 Android Policy with the intent of deceiving potential purchasers of Android devices into

17  buying them based on the promise that Google would not associate device-related information (such as

18  the device's IMEI) with a user's account, that Google had a secret plan to change that policy, and that

19  "[h]ad Google disclosed in June 2010 that it did not intend to honor the terms of the 'Android-powered

20  device privacy policy' at that time, Plaintiff Nisenbaum would not have purchased his Android device."

21  CSAC ¶ 66 (internal quotation marks added).

22         This claim, like its predecessor, is a fraud claim, and must meet the standards of Rule 9(b).  It

23  fails to do so in every particular.  Mr. Nisenbaum does not allege what product he purchased.  He does

24  not allege from whom he purchased it.  He does not allege that he ever saw or heard a word of the

25  Android Policy on which he bases his claim, much less that anything contained therein led him to make

26  his purchasing decision.  He makes no allegation that Google in fact *does* associate Android device

27  IMEIs with Google Accounts (in fact, as the document on which Mr. Nisenbaum relies itself clearly

28  states, Google instead interposes "one or more unique identification numbers"; RJN, Ex. A at 1).  And he

9

1  makes no coherent allegation that any change Google made caused his unidentified Android device not to

2  continue function exactly as advertised.

3  Moreover, he *cannot* make any such allegation. As set forth above, the document Mr. Nisenbaum

4  quotes as containing representations that violate the CLRA—but which he neither submits nor

5  identifies—was in fact a privacy policy that had been discontinued in January 2010, long before he

6  claims to have bought an unidentified Android device from an unidentified seller and an unidentified

7  manufacturer in June 2010.[9] Thus not only does he not allege having ever seen or heard a word of that

8  document, much less claim to have relied upon it, he has affirmatively alleged purchasing his device at a

9  time when the applicable privacy policy for Google's mobile Apps and Android devices disclosed

10  precisely the policy he now claims would have caused him *not* to buy the device:

11  
12  
13  
14  
15  

> Most of the other information we collect for mobile, such as your device and hardware IDs and device type, the request type, your carrier, your carrier user ID, the content of your request, and basic usage stats about your device and use of Google's products and services does not by itself identify you to Google, though it may be unique or consist of or contain information that you consider personal. ***However, if you use an Android-powered device, Google will associate your device id with your Google Account in order to provide services, such as sync functionality for your Google email and contacts.***

16  RJN, Ex. B.

17  In short, the CSAC attempts to state a claim against Google based on an alleged

18  misrepresentation that was never made to Mr. Nisenbaum (or anyone else after January 2010), and which

19  he does not claim ever to have seen, much less relied upon, but which nevertheless allegedly induced Mr.

20  Nisenbaum to buy an undisclosed device from an unidentified seller in June 2010. Moreover, by that

21  time the terms on which he bases his claim had long been removed from the applicable policy.

22  Rather than plead any of the *facts* that might support a CLRA claim, Plaintiffs go off on an

23  extended frolic in an attempt to portray Google's decision to create Google+, and to update its privacy

24  policies in March 2012, as somehow fraudulent. Plaintiffs devote no fewer than seven pages to a

25  

26  [9] As noted above, although not contained in the Complaint, Plaintiffs have confirmed that Mr.
27  Nisenbaum's device was in fact an HTC Droid Incredible purchased from Verizon in June 2010. Thus the omission of the operative facts from the complaint cannot be cured by amendment: adding the relevant facts would only conclusively establish that Mr. Nisenbaum never owned an Android device that
28  was subject to the October 2008 Android Policy.

breathless retelling of the in-house development effort that went into designing Google+, drawn primarily from Steven Levy's *In the Plex: How Google Thinks, Works, and Shapes Our Lives*.  Plaintiffs seem shocked that technology companies plan and design new products in secret, and that they typically even use code names (in this case, "Emerald Sea") for such efforts.  But the fact that a company designs a new set of products, or that those new or changed products may require new or changed user agreements, does not justify the remarkable *non sequitur* that the company must have had fraudulent intent in continuing to use its existing products and user agreements while it designed the new ones.  There is *no* factual allegation to support such a claim, and simply assuming a nefarious intent to defraud current customers every time a company changes its Terms of Use or Privacy Policy clearly proves far too much.  *Every* new Terms of Use supplants its predecessor, no company designs its products or drafts its contracts in public, and no such revision can occur instantaneously.  Under Plaintiffs' theory, any time a company starts to draft a new user agreement, it is automatically committing fraud by using the previous agreement in the interim.  This is nonsense.

There is another problem with presuming fraudulent intent simply because Google knew it would be changing its privacy policies for some period of time before announcing it to the world:  it presupposes exactly the same nonexistent promise *not* to change those policies that this Court rejected the last time around.  It is, simply put, coextensive with the breach of contract claim this Court has already dismissed.  As this Court has already held in dismissing Plaintiffs' breach of contract claims, the *existing* contracts to which Mr. Nisenbaum was a party at the time Google implemented the March 1, 2012 Privacy Policy *expressly* included the "change" Mr. Nisenbaum now claims was fraudulently concealed:

> The policy plainly includes a provision for the commingling of PII across Google products. That provision states: "We may combine the information you submit under your account with information from other services."  In light of this express provision, it is not plausible to say that Google could be considered to have breached the contract.  Plaintiffs again have failed to state a claim.

Order 2 at 25 (internal footnote omitted).  Mr. Nisenbaum cannot ask the Court to infer a fraudulent intent to conceal its plan to introduce a policy term that was *already* expressly part of his existing

contract.[10]

Perhaps because this Court's previous order disposed of the CLRA claim on Rule 9(b) grounds, the CSAC focuses almost entirely on its attempt to paint "Emerald Sea" as a fraudulent scheme. But in so doing, it ignores and repeats the other defects addressed in previous briefing. *First*, Plaintiffs have again failed to allege any cognizable damage. In addition to the threshold Article III issue, the CLRA itself conveys standing only on plaintiffs who have suffered "any damage" as a result of the alleged actions. Cal. Civ. Code § 1780(a); *In re iPhone*, at *10 (dismissing CLRA claims for failure to plead monetary damage). Mr. Nisenbaum fails entirely to plead credible damage. He alleges that he chose to replace his Android device rather than succumb to the "new" policy that allowed Android data to be shared with other, *free* Google products. As an initial matter, and as this Court has already held, the underlying premise of this claim is fiction: Mr. Nisenbaum was *already* a party to existing product-specific agreements that expressly allowed that sharing of information. That holding is "law of the case." But even were that not so, the solution to Mr. Nisenbaum's invented conundrum is *not* to replace the device, which we must assume continued to operate precisely as advertised.[11] If Mr. Nisenbaum was seriously concerned that Google's mobile Apps could learn the IMEI or type of the device with which they were being asked to communicate, the solution would have been to stop using the free Apps, not to buy a new phone.[12] Again, nothing compelled Mr. Nisenbaum or anyone else to choose Google's free products over their competitors, and if Mr. Nisenbaum was not comfortable with the terms under which he received those free services, the damage-mitigating solution was to delete the Apps, not scrap the device.

---

[10] Note, moreover, that Plaintiffs' "Emerald Sea" conspiracy theory alleges that Google had formed its intent to launch Google+ and change its policies "[b]y no later than May 2010[.]" CSAC ¶ 127. But as noted above, the October 2008 Android Policy was superseded by the December 2009 Mobile Privacy Policy (released January 2010). Even under Plaintiffs' imaginings, the policy on which they now base their claims is thus wholly irrelevant.

[11] We note, again, that it is impossible to assess coherently a false advertising claim when the Plaintiff refuses to identify the product, the manufacturer, the seller, or any advertising or representations he was exposed to.

[12] As far as we know, no other phone acts any differently: it is difficult if not impossible to design any mobile App without knowing which device it is being used on, as each App must adjust to the specifications of each device. One screen does not fit all, for example.

12

GOOGLE INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED
SECOND AMENDED CLASS ACTION COMPLAINT / CASE NO. 5:12-CV-01382-PSG

*Second*, the CLRA applies only to the sale of "goods" or "services." Cal. Civ. Code § 1770. There is no allegation that Google has sold anything at all to Mr. Nisenbaum, and thus the CLRA simply doesn't apply. And to the extent Plaintiffs' claims are based on a third party's sale to them of Android phones, Google is not the proper defendant in such a case. Google was not the seller of any Android phone at issue here. Neither was it the manufacturer. Rather, Google merely provided the Android operating system to the manufacturer. It is established law that a CLRA claim cannot apply to the sale or licensing of software, as it is neither a "good" nor a "service." *In re iPhone*, at *10; *Ferrington v. McAfee, Inc.*, Case No. 10-CV-01455-LHK, 2010 WL 3910169, at *14 (N.D. Cal. Oct. 5, 2010).

In previous briefing, Plaintiffs have noted that courts have extended the CLRA "up the chain" to include manufacturers as well as the actual seller. But Google is **neither** the manufacturer nor the seller of the Plaintiffs' Android phones—the product on which Plaintiffs' CLRA claim is based. Google merely provided free software to those manufacturers and sellers (the Android operating system and bundled Google software Apps) and to Plaintiffs (to the extent any of them downloaded additional Google Apps). It is black letter law that, even if the provision of free software can constitute a sale, sale or licensing of software is not a "good or service" subject to the CLRA. The court in *In re iPhone*, 2011 WL 4403963 at *10, confronted this precise question, in exactly the same context. Indeed, it is impossible to imagine a less distinguishable case than one addressing the provision of the other leading mobile phone operating system, Android's direct competitor. Providing the software for a mobile phone does not bring the software provider under the CLRA, even if the Plaintiff could allege (and he has not) that he suffered "any damage" as a result of their purchase of those phones.

Neither can Plaintiffs avoid this result by arguing that any representation by Google caused them to purchase a defective "good or service." An Android phone is certainly a good, but Plaintiffs' claim is *not* that there is anything wrong with that device, or that it fails to operate as advertised. Their claim is that Google's operation of its *software* (the Android operating system and Google's Apps) does not conform with representations Google made concerning that software and its operation. The CLRA does not reach such claims, both because they concern software and because no Plaintiff purchased any of that software, which is all provided for free. For that reason as well, Plaintiffs' CLRA claim fails.

**C.     Plaintiffs' Other Claims Fail on the Merits**

**1.     Breach of Contract**

Plaintiffs have previously tried, and failed, to state a breach of contract claim based on Google's new Privacy Policy.  As this Court previously held, that claim fell apart when one read the *actual* terms of the contracts at issue:

> The policy plainly includes a provision for the commingling of PII across Google products. That provision states: "We may combine the information you submit under your account with information from other services."  In light of this express provision, it is not plausible to say that Google could be considered to have breached the contract.  Plaintiffs again have failed to state a claim.

Order 2 at 25 (internal footnote omitted).  Plaintiffs now reverse field, and attempt to base a breach of contract claim, on behalf of the disclosure subclass only, based on a different contract:  the 2008 Android Policy.  The new theory is that, by allegedly providing Plaintiffs' name, email address, and "coarse location" (i.e., zip code or foreign equivalent) to sellers of Apps on Google Play, Google has breached an alleged promise not to do so contained in the "Android-powered device privacy policy."[13]

This claim fails for multiple reasons.  *First*, it fails Article III analysis:  the sole allegation of harm is that the transmission of a few bytes of information (name, email address, and zip code), in the process of ordering and downloading an entire App, somehow taxes the user's battery life.  On its face, this claim is ludicrous:  as the Court noted in dismissing the prior Complaint, allegations of sporadic transmission of small amounts of information cannot satisfy Article III standing, citing *Hernandez v. Path, Inc.*, Case No. 12-CV-01515 YGR, 2012 WL 5194120 (N.D. Cal. Oct. 19, 2012), which alleged the uploading of the entire contents of the user's address book, but was nonetheless found *de minimis*.  Order 2 at 13.  By contrast, Plaintiffs here allege the transmission of nothing more than a few bytes of data to the sellers of a few Apps.  But more importantly, they do not allege that transmission *came from their*

---

[13] Plaintiffs attempted this argument without success in their prior complaint.  Now, just as then, they do not actually allege that any of their personal data was transmitted to App sellers (or anyone else), but rather only that such transmission had been "reported" in the press.  CSAC ¶ 136.  In response Google explained that the transmission of a purchaser's identity and rough location is an entirely ordinary and (in the case of sellers who much decide whether to charge VAT or other tax) required part of a commercial transaction.  Motion to Dismiss First Amended Complaint at 4, ECF No. 53.  Plaintiffs now omit their prior reference to the blog post from which their allegation was lifted, but replace it with no other factual basis.

*phones at all*.  Rather, to the extent the claim is articulated at all, it is that *Google Play* improperly transmits that information to App sellers—a claim that, even if true, does not implicate Plaintiffs' battery lives.  The allegedly improper transmission is from Google's servers to the App developers.

*Second*, Plaintiffs conveniently gloss over both whether and when they purchased (as opposed to downloaded for free) various apps.  The allegedly infringing disclosures are to *sellers* of Apps.  In their prior complaint, none of the Plaintiffs claimed to have *purchased* a single App, instead claiming only to have downloaded free Apps.  Plaintiffs now try to finesse this issue, stating that they each have "downloaded **and/or** purchased" Android applications.  CSAC ¶¶ 275 & 276 (emphasis added).  But in fact, of the six putative class representatives, only 2 now allege they have ever purchased an App via Google Play:  Plaintiffs Marti and McCulloch (one and two Apps, respectively).  *Id*. ¶¶ 162-167.  Moreover, neither of them identify *when* they purchased those Apps, and thus it is impossible to determine what privacy policy they allege governed those transactions.

*Third*, and dispositively, Plaintiffs once again based their breach of contract claim on a contract to which they are not parties.  Just as Mr. Nisenbaum, the Android App Disclosure Class purports to claim breach of the partially-quoted and unidentified 2008 Android Policy.  CSAC ¶¶ 128-144.  As set forth above, however, that document—even if it prohibited providing names, email addresses, and zip codes to App sellers, which it does not—is a document to which none of the Plaintiffs was ever a party, as it applied only to purchasers of Android phones prior to January 2010.  No Plaintiff claims to have purchased any Android device to which that policy applied.  *Id*. ¶¶ 25-31.

After alleging breach of specific terms in that document, to which none is a party, Plaintiffs then make passing reference to "various" other "policy documents" ("the Google Wallet privacy policy, the Google Play terms of service, . . . and the default Google privacy policy") (CSAC ¶ 277).  But they do not identify any term of any of those contracts they allege has been breached.  To the contrary, they expressly *disclaim* any breach of those contracts, admitting, for example, that "[t]he Google Play terms of service simply refer to the Google Wallet privacy policy; **no provision in the Google Play terms of service colorably relates to the arbitrary disclosure of personal information to third party app developers**."  *Id*. ¶ 131 (emphasis added).

In short, Plaintiffs point to no breach of any term of any contract to which they are party, and allege no harm flowing from any such breach.  Their contract claims fail again.

## 2. Intrusion on Seclusion

Next, Plaintiffs simply repeat their previously dismissed intrusion on seclusion claim, alleging—again—that "On or around March 1, 2012, Google began combining information" among its services, and that "Google did not seek or acquire the explicit consent of any Plaintiff" in doing so.  CSAC ¶¶ 183-184.  This Court has already expressly rejected this argument:

> Plaintiffs here allege that Google's PII commingling intruded upon their email, contact lists, web histories, and other secluded and private spaces.  According to Plaintiffs, this expectation was reasonable in light of the previous privacy policies, which assured Plaintiffs of the isolated use of their data.  But once again, the court does not find any expectation to be plausible in light of Google's earlier disclosure that it would commingle PII across products to support its advertising model.  Without a plausible expectation, Plaintiffs seclusion on intrusion claim cannot stand.

Order 2 at 29.

Nothing justifies changing that holding.  The only alleged agreement Plaintiffs add to this iteration of their complaint is the 2008 Android Policy.  But again, none of the Plaintiffs was or is a party to that agreement and nothing in that agreement precluded intermingling of data among Google applications in any case.  To the contrary, that agreement (before it was retired entirely) expressly incorporated by reference the same individual Privacy Policies this Court has already held *authorized* commingling between applications.  RJN Ex. 1 at 2.

Plaintiffs also attempt to piggyback their newfound claims of alleged disclosure of their names, email addresses, and zip codes into an intrusion claim.  But intrusion upon seclusion, just like any other invasion of privacy tort, requires conduct that would be "highly offensive to a reasonable person." *Hernandez v. Hillsides, Inc.*, 48 Cal. Rptr. 3d 780, 787 (2006), *rev'd on other grounds*, 47 Cal. 4th 272 (2009); *see also Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 36-37 (1994) (invasion of privacy rights must be "sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right.").

Plaintiffs have pled no such conduct, and cannot:  their claims are based on the allegedly improper sharing of basic address information that each of them freely shared with Google under

1   Google's prior policies.  As explained by the California Court of Appeal, information collected from

2   consumers for purposes of delivering advertising, even "without [consumers'] knowledge or permission,"

3   "is not an egregious breach of social norms, but routine commercial behavior."  *Folgelstrom v. Lamps*

4   *Plus, Inc.*, 195 Cal. App. 4th 986, 992 (2011).  Knowledge of such basic information as one's email

5   address or zip code can hardly be described as an intrusion "highly offensive to the reasonable person."

6   It is simply the modern analogue to the information we used to put on the *outside* of every letter, and

7   which was printed in the phone books given away to every home.  Indeed, it is less invasive, as the

8   former allowed anyone to locate one's home.  Simply put it is not information of such a personal nature

9   that its disclosure would shock the conscience.

10       And finally, just as Plaintiffs' other nonstatutory claims, the absence of any allegations of injury

11   deprives Plaintiffs of standing to bring this claim.

12                    **3.    Section 17200**

13       Plaintiffs once again bring Section 17200 claims:  one on behalf of the Android App Disclosure

14   Subclass on the theory that Google fraudulently represented that it would not share information with App

15   Developers, and a second on behalf of the Android Device Switch Subclass on what appears to be two

16   theories: that Google's alleged violation of the CLRA violated the "unlawful" prong of the UCL, and that

17   Google fraudulently concealed its intent to breach the Android Policy.  Once again, those claims fail.  To

18   begin with, they fail on their merits, as each rests on underlying CLRA and contract claims that

19   themselves fail, as set forth above.  In particular, they each rest on the counterfactual premise that any of

20   the Plaintiffs was ever a party to the 2008 Android Policy.

21       They also fail the "fraudulent" prong because they do not satisfy Rule 9(b).  They fail to allege

22   with particularity the particular statements Plaintiffs claim were false, when they heard or read them, how

23   they relied on them, or how they were breached.  After multiple rounds of briefing, the time is long past

24   for a clear statement of the allegedly fraudulent conduct.

25       Additionally, they fail because neither is based on a claim for lost money or property.  Under

26   California's UCL, a private person has standing to bring a UCL action only if he or she "has suffered

27   injury in fact **and** has lost **money or property** as a result of the unfair competition."  Cal. Bus. & Prof.

28   Code § 17204 (emphasis added).  In *Kwikset Corp. v. Superior Court*, the California Supreme Court held

that standing requires actual harm in the form of economic injury. *See Kwikset Corp. v. Superior Court* (*Benson*), 51 Cal 4th 310, 322 (2011) (requiring "loss or deprivation of money or property"). Plaintiffs here have not shown that they suffered any injury-in-fact, and they certainly have not pointed to any loss of money or property. Nor can they. The case law is clear that the loss of personal information cannot constitute lost money or property under the UCL. As the Court recently explained in *In re Facebook Privacy Litigation*, 791 F. Supp. 2d 705, 714 (N.D. Cal. 2011) (internal citation omitted):

> Here, Plaintiffs do not allege that they lost money as a result of Defendant's conduct. Instead, Plaintiffs allege that Defendant unlawfully shared their "personally identifiable information" with third-party advertisers. However, personal information does not constitute property for purposes of a UCL claim.

*See also Ruiz v. Gap, Inc.*, 540 F. Supp. 2d 1121, 1127 (N.D. Cal. 2008) (granting motion for judgment on the pleadings with respect to UCL claim, and rejecting plaintiff's arguments that "the theft of the laptops somehow constitutes a loss of property because his personal information was contained on the laptop," and noting that plaintiff has not "presented any authority to support the contention that unauthorized release of personal information constitutes a loss of property."); *Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855, 862-63 (N.D. Cal. 2011) (personally identifiable information obtained by hacker not "money" or "property" and not "lost"); *Thompson v. Home Depot, Inc.*, No. 07cv1058 IEG, 2007 WL 2746603, at *3 (S.D. Cal. Sept. 18, 2007) ("Plaintiff's . . . argument . . . that his personal information constitutes property under the UCL, is . . . unpersuasive and also rejected."); *Cf. In re Jetblue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 327 (E.D.N.Y. 2005) ("There is . . . no support for the proposition that an individual passenger's personal information has or had any compensable value in the economy at large.").

Plaintiffs will argue that at least Mr. Nisenbaum alleges loss of property. But as set forth above, there is no nexus between that alleged loss (buying a new phone) and the claimed offenses. Mr. Nisenbaum was never a party to the latest asserted contract, and thus cannot claim a loss flowing from a breach of that contract. And, as this Court has already held, none of the other contracts to which he was a party was breached at all.

Thus Plaintiffs' UCL claims must be dismissed as well.

1

        **D.    Additional Claims Pled Solely for Appellate Preservation**

2

        Plaintiffs also replead Counts VII through IX solely for the purpose of preserving them for

3

appeal.  As they simply repeat already-dismissed claims, they should be dismissed anew.

4

**III.    CONCLUSION**

5

        This case has gone on far too long.  Plaintiffs have bombarded this Court with hundreds of pages

6

of seriatim complaints, repeatedly switching theories and facts each time their claims are dismissed.

7

Those complaints are larded with scores of paragraphs of narratives of European privacy proceedings,

8

long-past FTC inquiries, irrelevant lawsuits, and lengthy retellings of equally irrelevant books and

9

newspaper articles.  But when it comes time to include the *relevant* facts, Plaintiffs demur.  Here, just as

10

in each prior pleading, Plaintiffs omit the most basic facts on which their claims rely:  the identity and

11

terms of contracts they claim are breached, the formation of those alleged contracts, the reliance they

12

claim, and even such basic facts as what devices and Apps they purchased, when, and from whom.

13

        This places an undue burden on Google, which is repeatedly required to figure out and locate

14

which documents Plaintiffs purport to rely on each time, place them before the Court, and then compare

15

the actual terms to Plaintiffs' imagined versions.  It also places an undue burden on the Court, which

16

must wade through hundreds of paragraphs (383 this time around) of scattershot narrative and irrelevant

17

invective to determine whether a claim may be hiding somewhere.  It is Plaintiffs' job under Rule 8 to

18

present the Court with a plain and concise statement of facts supporting their claims.  They now have had

19

four chances to do so (not counting the other complaints merged into the original case).  They have failed

20

repeatedly.  The CSAC should be dismissed with prejudice.

21

22

Dated:  February 21, 2014                                    DURIE TANGRI LLP

23

24                                                           By:  _____/s/ Michael H. Page_____
                                                                      MICHAEL H. PAGE
25                                                                    JOSHUA H. LERNER
                                                                      SONALI D. MAITRA
26
                                                                  Attorneys for Defendant
27                                                                GOOGLE INC.

28

1

### CERTIFICATE OF SERVICE

2        I certify that all counsel of record is being served on February 21, 2014 with a copy of this

3 document via the Court's CM/ECF system.

4

5

6                                                              */s/ Michael H. Page*
                                                        Michael H. Page
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28