**GARDY & NOTIS, LLP**
Mark C. Gardy
James S. Notis (*pro hac vice*)
Orin Kurtz (*pro hac vice*)
560 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337

**GRANT & EISENHOFER P.A.**
James J. Sabella (*pro hac vice*)
Diane Zilka (*pro hac vice*)
Kyle McGee (*pro hac vice*)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, California 94596
Tel:  925-300-4455
Fax:  925-407-2700


*Interim Lead Counsel for the Class*

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE, INC. PRIVACY POLICY LITIGATION | CASE NO. 12-CV-01382 PSG<br><br>**CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>**COMPLAINT FOR DAMAGES, EQUITABLE, AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Michael Goldberg, Pedro Marti, David Nisenbaum, Robert B. DeMars, Lorena Barrios, Nicholas Anderson, Matthew Villani, and Scott McCullough ("Plaintiffs"), by and through their attorneys, bring this class action complaint on their own behalf and on behalf of all others similarly situated, to obtain an injunction, damages, costs of suit, and attorneys' fees from defendant Google, Inc. ("Google").  Plaintiffs complain and allege, upon knowledge as to themselves and their acts, and upon information and belief, and investigation of counsel, as to all other matters, as follows:

## NATURE OF THE ACTION

1.     This is a nationwide class action against Google on behalf of all persons and entities in the United States that purchased at least one paid Android application through the Android Market and/or Google Play Store between February 1, 2009 and May 31, 2014 (the "Android App Disclosure Subclass").  This action previously asserted claims against Google on behalf of all persons and entities in the United States that acquired a Google account between August 19, 2004 and February 29, 2012, and continued to maintain that Google account on or after March 1, 2012, when Google's new privacy policy went into effect (Counts VI-IX), and such claims, though dismissed, are herein preserved for appeal.  Plaintiffs also asserted claims on a nationwide class basis against Google on behalf of all persons and entities in the United States that acquired an Android-powered device between May 1, 2010 and February 29, 2012, and switched to a non-Android device on or after March 1, 2012 (the "Android Device Switch Subclass") (Counts I-II), and such claims have been similarly dismissed and are herein preserved for appeal.

2.     Google is a technology and advertising company that provides free web-based products to billions of consumers across the globe.  Over one billion consumers use Google's search engine, google.com, each week; over 425 million consumers use Google's web-based email service, Gmail; and Google's video sharing site, YouTube, streams over 4 billion videos per day to consumers.

3.     Google's mobile platform, Android, is the most highly used platform in the world, with over 750 million activated Android-powered devices.  Android devices can utilize over one

million different apps, accessible for free or for a charge in Google Play (formerly known as Android Market). Over 50 billion Android apps have been downloaded by Android device users.

4. Google's advertising revenues are dependent upon its ability to deliver highly relevant, targeted advertisements that are tailored to a consumer's interests and online habits. In order to accomplish this, Google logs personal identifying information, browsing habits, search queries, responsiveness to ads, demographic information, declared preferences, and other information about each consumer that uses its products. Google's Gmail service also scans and discloses to other Google services the contents of Gmail communications. Google uses this information, including the contents of Gmail communications, to place advertisements that are tailored to each consumer while the consumer is using any Google product or browsing third-party sites that have partnered with Google to serve targeted ads.

5. Prior to March 1, 2012, information collected in one Google product was not automatically commingled with information collected during the consumer's use of other Google products. Thus, Google did not, for instance, ordinarily and automatically associate a consumer's Gmail account (and therefore his or her name and identity, his or her private contact list, or the contents of his or her communications) with the consumer's Google search queries or the consumer's use of other Google products, like Android, YouTube, Picasa, Voice, Google+, Maps, Docs, and Reader.

6. Google has always maintained a general or default privacy policy purporting to permit Google to "combine the information you submit under your account with information from other services." However, prior to the introduction of the new privacy policy on March 1, 2012, this statement was qualified, limited, and contradicted in privacy policies associated with specific Google products, including both Gmail and Android-powered devices. The privacy policies associated with Android-powered devices, for example, specified that, although the default terms would be applicable, "Certain applications or features of your Android-powered phone may cause other information [that is, other than certain delimited "usage statistics"] to be sent to Google *but in a fashion that cannot be identified with you personally*" and that "[y]our device may send us location

information (for example, Cell ID or GPS information) *that is not associated with your [Google] Account*."   These categories of information, and certain other discrete categories of Android user information identified and discussed in more detail below, by the terms of the Android-powered device policy in effect prior to March 1, 2012 could affirmatively *not* be "combine[d] … with information from other services" (quoting Google general privacy policy).

7.   The major change that occurred on March 1, 2012 was that all of those standalone privacy policies governing Google's relationship with users of specific products (including Android and Gmail) were eliminated, meaning that the default policy's terms, including that which purports to permit Google to combine information across product platforms, now replaced any contradictory language in specific product policies.

8.   This overhaul of Google's privacy practices, including the elimination of any privacy policies that limited Google's ability to commingle user data across different product platforms, was prompted by Google's desire to reinvent itself as a social-media advertising company.   Under increasing pressure from competitors, especially Facebook, as well as from advertisers, to integrate a substantial social media component to the Google interface (including all Google products, such as search, YouTube, Picasa, Gmail, and Android), Google executives decided, in May 2010, to redesign Google from the ground up.   Rather than limiting the social media dimension to a standalone social network (which was, nevertheless, in the works in May 2010, and was eventually released as Google+), Google executives decided to reformulate existing Google products as social media products.   Thus, for example, YouTube would no longer be simply a video delivery service, but a "smart" video delivery service capable of understanding the kind of content a given user might be interested in based on prior usage of the service and contact with other users, whose preferences and viewing habits are similarly known to YouTube, while sharing opinions and preferences between users would become seamlessly integrated in the YouTube experience.

9.   Google executive Vic Gundotra spearheaded this all-encompassing social-mediatization of Google based on a plan he presented to CEO Larry Page and other executives in May 2010.   The plan was called "Emerald Sea" and it entailed leveling all existing barriers between

distinct Google properties. The "ambitious" Emerald Sea project presupposed the sharing and commingling of user data across Google platforms; thus, elimination of any privacy protections for users as provided in specific Google product privacy policies was a requirement for realizing the project. Since that time, Google has unrolled several new products that began as confidential Emerald Sea projects, including the Google+ social network and the +1 endorsement mechanism. Crucially, the March 1, 2012 elimination of product-specific privacy policies and introduction of a single, unified policy governing all Google products was a piece of the larger Emerald Sea puzzle.

10.     Also in May 2010, Google executives, including CEO Page, made a conscious decision to withhold from the public information pertaining to the Emerald Sea plan, including Google's intention to violate all existing privacy policies that placed any limitations on Google's ability to combine information across platforms by doing precisely that, once Emerald Sea became a reality. Google allowed new users of those products – including Android – to form a business relationship with Google in and after May 2010, *fully intending not to honor the privacy policies at the base of such relationships*. The Emerald Sea redesign dictated that any and all limitations on Google's ability to combine user data across product platforms had to be eliminated, and on March 1, 2012, they were eliminated.

11.     The "simpler, more intuitive Google experience" touted by Google in its description of the new unified privacy policy comes at a tremendous cost to the privacy interests and the legal rights of Google's users, as explained in more detail herein. Following Google's introduction of the unified privacy policy, Google now uses detailed and highly specific, highly sensitive personal information gathered from multiple product platforms, including various forms of activity and location data culled from Android devices as well as the contents of Gmail communications, to optimize search results and, thus, Google's ability to display targeted ads when that consumer uses the google.com search engine or other Google products that employ querying, or when that consumer visits third-party sites that have partnered with Google in its advertising networks.

12.     The new privacy policy thus results in the commingling of user data without consumers' consent (where a specific privacy policy limited Google's ability to commingle user data

across its product platforms), and it no longer allows consumers to keep the personal information and communications contained on one Google service separate from information gathered about the consumer by other Google services, even where consumers were told by Google that they would be able to keep this information separate (or anonymous).  By implementing the new privacy policy, Google violated all of its prior privacy policies that limited Google's ability to commingle user data across platforms and rendered them misleading because they stated that Google would not utilize certain information provided by a consumer in connection with his or her use of that particular product, with any other product, for any reason, without the consumer's explicit consent (or, in some cases, without even allowing itself this consent-based access).

13.   Google's display advertising revenue is second in the United States only to Facebook. Facebook garners a larger market share of display advertising revenue because consumers that use Facebook set up, manage, maintain, and populate personal profiles with very specific information about themselves.  This allows Facebook to deploy a more complete picture of the individual to most effectively target advertisers' messages only to qualified consumers, providing advertisers the best return on their investments, using information each consumer willingly supplies to Facebook.

14.   Unlike Facebook, a holistic view of each consumer was previously unavailable to Google, precisely because Google could not integrate all user data, and because the integration that it did perform was not automatic and total but partial.  Before implementing the new privacy policy, Google could not easily target consumers for advertising because Google used bits and pieces of often anonymous information garnered from each discrete Google service, which had more than 60 distinct privacy policies.  But as early as May 2010, Google intended to correct this information asymmetry (vs. Facebook) by systematically commingling user data across the entire Google universe.  The March 1, 2012 privacy policy overhaul is the direct outgrowth of Emerald Sea, a necessary legal condition for effectuating Google's long-held designs on constructing staggeringly detailed images or profiles of individual users.  Until the initial notices alerting users to the impending March 2012 unification of the privacy policy (made public on January 24, 2012), Google did not so much as publicly hint, let alone adequately disclose, that it intended to commingle *all* user

data across distinct platforms, including Android, Gmail, YouTube, Maps, Docs, Reader, Picasa, Voice, and search and general web browsing, *even where existing specific privacy policies forbid such commingling*, in order to create a digital dossier exceeding even Facebook's profiles in granularity of detail to maximize its advertising revenues.  Indeed, Google executives consciously decided in May 2010 to keep this information from the public, though they knew for certain that Google would not be honoring its existing privacy policies, to the extent they limited Google's ability to commingle user data, when the time came to unroll certain elements of Emerald Sea.

15.     Thus, Google's new privacy policy – and the social media redesign of Google as a whole – is nothing more than Google's effort to garner a larger market share of advertising revenue by offering targeted advertising capabilities that compete with or surpass those offered by social networks, such as Facebook, where all of a consumer's personal information is available in one site.

16.     Users of Google's immensely popular Android mobile operating system – which is pre-loaded on millions of devices including smartphones, tablets, digital assistants, and similar devices – have suffered many violations of their privacy interests and other injuries, as explained in more detail below.  Google requires that users of Android devices create an account to access Google Play (formerly known as the Android Market), which is the primary service through which Android users purchase or otherwise acquire apps for their devices.  Once such an account is created, the Android user is *permanently* "logged in."  Prior to March 1, 2012, Google agreed that it would not commingle certain information (*e.g.*, location data, activity conducted on non-Google products or applications) acquired via Android devices with other information maintained by Google, as alleged above and as set forth in more detail below.  Following March 1, 2012, however, each and every action taken on the device is recorded and aggregated with that user's other Google accounts, including their Gmail, YouTube, Picasa, Google+, Maps, Docs, and other accounts.  There is no way to opt out of this practice, and many users have voiced their disapproval of Google's treatment of Android users in this regard.  Indeed, some reports state that the March 1, 2012 privacy policy unification had Android users at "ground zero."  ("How Google's privacy policy changes will affect Android," ITWorld.com, Jan. 25, 2012.)  For example, Plaintiff Nisenbaum owned and used an

1   Android device before and after March 1, 2012, but subsequently ceased using the device and

2   acquired an Apple device in its place in substantial part because of Google's invasive practices.

3   Switching from an Android device to another comparable device is costly to consumers.   That

4   burden should be borne by Google rather than consumers.

5          17.     To make matters worse, since approximately February 1, 2009, Google has subjected

6   Android device users to yet another injury by secretly disclosing to third-party application

7   developers certain sensitive personal information of users that purchase applications through Google

8   Play, without such users' authorization or consent.   Indeed, until approximately May 31, 2014,

9   Google caused this disclosure to occur automatically and without even notifying Android users that

10  it is occurring, each and every time they purchase an Android application through Google Play.   The

11  disclosed information includes at least the name, email address, and physical or geographical

12  location associated with the Google account and/or Android device.   This unauthorized disclosure

13  subjects every affected Android app purchaser to a substantially increased, unexpected, and

14  unreasonable risk of further interception or dissemination of their personal information as well as of

15  harassment and even a non-trivial likelihood of identity theft given Google's low barrier to the entry

16  of app developers to the Play market (namely, a $25 fee).

17         18.     Further, Android device users that purchase paid applications were, during the

18  February 1, 2009 to May 31, 2014 time period, made to carry the burden of involuntarily

19  transmitting this additional data to third parties, in the form of depleted device battery power and

20  extra bandwidth consumed by the device.   As courts have recognized, device battery power and

21  bandwidth are not free but must be paid for by individual users.   All Android device users that have

22  purchased at least one paid application through Google Play have therefore been injured in a

23  measurable and quantifiable manner by Google's practice of requiring the disclosure of certain

24  personal information of those users to third parties, in contravention of Google's privacy policy.

25  Moreover, because most Android users purchase multiple apps, these unlawful transmissions and the

26  consumption of finite resources, like bandwidth and battery power, occur repeatedly and

27  systemically.

28

1    19.    Accordingly, contrary to Google's previous privacy policies and contrary to

2   Plaintiffs' and other users' agreements with Google at the time their accounts were created and/or at

3   the time they acquired Android-powered devices, Google is now aggregating such users' personal

4   information without their explicit consent, including categories of information previously off-limits

5   to Google's commingling practices; is disclosing the contents of users' Gmail communications to

6   other services and products as well as independent third parties for advertising purposes; is driving

7   Android device users to switch to non-Android devices because of these invasions of user privacy

8   interests; has, for the February 1, 2009 to May 31, 2014 time period, disclosed certain personal

9   information of Android device users to third-party application developers, subjecting such users to

10   heightened and unexpected risks as well as consuming additional battery power and bandwidth in the

11   process; and has failed to provide a simple, effective opt-out mechanism by which these harms can

12   be avoided.  Consumers are entitled to damages and injunctive relief as a result.

13                              **JURISDICTION AND VENUE**

14    20.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this

15   action arises under federal statutes, namely the Federal Wiretap Act, 18 U.S.C. § 2511, and the

16   Stored Communication Act, 18 U.S.C. § 2701.  This Court has jurisdiction over the remaining

17   claims pursuant to 28 U.S.C. § 1367.  Furthermore, this Court has jurisdiction over this action

18   pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because the aggregated claims of the

19   individual Class members exceed the sum or value of $5,000,000, exclusive of interests and costs,

20   and this is a class action in which more than two-thirds of the proposed plaintiff Class, on the one

21   hand, and defendant Google, on the other, are citizens of different states.

22    21.    This Court has jurisdiction over Google because it maintains its principal

23   headquarters in California; is registered to conduct business in California; has sufficient minimum

24   contacts in California; or otherwise intentionally avails itself of the markets within California

25   through the promotion, sale, marketing, and distribution of its products and services to render the

26   exercise of jurisdiction by this Court proper and necessary.  Moreover, Google's wrongful conduct

27   (as described herein) emanates from California and foreseeably affects consumers in California.

28

1  Most, if not all, of the events complained of below occurred in or emanated from Google's corporate

2  headquarters located in Mountain View, California.

3        22.    Venue is proper in this District under 28 U.S.C. § 1391(a) because Google resides in

4  this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred

5  in this District.

6        23.    Venue is also proper in this Court because Google's User Agreement provides:

7      The laws of California, U.S.A., excluding California's conflict of laws rules, will
    apply to any disputes arising out of or relating to these terms or the Services. All

8      claims arising out of or relating to these terms or the Services will be litigated
    exclusively in the federal or state courts of Santa Clara County, California, USA,

9      and you and Google consent to personal jurisdiction in those courts.

10  *Available at* http://www.google.com/intl/en/policies/terms/.

11                                    **THE PARTIES**

12        24.    Plaintiff Michael Goldberg ("Goldberg") is an Ohio resident. Goldberg purchased an

13  HTC EVO device, an Android-powered mobile device, in or about September of 2010, and

14  continued to use this device through approximately October 2012. In or about October of 2012,

15  Plaintiff Goldberg purchased a Samsung Galaxy Nexus, an Android-powered mobile device, and

16  continued to use this device through approximately November of 2013. In or about November of

17  2013, Plaintiff Goldberg purchased an HTC One, an Android-powered mobile device, and continues

18  to use this device as of the date of filing of this complaint. Plaintiff Goldberg purchased several paid

19  applications through Google Play using each of these three devices during the February 1, 2009 to

20  May 31, 2014 time period. Plaintiff Goldberg has purchased over 40 paid applications through

21  Google Play during this period.

22        25.    Plaintiff Pedro Marti ("Marti") is a New York resident. Marti acquired his Gmail

23  account on September 14, 2004, and continued to maintain his Gmail account on March 1, 2012.

24  Like all members of the Class, Google aggregated Marti's personal information without his consent.

25  Plaintiff Marti purchased an HTC G2, an Android-powered mobile device, in or about January of

26  2011, and continued to use it on or after March 1, 2012, and uses it still.

27

28

1    26.    Plaintiff David Nisenbaum ("Nisenbaum") is a New York resident.   Nisenbaum

2    acquired his Gmail account in or about June of 2010, and continued to maintain his Gmail account

3    on March 1, 2012.   Like all members of the Class, Google aggregated Nisenbaum's personal

4    information without his consent.   Furthermore, Plaintiff Nisenbaum purchased an Android-powered

5    HTC mobile device in or about June 2010 and continued to own and use that mobile device on or

6    after March 1, 2012.  Like all Android device users, Plaintiff Nisenbaum could not prevent Google's

7    aggregation of his personal information (including categories of information expressly excluded by

8    the Android-powered device privacy policy from Google's commingling practices) without

9    purchasing a new mobile device that is not powered by Android.  In or about May 2012, Plaintiff

10   Nisenbaum ceased using his Android device and purchased an alternative mobile device that was not

11   powered by Android, in substantial part because of his concern for the privacy of his personal

12   information.  Had Google disclosed in June 2010 that it did not intend to honor the commitments it

13   made to protect Android users' privacy, as set forth in the Android-powered device privacy policy

14   discussed in more detail below, Plaintiff Nisenbaum would not have purchased his Android device

15   in June 2010.

16   27.    Plaintiff Robert B. DeMars ("DeMars") is a California resident.  DeMars acquired his

17   Gmail account in or about May of 2011, and continued to maintain his Gmail account on March 1,

18   2012.  Like all members of the Class, Google aggregated DeMars' personal information without his

19   consent.  Plaintiff DeMars purchased an LG Optimus, an Android-powered mobile device, in or

20   about May of 2011, and continued to use it on or after March 1, 2012.  Plaintiff DeMars purchased a

21   Samsung Galaxy II, another Android-powered mobile device, thereafter, and uses it at present.

22   Plaintiff DeMars has purchased at least one Android application through Google Play, on both his

23   LG Optimus and his Samsung Galaxy II.

24   28.    Plaintiff Lorena Barrios ("Barrios") is a California resident.   Barrios acquired her

25   Gmail account in or about February of 2012, and continued to maintain her Gmail account on March

26   1, 2012.  Like all members of the Class, Google aggregated Barrios' personal information without

27

28

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT                                10
CASE NO. 12-CV-01382 PSG

her consent.  Plaintiff Barrios purchased a Verizon HTC mobile device powered by Android in or about February of 2012, and continued to use it on or after March 1, 2012, and uses it still.

29.    Plaintiff Nicholas Anderson ("Anderson") is a California resident.  Anderson acquired his Gmail account in or about June of 2005, and continued to maintain his Gmail account on March 1, 2012.  Like all members of the Class, Google aggregated Anderson's personal information without his consent.  Plaintiff Anderson purchased a Samsung Nexus S, an Android-powered mobile device, in or about May of 2011, and continued to own that mobile device on or after March 1, 2012, and uses it still.

30.    Plaintiff Matthew Villani ("Villani") is a New Jersey resident.  Villani acquired his Gmail account in 2007, and continued to maintain his Gmail account on March 1, 2012.  Like all members of the Class, Google aggregated Villani's personal information without his consent.  Plaintiff Villani purchased a Droid X, an Android-powered mobile device, in or about September of 2010, and continued to own that mobile device on or after March 1, 2012, and uses it still.

31.    Plaintiff Scott McCullough ("McCullough") is a New Jersey resident.  McCullough acquired his Gmail account in 2011, and continued to maintain his Gmail account on March 1, 2012.  Like all members of the Class, Google aggregated McCullough's personal information without his consent.  Plaintiff McCullough purchased a Casio G'zOne Commando, an Android-powered mobile device, in or about July of 2011, and continued to own that mobile device on or after March 1, 2012, and uses it still.  Plaintiff McCullough has purchased at least one Android application through Google Play.

32.    Google is a Delaware corporation with its principal place of business located at 1600 Amphitheatre Parkway, Mountain View, California 94043.  At all times relevant hereto, Google was a multinational, publicly held internet technologies corporation.  Google owns, services, and develops internet-based services and products.  Google was first incorporated as a privately held company on September 4, 1998, with its initial public offering to follow on August 19, 2004.  Google consumers do not pay money to use Google's services and products.  Instead, Google's primary business model is advertising, which constituted over 95% of Google's profits last year.

**PLAINTIFFS' CLASS ALLEGATIONS**

33.     Plaintiffs originally sought to bring this case as a nationwide class action on behalf of themselves  and all others similarly situated in the United States as members of the proposed Class, defined as follows:

> All persons and entities in the United States that created an account on any Google product platform, the privacy policy for which provided any limitations on Google's ability to combine personal information provided in connection with that account with information provided to Google in connection with other accounts, between August 19, 2004 and February 29, 2012, and continued to maintain that account on or after March 1, 2012.

34.     Plaintiffs also sought to represent a nationwide subclass of individuals situated similarly to Plaintiff Nisenbaum (*i.e.*, the "Android Device Switch Subclass"), defined as follows:

> All persons and entities in the United States that acquired a device powered by Android between May 2010 and February 29, 2012, continued to own that device on or after March 1, 2012, and switched to a non-Android device on or after March 1, 2012.

35.     Plaintiffs currently seek to represent a nationwide subclass of individuals situated similarly to Plaintiffs Goldberg, DeMars, and McCullough (*i.e.*, the "Android App Disclosure Subclass"), defined as follows:

> All persons and entities in the United States that purchased at least one paid Android application through the Android Market/Google Play Store between February 1, 2009 and May 31, 2014.

36.     Excluded from the Class, the Android Device Switch Subclass, and the Android App Disclosure Subclass are all claims for wrongful death, survivorship and/or personal injury by Class, Android Device Switch Subclass, or Android App Disclosure Subclass members.  Also excluded from the Class, Android Device Switch Subclass, and Android App Disclosure Subclass is Google, any entity in which Google has a controlling interest, and its legal representatives and successors.

**NUMEROSITY**

37.     The Class is so numerous that joinder of all of its members is impractical.  Upon information and belief, Google has provided products and services to millions of consumers in the United States, and there are millions of devices powered by Android.

1    38.    Although the precise number of Class and Subclass members and their addresses

2    and/or email addresses is unknown to Plaintiffs, that information is readily ascertainable from

3    Google's records.  Class and Subclass members may be notified of the pendency of this action by

4    mail, email, or internet publication, supplemented (if deemed necessary or appropriate by the Court)

5    by published notice.

6                        **COMMON QUESTIONS OF LAW AND FACT**

7    39.    Common questions of law and fact exist as to all Class and Subclass members.  These

8    questions predominate over questions affecting only individual Class and Subclass members.  These

9    common legal and factual questions include but are not limited to the following:

10        a.    Whether Google placed limits on its ability to combine information provided by users

11   in connection with one account with information provided by users in connection with other

12   accounts, and violated such limits in unrolling the unified privacy policy on March 1, 2012 or at any

13   time prior thereto;

14        b.    Whether, as of May 2010, Google fraudulently intended not to honor its Android (or

15   any other) privacy policies in effect at that time, by devising a plan in which Google would eliminate

16   all existing limitations on its ability to commingle or combine information across product platforms,

17   including Android;

18        c.    Whether Google deceptively claimed that it would seek the consent of consumers

19   before using their personal information for a purpose other than that for which it was collected, in

20   breach of its contracts with its users;

21        d.    Whether Google misrepresented the ability of consumers to exercise control over

22   their personal information, in breach of its contracts with its users;

23        e.    Whether Google's practice of sharing users' personal information, including the

24   contents of users' electronic communications, that was provided to one service or product (such as

25   Gmail) with different services or products (such as google.com search, Picasa, YouTube, Voice,

26   Google+, etc.) constitutes a violation of federal privacy statutes;

27

28

f.      Whether the fact that independent third party entities are used by Google to cross-pollinate users' personal information across multiple services or products constitutes a violation of federal privacy statutes;

g.      Whether Google violated its previous privacy policies by merging data across products and services without consumers' explicit consent, in breach of its contracts with its users;

h.      Whether Google's opt-out practices for its new privacy policy are deceptive and misleading;

i.      Whether consumers can effectively opt out of Google's new privacy policy;

j.      Whether Android users can effectively opt out of Google's new privacy policy;

k.      Whether Google should provide an opt-in measure for its new privacy policy;

l.      Whether Plaintiffs and the Class, Android Device Switch Subclass, and Android App Disclosure Subclass are entitled to injunctive relief;

m.      Whether Android Device Switch Subclass members are entitled to the cost of purchasing a new, non-Android powered device;

n.      Whether Android App Disclosure Subclass members are entitled to remuneration for their losses associated with device battery power and bandwidth consumed without their authorization in transmitting certain personal information to third-party application developers; and

o.      Whether Plaintiffs and the Class, the Android Device Switch Subclass, and the Android App Disclosure Subclass are entitled to damages, costs of suit, and attorneys' fees.

## TYPICALITY

40.     Plaintiffs' claims are typical of the claims of the Class and Subclasses.  Plaintiffs and each member of the proposed Class created one or more Google accounts between August 19, 2004 and February 29, 2012, and continued to maintain those Google accounts after March 1, 2012; each member of the Android Device Switch Subclass acquired a device powered by Android between May 2010 and February 29, 2012, continued to own that device on or after March 1, 2012, and acquired an alternative, non-Android device on or after March 1, 2012; and each member of the

Android App Disclosure Subclass purchased at least one paid Android application through Google Play on an Android device between February 1, 2009 and May 31, 2014.

41. In connection with their respective use of Google products, Plaintiffs and each Class and Subclass member were subject to the same disclosures and agreed to the same privacy policies or terms and conditions existing at the time they began using Google products.

42. Google has used Plaintiffs' and all Class and Subclass members' personal information without their consent, inconsistent with Google's affirmative representations and/or without adequate disclosure to users, and to Google's financial benefit. Plaintiffs and all Class and Subclass members have suffered injuries as set forth below in the section titled, "Plaintiffs' Injuries Resulting from Google's Privacy Overhaul," and sustained damages as a result, including losses directly caused by Google's actions as alleged herein.

## ADEQUACY OF REPRESENTATION

43. Plaintiffs can and will fairly and adequately represent and protect the interests of the Class and Subclasses, and have no interests that conflict with or are antagonistic to the interests of the Class and Subclasses. Plaintiffs have retained attorneys competent and experienced in class action litigation.

## SUPERIORITY

44. A class action is superior to any other available method for the fair and efficient adjudication of this controversy, since, as demonstrated above, common questions of law and fact overwhelmingly predominate over any individual questions that may arise.

45. The prosecution of separate actions by individual members of the Class and Subclasses would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Google, or adjudication with respect to individual members of the Class and Subclasses which would, as a practical matter, be dispositive of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

1    46.    Google has acted or refused to act on grounds generally applicable to all Class and

2    Subclass members, thereby making appropriate any final judgment with respect to the Class and

3    Subclasses as a whole.

### SUBSTANTIVE ALLEGATIONS

**Google's Business Model**

**A.  General Background**

7    47.    Google is a technology and advertising company that provides free web products to

8    consumers.  Google's products are globally pervasive and have become staples of society.

9    48.    Although Google does not charge consumers to use its many products, Google's

10   revenues are staggeringly high.  The company produces revenue primarily by selling advertising to

11   other businesses.  In 2011, Google's revenues were $37.91 billion, approximately 95% of which

12   ($36.53 billion) came from advertising.  In 2012, Google's revenues increased to $46.04 billion,

13   approximately 95% of which ($43.69 billion) came from advertising.

14   49.    Before Google's implementation on March 1, 2012 of the new privacy policy, each

15   Google product was governed by a separate privacy policy that described the permissible uses to

16   which Google may put personal information collected during the use of each specific product.

17   Google also maintained a general privacy policy that provided default terms, from which individual

18   product policies could deviate.  The general privacy policy purported to allow Google to "combine

19   the information you submit under your account with information from other services."  However,

20   prior to the introduction of the new privacy policy on March 1, 2012, this statement was contradicted

21   in privacy policies associated with specific Google products, including both Gmail and Android-

22   powered devices.  Terms from both the general and specific policies that are relevant to this action

23   are described below, in the section titled "Conflicting Terms in Privacy Policies Prior to March 1,

24   2012."

25   50.    Because its products generate substantial web traffic, the ads Google is paid to host

26   are valuable to advertisers.  Although competitors, such as Microsoft and Yahoo!, offer similar ad

placement within most of their products (such as bing.com or yahoo.com), Google remains the most popular – and most profitable – purveyor of search-related ads.

51.     To maintain its industry position, Google is constantly enhancing its ability to target relevant ads to precisely those consumers most likely to make a purchase from the advertiser.

**B.  Google.com**

52.     Google's well-known and globally utilized search engine is google.com.  It dominates the search engine industry, representing over 65% of Internet searches in the United States.  Over one billion consumers use google.com each week.  According to Alexa, a web statistics company, google.com is the most heavily-trafficked website on the Internet.

53.     A consumer must set up a Google account to use many of Google's products.  On all google.com searches, users will see targeted ads at the top and side of their search results.  If the user is not signed in to any Google account while making the search, Google displays ads related to the terms searched; if the user is signed in to a Google account, Google draws not only on the terms searched but also on the user's history of google.com searches and activity on other Google products to determine which ads are most likely to generate a sale for the advertiser, and displays those ads.

**C.  Gmail**

54.     Gmail is Google's widely used web-based email service that has been available since 2004.  It allows consumers to send and receive emails, chat with other consumers through Google Chat (Google's instant messaging service), and stores consumers' email messages, contact lists, calendar entries, and other information on Google's servers.  When viewing a message on Gmail, targeted advertisements appear at the top and side of each message.  The ads that appear while viewing a mailbox on Gmail, rather than a specific message, are determined with reference to the content of the mailbox being viewed.  The ads that appear while viewing a message on Gmail are determined with reference to the content of the specific email message being viewed.  Gmail scans the contents of all messages to determine which ads to display.

55.     Through the use of certain computer systems, applications, and/or code that are unrelated to the provision of the Gmail service (*i.e.*, to the provision of the capacity to send and

1    receive email, store email messages, maintain contact lists and calendars), Google exports portions

2    of users' personal information from Gmail, including the contents and/or data derived from the

3    contents of users' Gmail communications, for use in other Google products and for use in

4    advertising on third-party sites that have partnered with Google in advertising networks.

5         56.    This cross-pollination is achieved through independent third party entities that

6    "process" and are thus exposed to users' personal information, including the contents of their Gmail

7    communications.  The Gmail platform has in place an automatic mechanism that routes incoming

8    and outgoing messages contemporaneously to such third parties – not, or not only, to facilitate the

9    transmission of such messages, but to distribute portions or derivations of the contents of Gmail

10   communications to other Google services for use in those other services and in advertising on third-

11   party websites that have partnered with Google in advertising networks.  This automatic routing

12   mechanism is unrelated to the provision of the Gmail service (*i.e.*, to the provision of the capacity to

13   send and receive email, store email messages, maintain contact lists and calendars).

14        **D.  Google+**

15        57.    Google+ is Google's web-based social network where a consumer can set up a

16   personal profile and share photos, links, videos and text with friends.  Google+ was unrolled

17   publicly in June 2011, but began as a part of an expansive plan, dating to at least May 2010, to unify

18   all user data across all Google platforms and products in order to create a highly personalized, and

19   highly marketable, dossier on individual users.  This project, called "Emerald Sea," is described

20   below in the section titled, "Emerald Sea: May 2010."

21        58.    Google+ was intended by Google to compete with Facebook.  However, Google+ is

22   not as widely used by consumers and is less popular than Facebook.  Google claims that Google+

23   has over 540 million active users, as of December 2013 (Facebook claims to have over one billion

24   active users).  Users must provide their real name and gender when signing up (very recent policy

25   changes permit use of established pseudonyms and a degree of user control over publicity of gender

26   identity).  Google suspends accounts that use pseudonyms not regarded as "established" by Google.

27   Like other Google products, targeted advertisements appear across Google+.  Google+ thrives on the

28

"+1" concept, by which Google+ users could indicate that they liked a particular website, ad, product, or brand.  Google then serves targeted ads to different users indicating that others they know have declared a preference for that website, ad, product, or brand by clicking "+1."

59.     Google+ is rapidly growing thanks to Google's integration of its many privacy policies and its new practice of linking product platforms.  Google+ is now ahead of major social networking and microblogging services like Twitter and LinkedIn in terms of user activity, and behind only Facebook.  As GlobalWebIndex reports (in commentary, January 28, 2013), "[T]he social media landscape is becoming an oligopoly with the big 3 (Facebook, Google and Twitter) dominating on a global scale due to their level of integration throughout the web.  This is a fundamental reason why Google+ has been so quick to grow.  *It links together and increasingly enhances all of Google's other products from Android to Gmail to Search in a way that builds a complete digital experience for the user and works as a social layer, not just a network.*"

**E.  YouTube**

60.     YouTube is a video sharing site that Google purchased in 2006, where consumers can stream videos of interest to them.  According to Alexa, YouTube is the third most heavily-trafficked website on the Internet.  YouTube serves over 4 billion videos to consumers per day.  Like other Google products, targeted advertisements appear across YouTube.  As of November 6, 2013, in order to comment on YouTube videos, YouTube users must be signed in to their Google+ accounts.

61.     According to GlobalWebIndex's recent research, YouTube is the third most popular social networking site on the internet, after Facebook and Google+.

**F.  Maps**

62.     Google Maps allows consumers to view satellite images of locations all over the world, plan routes for traveling by foot, car, or public transport, and has a GPS-like service that tracks the consumer's location.  Like other Google products, targeted advertisements appear across Google Maps.

**G.  Android and Google Play**

63.     Google's Android operating system was developed by Android, Inc., which Google acquired in 2005.   Google partners with and licenses the use of Android to manufacturers of smartphones, tablets, digital assistants, and similar mobile devices, who pre-load such devices with the Android operating system.   Android is the world's most widely used smartphone platform: as of late 2013, it enjoys more than 75% of worldwide smartphone market share (and over 50% of US market share), with over 750 million devices activated.   Google examines and certifies the compliance with Google's standards of each device that manufacturers seek to load with Android.

64.     Google Play, formerly known as the Android Market, is the primary gateway for Android users to acquire, purchase, and download apps and other digital media for their Android devices.   Google Play is operated by Google.   Over 1 million apps are available through Google Play, and over 50 billion apps have been downloaded through Google Play, as of July 2013.   More than 200,000 such apps cost money to purchase, while other apps are free to download and require no purchase.   Payments for paid apps are processed through Google Wallet (formerly Google Checkout), which has access to Android users' payment information.

65.     Android device users must create an account to access Google Play, or, indeed, to do anything other than make voice phone calls and use default apps.   Once an account is created, all activity on the device, from web surfing and search query histories to app and media acquisition and usage, is recorded because users are permanently logged in.

66.     However, as explained below, Google's Android-powered device privacy policy that existed before March 1, 2012 limited the categories of information that Google could combine with the device owner's other Google accounts.   After Google's introduction of the new privacy policy on March 1, 2012, the totality of an Android device user's activity and personal information is aggregated with all of that user's other Google accounts in one comprehensive profile, so that such activity and personal information can be deployed in targeting ads to the user.

67.     Google also causes certain personal information of every Android user that purchases an Android application through Google Play to be disclosed to the developer of the application purchased.   This disclosure occurs without the consent, authorization, or indeed the knowledge of

the Android user.  No notice is provided that the user's personal information is being or has been disclosed to a third-party application developer, but several such developers have publicized this fact.  No terms of service or privacy policy, or other policy, related to the relationship of Google to Android users permits Google's surreptitious disclosure of personal information to third party app developers.  The Android-powered device privacy policy specifically states that the only reason personal information would be disclosed is for "billing related tasks," but the disclosures at issue clearly do not relate to any "billing" tasks.  The personal information so disclosed includes at least the name, email address, and physical or geographical location associated with the Play account and/or the Android device used to download the application; it does not include any payment information.

68.     The involuntary disclosure of such information to third-party application developers is triggered by an electronic transmission of data that consumes device battery power and bandwidth in measurable quantities, and recurs each and every time an app is purchased.  Both of these (battery power and bandwidth) are commodities purchased by Android device users, not resources freely available in infinite supply.

## H.  Other Products

69.     Google also offers dozens of other products and services.  Google Voice (formerly GrandCentral) is a telecommunications service for PC-to-phone or PC-to-PC calling as well as video calling.  Google Docs (also known as Drive) allows consumers to create and edit documents online while collaborating in real-time with other consumers.  Google Blogger is Google's weblog publishing tool that allows consumers to share text, photos, and video.  Picasa is Google's photo sharing tool that allows consumers to edit, post, and share digital photos.  Targeted advertisements appear while consumers are using these products as well.

70.     Google engages independent third-party entities to process user information and to distribute it across its various product platforms.

71.     Each Google product logs and keeps track of different categories of information about the consumer.   The following categories of personal information are collected by the various products.  This list is not exhaustive:

- the consumer's first and last name;

- the consumer's home or other physical address (including street name and city or town);

- the consumer's current, physical location;

- the consumer's email address or other online contact information (such as a consumer's identifier or screen name);

- the consumer's IP address;

- the consumer's telephone number (including home and mobile telephone numbers);

- the consumer's list of contacts;

- the contents of consumers' Gmail messages (incoming, outgoing, and stored);

- the consumer's search history from Google's search engine and other query-based platforms, including YouTube;

- the consumer's web surfing history from cookies Google places on consumers' computers and other devices;

- the consumer's responsiveness to advertisements;

- all Android device activity, including app and media acquisition and usage; and

- all of the consumer's Google+ posts and "+1" usage across the internet.

**Google vs. Facebook: Background**

72.     Although Google ranks first in search-related ad revenues, its display advertising revenue is second to Facebook.  Facebook garners a larger market share of display advertising revenue because consumers that use Facebook set up, manage, maintain, and populate personal profiles with very specific information about themselves.  This allows Facebook to deploy a more complete picture of the individual to most effectively target advertisers' messages only to qualified

consumers, providing advertisers the best return on their investments, using information each consumer willingly supplies to Facebook.

73.     Unlike Facebook, a holistic view of each consumer was not available to Google until it changed its privacy policy on March 1, 2012.  Prior to March 1, 2012, intended consumers were not easily identified by advertisers through Google.  Google previously targeted its advertising using bits and pieces of often anonymous information garnered from each discrete Google service, and had in place no mechanism through which user information provided on different product platforms would be aggregated and combined in an automatic and systematic manner.  Indeed, prior to March 1, 2012, in certain specific product privacy policies, Google expressly prohibited itself from aggregating and combining *all* categories of information across product platforms as a privacy protection for the benefit of users.  Because each Google product had a distinct privacy policy with non-identical terms, including exclusions of certain categories of information, Google could not aggregate or combine data across its many platforms without violating the terms of its agreements with consumers.

74.     James Whittaker, a former Google Engineering Director, described Facebook's advantage over Google when it came to profiting from user data.  In a public explanation of his resignation, he wrote, on March 13, 2012:

> It turns out that there was one place where the Google innovation machine faltered and that one place mattered a lot:  competing with Facebook…. Like the proverbial hare confident enough in its lead to risk a brief nap, Google awoke from its social dreaming to find its front runner status in ads threatened…. Google could still put ads in front of more people than Facebook, but Facebook knows so much more about those people.
>
> Advertisers and publishers cherish this kind of personal information, so much so that they are willing to put the Facebook brand before their own.  Exhibit A: www.facebook.com/nike, a company with the power and clout of Nike putting their own brand after Facebook's? No company has ever done that for Google and Google took it personally.

75.     Google's overhaul of its approach to privacy, which culminated in the implementation of the new unified privacy policy on March 1, 2012, is an attempt to squeeze more revenues out of its targeted ad system by, among other things, luring advertisers from Facebook to

Google.  Facebook set a new standard in targeted advertising because it had access to a relatively comprehensive profile of each user.  Google could only compete by creating similar profiles of its users.

76.     However, Facebook users provide the information that goes into their profile willingly and voluntarily.  Because Google agreed with its users before March 1, 2012 that it would not combine certain categories of information they provided to Google, or that Google otherwise acquired (such as geolocation data of Android devices) with information provided to Google in connection with other product platforms, Google could not simply construct individual user profiles; it had to *cancel* the privacy policies in place when users agreed to create Google accounts and replace them with a policy that permitted Google to create such a dossier, and notify consumers of the change.  Additionally, the policy had to permit Google to retroactively take advantage of users' activity prior to March 1, 2012 in constructing that dossier.

77.     As part of this privacy overhaul, Google also imitated Facebook's iconic personal recommendation feature, called the "Like" button.  When a user "Likes" a website, a brand, a product, or other content on Facebook, that user's friends see the recommendation in their own news streams, consisting typically of a thumbnail image depicting the thing recommended, a note that "John Doe likes this," and a link to the website recommended.  Facebook (and advertisers) considered this personal recommendation feature a "holy grail of advertising" because users take personal suggestions from friends much more seriously than anonymous corporate communications.  Google's imitation is the "+1" button.  Google introduced the "+1" button on March 30, 2011, but could not fully develop the concept until the privacy hurdles embedded in the multiplicity of policies were cleared.  This is described more fully in the "Emerald Sea" section below.

**Conflicting Terms in Privacy Policies Prior to March 1, 2012**

78.     Prior to March 1, 2012, Google maintained more than 70 separate privacy policies for its separate products.  On March 1, 2012, approximately 60 such policies were eliminated.

79.     Google has always maintained a general or default privacy policy.  Although it has been modified from time to time, it has, at all times relevant to this action, purported to permit

Google to "combine the information you submit under your account with information from other services or third parties in order to provide you with a better experience and to improve the quality of our services." But this self-authorization – prior to March 1, 2012 – was not unfettered.

80. Prior to March 1, 2012, Google typically accompanied new product roll-outs or substantial upgrades with privacy policies associated specifically with those products. In these product-specific privacy policies, Google uniformly refers to the general or default privacy policy as being in effect, in addition to the terms of the specific privacy policy for the product being used. Further, in those product-specific privacy policies, Google typically cross-references other product-specific privacy policies as being in effect to the extent such products are relevant.

81. For example, the Android-powered device privacy policy (issued no later than October 2008 and in effect through February 29, 2012) states: "The Google Privacy Policy and our various product-specific privacy policies describe how we treat personal information when you use Google's products and services, including any Google products and services on your Android-powered phone. In addition, this document describes our privacy practices specifically for Android-powered phones."

82. With respect to commingling or combining certain categories of users' personal information specific to one Google product with other information acquired in connection with another Google product, the terms of Google's general or default privacy policy, as it existed at all relevant points prior to March 1, 2012, conflicted with the terms of the individual product-specific privacy policies that existed prior to March 1, 2012.

83. For example, in the Android-powered device privacy policy, Google makes the following specific assurances to all users of Android-powered devices:

> a. "Information such as the hardware model of your phone and the version of the Android software you are running is collected but **not stored in association with your Google Account**. In addition, we collect some information on phone-level events such as crashes that is **associated with your Google Account temporarily**

1    in order to provide customer service."   (Together, these data points are called

2    "usage statistics.")

3    b.  "Certain applications or features of your Android-powered phone may cause other

4    information [*i.e.*, information other than "usage statistics"] to be sent to Google

5    **but in a fashion that cannot be identified with you personally**."

6    c.  "Your device may send us location information (for example, Cell ID or GPS

7    information) that is **not associated with your [Google] Account**."

8    84.   The Android-powered device privacy policy further states that information provided

9    in connection with users' use of other Google products on an Android-powered device will be stored

10    and associated with the users' Google Accounts and maintained in accordance with the specific

11    privacy policy(ies) governing those other Google products.   The Android-powered device privacy

12    policy also states that information regarding use of Android Market will be stored and associated

13    with users' Google Accounts.

14    85.   The Android-powered device privacy policy thus distinguishes (a) information that

15    ***will not be*** stored and associated with a user's Google Account (or that will only be associated

16    temporarily, as with usage statistics regarding "phone-level events") and (b) information that ***will be***

17    stored and associated with a user's Google Account.   The distinction is meaningful and important to

18    users: were Google to commingle categories of information such as Android device location

19    information with information provided by users in connection with non-mobile products such as

20    search or YouTube by way of a Google Account, Google would be able to identify the particular

21    individual and associate his or her physical movements with a broad set of data points about that

22    individual user, exponentially increasing the amount of knowledge Google has regarding him or her.

23    At the time the Android-powered device privacy policy was in effect (that is, up until the new

24    unified privacy policy was introduced), Google clearly understood that its agreement not to correlate

25    such information as location data, phone-specific identifiers, and information transmitted to Google

26    by third-party apps with its broader base of knowledge about each user was important to convincing

27

28

1    consumers to get started with Android, or to remain committed to Android, rather than competing

2    platforms.

3          86.    Thus, the Android-powered device privacy policy conflicts with the general or default

4    privacy policy by placing specific limits on Google's ability to (in the language of the general

5    policy) "combine the information you submit under your account with information from other

6    services."

7          87.    A similar conflict appears in the Gmail privacy policy in effect prior to March 1,

8    2012.  In a "Gmail Legal Notice" from no later than 2011, Google states that, "We will not use any

9    of your content [defined to include "any text, data, information, images, photographs, music, sound,

10   video, or other material, that you upload, transmit or store in your Gmail account"] for any purpose

11   except to provide you with the Service."  "Service" is undefined in this document.

12         88.    Following introduction of the new unified privacy policy on March 1, 2012, Google

13   eliminated this provision from the Gmail Legal Notice.

14         89.    Language identical to the preceding quotation appears in the "Additional Terms of

15   Service" applicable to use of Google Voice, but "content" is not defined: "We will not use any of

16   your content for any purpose except to provide you with the Service."   "Service" is expressly

17   defined as "Google Voice (including the 'Call Phones' feature in Gmail and Google+ Hangouts)" in

18   this document.  This document appears to remain in effect.

19         90.    The same language appears in various other Google privacy policies and legal

20   notices.  For example, it appears in a legal notice associated with Google Correlate, a tool for

21   identifying search patterns.  This document appears to remain in effect.

22         91.    On information and belief, Plaintiffs allege that, throughout the Class Period, Google

23   made additional identical or substantially similar representations in individual product-specific

24   privacy policies and/or associated legal notices, which have now been removed, erased, deleted, or

25   otherwise made unavailable by Google.

26         92.    Like the terms in the Android-powered device privacy policy, reproduced above, this

27   representation appearing in a Gmail Legal Notice, the Additional Terms of Service associated with

28

1   Voice, the Correlate legal notice, and other documents conflicts with or contradicts Google's general

2   or default privacy policy because it places an express limitation on Google's ability to "combine the

3   information you submit under your account with information from other services."

4       93.     When Google implemented its unified privacy policy on March 1, 2012, Google

5   violated all of these representations by combining user data provided by users, or otherwise collected

6   by Google, in connection with Android, Gmail, Voice, Correlate, and other products the individual,

7   product-specific privacy policy (or legal notices) for which placed limits on Google's ability to

8   combine such data, with user data collected in connection with other Google products.

9       94.     In particular, beginning March 1, 2012, Google began combining (i) the hardware

10  model of a user's Android-powered phone or device; (ii) the version of Android software used by a

11  user; (iii) information about crashes or other phone-level events experienced by an Android user; (iv)

12  information generated by the use of third-party applications or features, such as mobile browsers,

13  social networking software, address books, and reference applications, used by an Android user; and

14  (v) an Android user's location information, including Cell ID and GPS information, with

15  information provided by the same user in connection with other, non-Android Google products, and

16  with that user's Google Account.

17      95.     Indeed, effective March 1, 2012, Google now openly discloses that it collects such

18  information and associates it with a user's individual account.  In the operative privacy policy, which

19  now governs Android users and has replaced the Android-powered device privacy policy quoted

20  above, Google states that the following categories of information, among many others, is collected

21  and associated with the user's account: "device-specific information (such as your hardware model,

22  operating system version, unique device identifiers, and mobile network information including

23  phone number)," "device event information such as crashes, system activity, hardware settings,

24  browser type, browser language …," and "GPS signals sent by a mobile device" as well as "sensor

25  data from your device that may, for example, provide information on nearby Wi-Fi access points and

26  cell towers."  These are precisely the categories that were off-limits to Google's practice of

27  combining user information across product platforms, according to the Android-powered device

28

privacy policy.  As a result, Google has failed to uphold its agreement with all Android-powered device users that entered into a business relationship with Google, by acquiring an Android-powered device, while the Android-powered device privacy policy remained in effect, so long as they remained Android users on or after March 1, 2012.

96.     Users of Gmail, Voice, Correlate, and any other Google product the individual, product-specific privacy policy and/or legal notices of which stated, "We will not use any of your content for any purpose except to provide you with the Service," have been similarly harmed by the introduction of the unified policy on March 1, 2012.  In particular, Google now uses content created by users – including text and information – to do more than merely "provide [them] with" a Google service: it uses such content to populate an extremely detailed digital profile that informs Google's delivery of advertisements to each user.  Google does not deny this.

97.     On March 1, 2012, Google announced that changes to its privacy policies had been made and that it had consolidated more than 60 of its privacy policies down to just one document. Nearly all of the product-specific privacy policies had been entirely eliminated, and what was formerly the general or default privacy policy was expanded.  The key implication of this unification of privacy policies was that *all limits placed by product-specific privacy policies on Google's ability to combine user information across product platforms had been eliminated*.

98.     As stated by Google, "Our new Privacy Policy makes clear that, if you're signed in, we may combine information you've provided from one service with information from other services."  This statement, though nearly identical in verbiage to a statement appearing in prior versions of the general or default privacy policy, has a new semantic content in the March 1, 2012 policy, because as of that point, no further obstacles or limitations remained to constrain Google's *ability* to combine many silos of users' personal information.

99.     An additional change associated with the March 1, 2012 privacy policy is that, when the user is not signed in to a Google account but browsing or otherwise using the internet anonymously, Google continues to aggregate data in an anonymous profile.  Google stores up to 180 days of signed-out search activity, including queries and results clicked in a cookie implanted on a

consumer's computer or device.  Now, when a consumer logs back into any Google account, that anonymous profile information is automatically appended to that user's account, at which point that anonymous information could be used to customize results for that user on that computer, or any other computer where the user is logged into a Google account.

100.    As alleged above, users of devices powered by Google's Android platform are automatically, and permanently, "logged in" for purposes of aggregation of their personal information.  They have no way to opt out, and cannot avoid this unauthorized invasion of privacy unless they replace their Google Android device with a non-Android device, which costs hundreds of dollars.

101.    All of this is designed to fuel advertising revenue.  By providing search results that are tailored to the consumer, Google can keep consumers engaged and, therefore, using its products and services for longer periods of time.  If consumers are using its products longer, Google can sell more advertising space because the advertising displays have more time to rotate.

102.    As long as the user is signed in to any Google account, such as Android, Gmail or Google+, Google will now aggregate in one individualized profile all of the user's activity on any other Google product he or she utilizes.  It will merge data from each of its platforms and services (including Android mobile devices), aggregating the content of the emails the user drafts, the content of emails the user receives, the searches the user conducts on google.com, the locations the user searches using Google Maps, the device-specific information and geolocation data associated with the user's Android device, the articles the user reads and pictures the consumer uploads to Google+, and many other categories of information; it is all combined to create a detailed and constantly evolving profile of the user.

103.    Google can also use this information to tailor the advertising to its intended user.  If the user is located in Manhattan, Google can display advertisements only for restaurants located in Manhattan.  More troublingly, if the consumer is considering purchasing a Mercedes-Benz, Google can display advertisements endorsing Mercedes-Benz vehicles or competitor vehicles, depending on which company is willing to pay more for that ad.

104.   Thus, by commingling data across Google products and optimizing search results, Google can:   (1) keep users engaged longer, and longer engagement allows Google to sell and deliver more advertisements (engagement creates inventory); and (2) display advertising that is specifically targeted to intended users, rather than the masses (which raises the likelihood that the user will click on the advertisement).Google can, therefore, sell more advertisements *and* command a higher price for them, by delivering more intended users to its advertisers.   The user's name and other personal information, some of which is very sensitive (such as geolocation data), are associated with the Gmail or Google+ account (because the user must provide that information to Google when he or she originally creates those accounts) and the user's identity is now associated with the whole spectrum of the user's internet activity (and Android mobile activity).   Google can now use that spectrum of data to sell advertisers the ability to target specific, intended consumers, rather than the masses.

105.   Google's current ability to create a clear, accurate, well-rounded picture of the individual user – as opposed to its previous privacy practices, which created largely anonymous puzzle pieces that could not always be stored, or linked together and associated with a particular user's identity (and were not always accurate) – is unquestionably invasive, and is being done in violation of its previous product-specific privacy policies that placed limits on Google's ability to combine user data across product platforms, pursuant to which the members of the Class agreed to utilize Google's products, and without users' express consent to the changes introduced on March 1, 2012.

106.   Indeed, the new unified privacy policy is emblematic of what former Google executive James Whittaker has called Google's recent shift from an "innovation factory" to "advertising company."   Google's highly profitable, highly effective transformation into a *social* advertising company is the culmination of years of planning and development that went by the name of Emerald Sea, detailed below.

107.   Not only has Google done this without each user's express consent; it has not provided users with an effective way to opt out.   While Google has made it very easy to universally

merge data across product lines, in violation of the several product-specific privacy policies that existed prior to March 1, 2012, as alleged above, it has not made it easy to opt out: users must manage their privacy settings for each Google product they use; a universal opt-out function is not available, and in any event, there is no way to limit Google's commingling of user data across platforms, because Google has eliminated the privacy policies that once prohibited Google from doing so.

108.   The thirty-six Attorneys General who on February 22, 2012 sent a letter to Google, opposing implementation of its new privacy policy, exposed Google's disingenuousness:

> Your company claims that users of Google products will want their personal information shared in this way because doing so will enable your company to provide them with a "simple product experience that does what you need, when you want it to," among many other asserted benefits. **If that were truly the case, consumers would not only decline to opt out of the new privacy policy, but would freely opt *in* if given the opportunity.** Indeed, an "opt-in" option would better serve current users of Google products by enabling them to avoid subjecting themselves to the dramatically different privacy policy without their affirmative consent. Unfortunately, Google has not only failed to provide an "opt-in" option, but has failed to provide meaningful "opt-out" options as well.

*available at* http://epic.org/privacy/google/20120222-Google-Privacy-Policy-Final.pdf.

109.   Thus, Google's increased optimization comes at a significant cost to privacy and consumers' rights.  By commingling data (including searches, locations derived from use of an Android-powered device, and email contacts), and tying it to a specific Google account (and therefore a specific, individually identified consumer), the consumer's personal information is tied to an overarching profile in that person's name, that is regularly supplemented through use of or interaction with all Google products.  That person no longer remains anonymous where he or she intended to remain anonymous.  The various portions of each person's life are no longer separate and treated in accordance with the expectation of privacy associated with each of them; they are no longer pieces to an impossible puzzle; they are pieces that can be, and as of March 1, 2012 have been, linked to create a clear picture of that consumer.  The fact that this is achieved, at least in part, through independent third-party entities, the identities of which remain undisclosed, is immensely troubling.

**Emerald Sea: May 2010**

110.    On November 4, 2010, an anonymous Google engineer let slip on Quora, a publicly accessible forum, the following: "Emerald City is the project name for what people outside of Google refer to as 'Google Me.'   Lots of existing projects like youtube, google docs, search, calendar, groups, picassa [sic], etc have had significant social integrations added to them.  This is an ongoing project that will launch as a major initiative across multiple services at once and many of the hooks endusers will see are currently being tested internally.  It is by no means done and is extremely ambitious in nature."   (http://www.quora.com/Google+/Is-Google-dogfooding-Google-Me-yet/.)

111.    On December 1, 2010, TechCrunch announced that it had confirmed with at least four sources that the project was actually called "Emerald Sea," not "Emerald City."  TechCrunch further confirmed that Emerald Sea was being tested within the company and that the anonymous Quora user's information, aside from the name, was consistent with "what we've heard.  That Emerald Sea will be a social layer that spread across the majority of Google's properties." (http://www.techcrunch.com/2010/12/01/google-social-emerald-sea/.)

112.    On December 7, 2010, the first (unofficial, confidential) screenshots of a socially-integrated    Google    ecology    were    released    to    the    web. (http://www.techcrunch.com/2010/12/07/google-plus-one-pic/.)    TechCrunch, which posted the image, stated that it had confirmed with a source that the screenshot was in fact legitimate.  Google issued a statement on the same day acknowledging that "we have already confirmed that we are focused on incorporating social elements across Google.  But we have nothing new to announce at this time."  The vague rumors of a new, socially-charged version of Google integrating a layer of interactive social media (rather than only a dedicated social network like Facebook or MySpace) were reinforced.  This represents the sum of publicly available knowledge about Google's intentions with respect to social media and cross-platform commingling of user data as of November/December 2010.

113.    What was inaccurately labeled "Emerald City" by the anonymous Google engineer on November 4, 2010 was in fact called "Emerald Sea."   By November 2010, as that individual reported, internally, Google was actively testing (or "dogfooding") a significant and diverse variety of features and modifications to existing Google products that were meant to heighten the "social" aspect of the experience of using Google's products.   One of the critical functions was a leveling of the barriers between different Google platforms and products.   Emerald Sea – "a major initiative across multiple services at once" – necessitated that the user's activity on one platform (say, Android, or Gmail, or YouTube, or Picasa) be accessible to the underlying code constituting other platforms.   As a strictly "in-house" project, Emerald Sea freed Google from the obligation to make any disclosures to the affected users (who were, after all, only Google employees or contractors).   Google could flout the restrictions in existing contracts and privacy policies because no real users "in the wild," in the words of Google's policy lawyer, Nicole Wong, would be impacted.

114.    Emerald Sea was already a sophisticated in-house experiment by November 2010 when the anonymous Google engineer posted on Quora.   It was designed by Google executives no later than May 2010.   Even then, May 2010 is only the point at which its various components – a leveling of barriers between all Google products and platforms, sharing of user data across those barriers, the introduction of an endorsement function (later called "+1"), etc. – were given a single name.   Emerald Sea obviously has conceptual affinities with Google's previous experiments in social media, including the disastrous Google Buzz (publicly launched just a few months prior, in February 2010).   Given an opportunity to pursue discovery, Plaintiffs will be able to produce evidence that Google designed and intended to launch product changes resulting in the commingling of user data across platforms, including Android, and thus violating the existing privacy policies, even earlier than May 2010.

115.    Steven Levy, a technology journalist that has covered Google for more than a decade, published *In the Plex: How Google Thinks, Works, and Shapes Our Lives* in April 2011.   In the Epilogue to that book, Levy presents the following discussion of Emerald Sea.   An internal crisis in

mid-late 2009 prompted by perceptions that Microsoft's recently released Bing search engine would threaten Google's dominance in search

> …energized the search team and forced a rethinking of how Google did its interface.  When Google's executives met in [May] 2010, the main topic of discussion was not search but Mark Zuckerberg.

> That March, Urs Hölzle [senior vice president of technical infrastructure at Google] sounded an alarum that evoked Bill Gates's legendary 1995 "Internet Sea Change" missive to his minions at Microsoft.  Just as the Internet threatened Microsoft back then, in 2010 the sea change to a more people-oriented Internet – social media – was becoming a problem for Google.  Hölzle said that the challenge required a decisive and substantial response, involving a significant deployment of personnel – right away.  The memo became known as the Urs-Quake.

> […]  After the Urs-Quake, the top two floors of 2000 [Charleston Road] became the nerve center for Google's social network.  Vic Gundotra [senior vice president, social at Google] led the team, joined by Bradley Horowitz [vice president of product management, Google+].  Teams of engineers from various outposts of the company moved into the building, and **almost on a daily basis Google's top executives would cross Permanente Creek to strategize**.

> **The project's internal code name was Emerald Sea**.  [Description of origin of designation omitted.]

> Gundotra rejected the perception that Google's DNA, rooted in the primacy of algorithms, was unsuited to accommodate the social networking revolution.  To the contrary, he felt Google had unique assets that could help it take the initiative in the field, if only it would atone for its "past sins" of snubbing a social approach.  **He outlined an ambitious plan that would involve a people-oriented remaking of almost every aspect of Google, from YouTube to search**.

> Oh, and Google would launch this effort in a hundred days.

> Horowitz later described this as "a wild-ass crazy, get-to-the-moon" goal, setting an impossible standard to underline the importance of the effort.  A project such as Emerald Sea – **which came to include eighteen current Google products, with almost thirty teams working in concert** – was complicated and challenging, with milestones more appropriately measured in months, not days.  Indeed, on the hundredth day after that May [2010] meeting, some time in August [2010], Emerald Sea was nowhere completed.  But its leaders were satisfied with the working prototype and had given it a new name: "+1."

> [Despite delays,] Gundotra and Horowitz were energized by what they felt were significant innovations in the initiative, and believed that Emerald Sea would finally establish itself as a primary player in the crucial area of social software.  "This is the next generation of Google – it's *Google* plus one," said Gundotra.

*In the Plex* at 381-83 (bold emphasis added).

116.    According to Levy, the March 2010 "Urs-Quake" memorandum was the initial impulse behind the creation of Emerald Sea.  The actual features grouped under that umbrella were not brought together formally until Gundotra's "ambitious plan that would involve a people-oriented remaking of almost every aspect of Google, from YouTube to search," was presented to other Google executives in May 2010.  But already, by May 2010, "almost on a daily basis Google's top executives" would visit the team of engineers that had been gathered in a single building "to strategize" in the creation and implementation of Gundotra's plan.  At least "eighteen current Google products" were redesigned as social-media products (which *all* of Google's products today are, following the March 1, 2012 unification of the privacy policy).

117.    In a follow-up piece for *Wired*, Levy reviewed Google's foray into social media following its announcement on June 28, 2011, of the product called "Google+."  He writes, "as I learned in almost a year of following the project's development, with multiple interviews with the team and its executives [forming the basis for the discussion in his book, *In the Plex*, quoted above], Google+ is not a typical release.  **Developed under the code name Emerald Sea, it is the result of a lengthy and urgent effort involving almost all of the company's products**.  Hundreds of engineers were involved in the effort.  **It has been a key focus for new CEO Larry Page**." (http://www.wired.com/business/2011/06/inside-google-plus-social/all/) (emphasis added).

118.    He goes on: "The parts announced Tuesday [June 28, 2011] represent **only a portion of Google's plans**.  In an approach the company refers to as 'rolling thunder,' Google has been quietly pushing out pieces of its ambitious social strategy – there are well over 100 launches on its calendar.  When some launches were greeted by yawns, the Emerald Sea team leaders weren't ruffled at all – lack of drama is part of the plan.  **Google has consciously refrained from contextualizing those products into its overall strategy.**"

119.    Google+, according to Levy, "marks just one more milestone in a long, tough slog to remake Google into something more 'people-centric.'"  He quotes Gundotra: "We're transforming

Google itself into a social destination at a level and scale that we've never attempted – orders of magnitude more investment, in terms of people, than any previous project."

120.    Levy recounts a discussion with Gundotra from August 2010: "As early as last August, I asked Gundotra whether he felt Emerald Sea was a bet-the-company project.  'I think so,' he replied.  'I don't know how you can look at it any other way.'"

121.    Levy provides additional detail from August 2010 discussions with Gundotra and Horowitz, the two leaders of the Emerald Sea project:

> "'The internet is nothing but software fabric that connects the interactions of human beings,' Gundotra said.  'Every piece of software is going to [be] transformed by this primacy of people and this shift.'  Gundotra said that **to date identifying people has been 'the most epic failure of Google … Because we're focusing on organizing the world's information, the search company failed to do the most important search of all**.'
>
> But that was about to change.
>
> 'Google, thank God, has a few assets.  We have hundreds of millions [of] people who love us – they love YouTube, they love Gmail, they love search.  **What if we were to go across each of those categories and rethink them?**  The things we have to do are obvious, but Google hasn't done them.  And so Bradley [Horowitz] and I have the odd chance to help lead the company to go fix these sins.'
>
> 'If you look at Google's mission of organizing information, you can't do that absent people,' added Horowitz.  '**The information I care about is very much informed by who I am and who I know.  That's the real motivation for doing this**'" (bold emphasis added).

122.    In the same article, Levy also confirms that, "Some features [of Emerald Sea] were pushed off until future releases.  Others – like the +1 button – were unmoored into separate products and launched separately."

123.    In an article published January 12, 2012 in *Wired*, Levy observed: "Google CEO Larry Page prepped us for this [*i.e.*, the integration of social media elements with Google search] recently by saying that Google+ was only the first part of Google's social ambitions – the next step is **to 'light up' all of Google**.  As someone who watched the evolution of Google's social strategy over a year before the release of Google+, **I can affirm that this has always been the plan**." (http://www.wired.com/business/2012/01/too-much-plus-a-minus/.) (emphasis added.)

124.    The unification of the privacy policy that went into effect on March 1, 2012 was a necessary step toward the full implementation of Emerald Sea.  The "ambitious plan" prepared by Gundotra and overseen by Page, put into action by over thirty teams of engineers and hundreds of employees in total under the direction of Gundotra and Horowitz, and intended to redesign Google from the inside out, producing nothing short of a new social media advertising company (as Levy observes, "Google+ *is* Google"), required the change.  The various products and platforms could no longer be conceived or treated as separate properties; the entire point of Emerald Sea is that "all of Google" has to be brought together and "lit up" (in Page's terms) with social media content.

125.    Eliminating the multitude of privacy policies in effect prior to March 1, 2012 was, consequently, a technical requirement of realizing the ambition of Emerald Sea.  Therefore, as of May 2010 *at the latest*, Google had no intention of honoring the various privacy policies that placed limits on Google's ability to combine user data across product platforms that were, inconveniently for Google, still in effect as of that date, and which were in effect at the time Plaintiff Nisenbaum agreed to purchase an Android-powered mobile device.  As alleged above, these include at least (a) the Android-powered device privacy policy, (b) the Gmail Legal Notice, (c) the Voice Additional Terms of Service, and (d) the Correlate legal notice, though, on information and belief, additional such policies and/or notices exist, but have been removed by Google.

126.    Yet Google failed to announce its actual intentions prior to stating that the multitude of product-specific privacy policies governing Google's use of user data would be eliminated and replaced by an all-encompassing policy with terms materially different, and unfavorable to users, as compared against those in the prior policies, as alleged above.  Indeed, as explained by Levy, this failure to disclose was part of a deliberate decision by Google executives, including CEO Page and senior vice presidents Gundotra and Horowitz, **to "consciously refrain[]" from revealing the "overall strategy" behind Emerald Sea**.

127.    By no later than May 2010, therefore, Google intended to deceive consumers, including Plaintiff Nisenbaum, about the ways in which Google would use their personal information across all Google platforms and products, including Android, and about Google's own

1    intentions with respect to honoring the terms of the privacy policies (including the Android-powered

2    device privacy policy) in effect at the time such consumers acquired Android-powered devices and

3    began using them to send and receive email, browse the web, purchase and download apps in Google

4    Play, use GPS services, and the myriad other activities facilitated by Android-powered devices that

5    Google tracks.

6    **Google's Concealed Disclosure of Android Users' Personal Information**

7            128.    As alleged above, and in more detail below, during the February 1, 2009 to May 31,

8    2014 time period, Google caused a surreptitious transmission of certain personal information of

9    Android users to third party application developers each and every time they purchase a paid

10   Android application through the Android Market/Google Play.  Google's Android mobile platform

11   and Google Play marketplace are governed by the same unified privacy policy as its other product

12   platforms.  Prior to March 1, 2012, the Android mobile platform and Google Play marketplace were

13   governed by independent policies and/or terms of service.  These policies place restrictions on

14   Google's ability to disclose personal information of Android users to third parties.  In addition to the

15   Android-powered device privacy policy, the Google Play terms of service, and the general or default

16   Google privacy policy, the privacy policy for a product called "Google Wallet" is relevant to the

17   propriety of this practice.  To the extent they bear on Google's practice of surreptitiously causing

18   Android users' personal information to be transmitted to third party application developers, the terms

19   of these documents are discussed in this section.

20           129.    Certain terms of the Android-powered device privacy policy that are relevant to this

21   action, bearing on the limits restricting Google's ability to combine user data across its product

22   platforms, are set forth above.  In addition, however, the Android-powered device privacy policy

23   contains terms restricting Google's ability to disclose personal information of Android users to third

24   parties.

25           130.    The Android-powered device privacy policy states, "We may share your information

26   with third parties we use to perform some functions, such as billing related tasks.  These third parties

27   will be required to treat your information in accordance with the applicable Google privacy policies.

28

We may also share your information with your wireless operator in order to perform customer service functions." The same policy states, "We may share non-personal, aggregated information with certain third parties. However, such information will not identify you personally."

131.    The Google Play terms of service simply refer to the Google Wallet privacy policy; no provision in the Google Play terms of service colorably relates to the arbitrary disclosure of personal information to third-party app developers.

132.    Google Wallet, a service through which payments on the Android Market/Google Play can be processed, places limits on Google's ability to disclose to third parties the personal information of Android users. The November 16, 2011 Google Wallet Privacy Policy states that Google may share personal information outside Google only in certain defined circumstances. For example, that policy states that Google may share personal information with third parties "[a]s necessary to process your transaction and maintain your account. As with any credit card payment, if you process a credit card transaction through the Processing Service, we need to share some information (for example, your name and credit card number) with the banks and other entities in the financial system that process credit card transactions." The only potentially relevant disclosure states, "Some retailers require that their buyers provide a telephone number in order to process a transaction. In those cases, we will share your telephone number with the merchant and you will be notified before you complete your transaction." Previous versions of the same policy (starting April 12, 2007) contain nearly identical language.

133.    Further, until the November 16, 2011 version of this policy (that is, in all such versions up to the one preceding it, introduced December 9, 2009), Google stated that the product "also gives you various choices regarding whether and how your email address is shared, on a seller-by-seller basis," adding that users may opt to keep their email address confidential.

134.    In the August 1, 2012 version of the policy, Google states that it will share personal information with third parties only "[a]s necessary to process your transaction and maintain your account" and "[t]o complete your registration for a service provided by a third party."

135.   Finally, in the general or default privacy policy (which on March 1, 2012 became the unified privacy policy), at all times relevant to this action, Google assured users that, "We take appropriate security measures to protect against unauthorized access to or unauthorized alteration, disclosure or destruction of [user] data," and that, "We restrict access to personal information to Google employees, contractors and agents who need to know that information in order to process it on our behalf.  These individuals are bound by confidentiality obligations and may be subject to discipline, including termination and criminal prosecution, if they fail to meet these obligations."

136.   In February 2013, American and international news media reported that Google has been, for an indefinite period, disclosing certain personal information of Android users to third parties that developed applications for Android.  In particular, it was reported that each time an Android user accessed Google Play and purchased an application, that user's name, email address, and physical or geographical location was automatically disclosed by Google to the third-party application developer.  In order to trigger that unauthorized disclosure, the user's Android device is required to transmit certain data to Google servers.  The user's personal information (name, email address, and physical or geographical location) is then made available to developers of applications purchased by the user via the Google Play Developer Console, a service Google provides to third party application developers.

137.   Android users are not notified of this automatic transmission involving their devices and their personal information, nor is their consent or authorization for this transmission and disclosure sought.  Indeed, the applicable privacy policies (such as the Android-powered device privacy policy, the Google Wallet privacy policy, and Google's general or default privacy policy) expressly assure users that their personal information will not be disclosed to third parties other than those Google "use[s] to perform some functions, such as billing related tasks" or "[a]s necessary to process your transaction and maintain your account" and "[t]o complete your registration for a service provided by a third party."  Google's disclosure of users' personal information to third-party app developers, however, is not a disclosure to a financial institution or entity that Google "use[s] … [for] billing related tasks," nor is it "necessary to process" any transaction or "maintain" any account

1   (purchasing an app does not necessarily entail creating, let alone maintaining, an account with a

2   third-party app developer), nor to "complete your registration for a service" (similarly, purchasing an

3   app does not necessarily entail registering for any service).   The allegation is not that Google

4   disclosed users' personal information to third-party app developers in certain situations, as where an

5   account must be created as a precondition to downloading an app, or where the app developer

6   requires registration as a precondition to downloading an app; it is that Google caused this

7   transmission and disclosure to occur uniformly and regardless of the circumstances for each and

8   every purchase of a paid app through Google Play during the February 1, 2009 to May 31, 2014 time

9   period.

10         138.   Disclosure of this personal information is manifestly unnecessary to completing or

11   processing any transaction.   As Ben Edelman, a Harvard business professor, has explained, "it

12   simply is not 'necessary' to provide developers with access to customer names or email addresses in

13   order to process customer transactions.   Apple has long run a similar but larger app marketplace

14   without doing so."

15         139.   This practice is contrary to the terms of both the old privacy policies (for Google

16   Play, Google Wallet, and for Android devices) and the new unified privacy policy – all of which

17   state that Google will not transmit users' personal identifying information to third parties absent

18   certain limited circumstances irrelevant to this scenario.

19         140.   The limited exception appearing in the Android-powered device privacy policy,

20   which states, "We may share your information with third parties we use to perform some functions,

21   such as billing related tasks," does not permit Google to surreptitiously disclose users' personal

22   information to third-party app developers (as distinguished from merchant exchange services or

23   payment processing entities, for example, although as noted above, Google Play transactions are

24   processed by Google Wallet, an in-house payment processing platform, the privacy policy for which

25   similarly prohibits the practice complained of).   Such developers are not "third parties [Google]

26   use[s] to perform [billing related] functions," but persons that paid a $25 fee to place an app for sale

27   in the marketplace.

28

CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT                                    42
CASE NO. 12-CV-01382 PSG

141.   Google's surreptitious practice of causing such disclosures came to light only thanks to the fact that one third-party application developer took to his blog to decry the practice.

142.   Following initial reports, no other third-party application developers have contested the assertion that Google does, in fact, permit disclosure to them of the name, email address, and physical or geographical location of every Android user that purchases the applications they have placed for sale in the Google Play marketplace, and certain self-interested entities, like the Application Developers Alliance, have announced their support of Google's practice.

143.   This unauthorized disclosure subjects every affected Android app user to a substantially increased, unexpected, and unreasonable risk of further interception or dissemination of their personal information as well as of other adverse consequences, including harassment, receipt of unwelcome communications, and identity theft.   The fact that third-party app developers have Android user data stored in their files makes such developers likely targets for hackers or others intent on acquiring that data, thanks to Google's practice.   Where users leave bad feedback or critical reviews of apps they've downloaded, the developers of such apps are able to respond directly to such users, thanks to Google's practice.   Further, many Android app developers are non-professionals or coding hobbyists that simply paid a $25 entry fee to register and sell their creations in Google Play, and are unlikely to have sophisticated security measures in place, and are also likely to listen when cyber-criminals tell them they can make thousands by giving up their Play records.   Every affected Android user is now subject to a heightened and substantial risk of these and other security events.

144.   The unauthorized disclosure of Android users' personal information by Google to third-party app developers begins from the Android user's device, insofar as the disclosure is triggered by a transmission of data from the device, and thus causes the depletion and consumption of device battery life and bandwidth, resources not freely available but purchased in finite quantities by Android users for their own exclusive use, not Google's.

**Plaintiffs' Injuries Resulting from Google's Privacy Practices**

1    145.   Plaintiffs Goldberg, Marti, Nisenbaum, DeMars, Barrios, Anderson, Villani, and

2  McCullough have suffered (and continue to suffer) pecuniary and non-pecuniary harms as a result of

3  Google's conduct as alleged herein.

4    146.   *First,* Plaintiff Nisenbaum has suffered harm in the form of the cost he paid to replace

5  his Android-powered device after March 1, 2012.  Plaintiff Nisenbaum acquired his Android device

6  in June of 2010, prior to the introduction of the new privacy policy, and purchased an alternative,

7  non-Android device (an Apple iPhone) after the introduction of the new privacy policy, in May of

8  2012.  As Google required him to do, in June of 2010, he created an account to access Google Play

9  (Android Market), prior to the introduction of the new privacy policy.  His reason for switching to

10  another mobile device in May of 2012 is substantially that Google's new privacy policy invades his

11  privacy more than alternative mobile operating systems do, since it requires him to be permanently

12  logged in to his account and aggregates, without his consent, all of his activity and other personal

13  information associated with his Android device with all the other information Google has acquired

14  from him in connection with other Google products, including Gmail.  Google, including its top

15  executives (for example, CEO Page and senior executives Gundotra and Horowitz), decided no later

16  than May of 2010 that it would aggregate such user data across all of its platforms, including

17  Android, leveling the barriers between all Google properties and sharing data between them, as part

18  of the Emerald Sea project (of which the March 1, 2012 privacy policy unification was a part).  Had

19  Google disclosed its intention to commingle all of Plaintiff Nisenbaum's Android-related personal

20  information (including app acquisition and usage, device-specific information, geolocation data, etc.)

21  with all other information available to Google via his use of other products, and consequently not to

22  honor the privacy policies in effect as of June 2010, an intention Google clearly formulated no later

23  than May 2010 when Gundotra presented the "ambitious plan" constituting Emerald Sea and

24  received the approval of other Google executives, who "consciously" decided in May 2010 to

25  withhold such information from the public, Plaintiff Nisenbaum would not have purchased an

26  Android-powered device in the first place.

27

28

147.    *Second*, Plaintiffs Goldberg, DeMars, and McCullough have suffered, and continue to suffer, harm in the form of the costs they have paid to provide their Android devices with the battery power and bandwidth necessary to trigger the disclosure to third-party application developers of their personal information, which Google caused to be involuntarily disclosed whenever they purchased a paid Android application between February 1, 2009 and May 31, 2014, in violation of the Android-powered device privacy policy, the Google Play privacy policy, and the unified privacy policy, and all other applicable policies.  Each of these Plaintiffs, like every other Android device user that has purchased at least one paid Android application through Google Play during this time period, has been compelled to transmit certain data that triggers this unauthorized disclosure, to the developers of the application or applications purchased, their personal information, including the name, email address, and physical or geographical location associated with the Play account and/or the Android device used to purchase the applications.  In every such transmission, device battery power was consumed without the Plaintiffs' consent, authorization, or knowledge.  In every such transmission, bandwidth was also consumed without the Plaintiffs' consent, authorization, or knowledge.  Each of these Plaintiffs has paid for the electricity required to charge his or her device and for the bandwidth required to purchase an application.  Therefore, each of these Plaintiffs has suffered a measurable pecuniary injury.

148.    *Third,* Plaintiffs Goldberg, DeMars, and McCullough have suffered, and continue to suffer, harm in the form of an invasion of their privacy interests each time that Google caused the involuntary disclosure, to third-party application developers, of their personal information when they purchased an Android application between February 1, 2009 and May 31, 2014.  This compulsory, non-consensual disclosure is not permitted by any privacy policy or terms of service or other agreement between Google and these Plaintiffs.

149.    *Fourth*, each Plaintiff suffered, and continues to suffer, an invasion of their privacy interests when the personal information that each provided in connection with their use of Gmail prior to March 1, 2012 – including without limitation name, location, email address, email contacts, calendar entries, and email message contents– was and is commingled with personal information

provided in connection with other Google products prior to and after March 1, 2012 without any Plaintiffs' consent.

150.   *Fifth*, each Plaintiff suffered, and continues to suffer, harm in the form of Google's unauthorized access and wrongful disclosure of each Plaintiff's communications.  As alleged above, Plaintiffs – like all Gmail users – consented prior to March 1, 2012 to provide the Gmail service with information, including email communications drafted and received by each Plaintiff, *only* in connection with delivery of the service, and not for generalized, cross-platform use of that information by other Google products, and Google affirmatively represented that it would "not use any of [Plaintiffs'] content" (defined to include text and information) "except to provide you with the Service."   Google's use of the contents of Plaintiffs' communications to inform their use of google.com, YouTube, Picasa, Google+, and other products is flatly inconsistent with the limited authorizations Plaintiffs granted to Google in connection with delivery of the Gmail service (*i.e.*, the provision of the capacity to send and receive email, store email messages, maintain contact lists and calendars).   By intentionally disclosing the contents of those communications outside of Gmail, Google has injured each Plaintiff.   Further, insofar as Google engages independent, unidentified third-party entities to process and distribute user information across its product platforms, including the contents of Plaintiffs' Gmail communications, Google intentionally discloses the contents of those communications outside of Google, thus further injuring each Plaintiff.   Because this is itself a violation of the pre-March 1, 2012 Gmail Legal Notice and the unified privacy policy, this practice falls outside the *legitimate* scope of Google's ordinary course of business, even if Google ordinarily and systematically violates its own privacy policies.

151.   *Sixth*, each Plaintiff suffered, and continues to suffer, harm in the form of Google's unauthorized interception of each Plaintiff's communications.  When Google discloses the contents of Plaintiffs' Gmail communications to services other than Gmail, such as Google+ or google.com, the recipient service unlawfully acquires the contents of those communications and thus invades the legally protected rights of each Plaintiff.  When Google goes further and discloses the contents of Plaintiffs' Gmail communications to independent, unidentified third-party entities to process and

distribute user information across its product platforms, using an automatic routing mechanism that operates contemporaneously with the transmission of such communications, Google similarly invades the legally protected rights of each Plaintiff.  As with the fifth form of injury, described above, this practice falls outside the *legitimate* scope of Google's ordinary course of business, even if Google ordinarily and systematically violates its privacy policies, because it constitutes a manifest violation of Google's pre-March 1, 2012 Gmail Legal Notice and the unified privacy policy.

### A.  Cost to Replace Android Devices

152.   As alleged in more detail above, Google's Android-powered device privacy policy stated that certain categories of personal information ((i) the hardware model of a user's Android-powered phone or device; (ii) the version of Android software used by a user; (iii) information about crashes or other phone-level events experienced by an Android user; (iv) information generated by the use of third-party applications or features, such as mobile browsers, social networking software, address books, and reference applications, used by an Android user; and (v) an Android user's location information, including Cell ID and GPS information) would not be associated by Google with an Android user's Google Account, or other personal information about that user held by Google.

153.   Plaintiff Nisenbaum acquired an Android-powered device in June of 2010 and continued to own that device on March 1, 2012, when the new privacy policy took effect.

154.   Plaintiff Nisenbaum created an account in connection with his use of his Android device, as required by Google to access the Android Market (now Google Play), in June of 2010.  At this time, the Android-powered device privacy policy was in effect.

155.   Thereafter, Plaintiff Nisenbaum was permanently logged in to his Android-related account.

156.   Unknown to Plaintiff Nisenbaum, for the entire duration of Plaintiff Nisenbaum's commercial relationship with Google (which began in June 2010), Google had no intention of honoring its existing privacy policies, including the Android-powered device privacy policy. Instead, no later than May 2010, Google, through its executives, including CEO Page and senior

executives Gundotra and Horowitz, decided to level all barriers between separate Google properties and to share and commingle user data across those barriers to create a more integrated, more holistic picture of each individual user, to more effectively target advertising material to users.  Google's code name for this confidential project was Emerald Sea, and it was intended to be a wholesale redesign of Google from the ground up, transforming every Google property into a social media version of the existing property.  The "ambitious" Emerald Sea plan was formulated no later than May 2010 and presented by Gundotra to other Google executives in the same month, receiving immediate approval from Google executives (or, in any event, within the month of May 2010).  Because Emerald Sea required the violation of any existing privacy policies that placed any limitation on Google's ability to combine user data across product platforms (since it required such sharing or commingling of user data), Google eliminated those privacy policies and replaced them with a universal policy effective March 1, 2012.

157.   On or around March 1, 2012, therefore, Google began combining information provided by Plaintiff Nisenbaum in connection with his Android device, or obtained autonomously by Google as a result of pre-programmed inquiries or reports made to Google by Plaintiff Nisenbaum's device and/or apps or features contained therein, as well as his usage of the Android Market/Google Play, with information provided in connection with other Google products, to create a more comprehensive and thus more lucrative representation of Plaintiff Nisenbaum.

158.   Google did not seek or acquire Plaintiff Nisenbaum's explicit consent in combining the different categories of information that he provided in connection with the different services, including Android.  Indeed, before the announcement of the privacy policy change that went into effect on March 1, 2012, Google made no disclosures about its intention not to honor existing privacy policies, such as the Android-powered device privacy policy.  Google executives, as alleged above, "consciously" decided in May 2010 to withhold such information from the public.

159.   As a result of Google's aggregation of his Android-related information with his non-Android related information, Plaintiff Nisenbaum felt that his privacy interests were invaded and purchased an alternative, non-Android mobile device in or about May 2012.

160.    Plaintiff Nisenbaum would not have purchased an Android device in June 2010 if Google had disclosed that it would begin aggregating the information it collected in connection with Plaintiff Nisenbaum's use of the device, including his use of the Android Market/Google Play, geolocation data, third-party application acquisition and usage, device-specific information and usage statistics, and other categories of information previously protected from commingling by the Android-powered device privacy policy, with information Plaintiff Nisenbaum provided in connection with other Google products, including Gmail.   Plaintiff Nisenbaum could not have known that this was Google's intention at that time, because Google decided in May 2010 to withhold that information, and to continue allowing users to enter into commercial relationships with it under the then-existing privacy policy's terms.

**B.  Cost of Device Battery Power and Bandwidth**

161.    Plaintiffs Goldberg, DeMars, and McCullough each acquired and used one or more Android-powered devices during the February 1, 2009 to May 31, 2014 period.

162.    Plaintiffs Goldberg, DeMars, and McCullough each purchased at least one paid Android application through Google Play on their Android devices during the February 1, 2009 to May 31, 2014 period.

163.    Plaintiff Goldberg purchased the following paid Android applications through Google Play during the February 1, 2009 to May 31, 2014 period: SoundHound; Ohio Cop; OfficeSuite Pro 6+; AquaMail Premium; ToDo List Task Manager Pro; 12C GOLD; mSecure Password Manager; TuneIn Radio Pro; ezPDF Reader PDF Annotate Form; MoreSpace: SwipePad; WiFi File Transfer Pro; Cloud TV HD Widgets; RocketDial Dialer & Contacts Pro; TimeClock – Time Tracker; Swype Keyboard; Avast Mobile Backup; Speaktoit Assistant; Scan – QR and Barcode Reader; Halfbit Power Toggles (Settings Extended); Dictomate MP3 Audio Recorder; EclipSim GPS Status PRO; Express Dictate; SimpleMind Mind Mapping; SuperBeam PRO Unlocker; Runloop Interval Timer; MiTech TV Portal Chromecast Plugin; Bubblesoft BubbleUPnP.  A complete list of apps purchased during the relevant time period by Plaintiff Goldberg will be supplied in discovery.   Plaintiff Goldberg paid a fee to download each of the foregoing applications.

164.   Plaintiff DeMars downloaded at least the following Android applications through Google Play during the February 1, 2009 to May 31, 2014 period: Chase Bank; Cracked Life; Flixster; Facebook; Angry Birds; and Bacon Reader.  Not all of these Android applications are or were cost-free at the time Plaintiff DeMars downloaded them.  Plaintiff DeMars paid a fee to download Angry Birds, for example.

165.   Plaintiff McCullough downloaded at least the following Android applications through Google Play during the February 1, 2009 to May 31, 2014 period: Angry Birds; Backpacker GPS Trails Pro; Blast Monkeys; Dive Log; Dragon Fly! Free; Epistle; Facebook; Flixster; Google Sky Map; Handcent SMS; handyCalc; iBird Pro; JuiceDefender Pro; MoboPlayer; Pandora; reddit is fun; REI; Ringdroid; AAA Roadside; SDCard Manager; Shazam; TED; Google Translate; TripAdvisor; Wells Fargo; Where's My Droid; and Wiki Encyclopedia.  Not all of these Android applications are or were cost-free at the time Plaintiff McCullough downloaded them.  Plaintiff McCullough paid a fee to download Backpacker GPS Trails Pro and JuiceDefender Pro, for example.

166.   Every time Plaintiff Goldberg, DeMars, and McCullough purchased a paid Android application through Google Play during the February 1, 2009 to May 31, 2014 period, unbeknownst to them, Google caused certain personal information belonging to them to be disclosed to the developer, or developers, of the application or applications purchased.

167.   The personal information so transmitted includes at least the name, email address, and physical or geographical location associated with the Android device and/or the Play account used to purchase the application.

168.   Each such disclosure required the consumption of Plaintiff Goldberg's, DeMars', and McCullough's device battery power because each such disclosure was triggered or initiated by a transmission from the Android device used to purchase the application, though they never consented or authorized Google to cause those transmissions for the purpose of making such disclosures.

169.   Each such transmission also required the consumption of Plaintiff Goldberg's, DeMars', and McCullough's bandwidth because each such disclosure was triggered or initiated by a

1  transmission from the Android device used to purchase the application, though they never consented

2  or authorized Google to cause those transmissions for the purpose of making such disclosures.

3  170.  Plaintiffs Goldberg, DeMars, and McCullough paid for the resources necessary to

4  charge their Android-powered devices and to access the internet, including Google Play, and to

5  purchase and download applications.

6  171.  Plaintiffs Goldberg, DeMars, and McCullough have therefore been deprived of the

7  money they paid to charge their devices and to access the internet and purchase and download

8  applications in proportion to the unauthorized consumption of those resources caused by Google's

9  conduct in requiring certain personal information to be disclosed to third-party application

10  developers, as alleged above.

11  172.  In addition, as alleged above, Google's surreptitious disclosure of such personal

12  information causes Android users – including Plaintiffs Goldberg, DeMars, and McCullough – to

13  become subjected to a heightened, unreasonable risk of security breaches, including identity theft.

14  The reason for this materially increased security risk is that Google has an extraordinarily low

15  barrier to entry for Android app developers.  Android app developers include not only large

16  corporations subject to strict internal controls about the use of personal information, but also and

17  perhaps predominantly non-professionals or coding hobbyists that simply paid a $25 entry fee to

18  register and sell their creations in Google Play, and are unlikely to have sophisticated security

19  measures in place, and are also likely to listen when cyber-criminals tell them they can make

20  thousands by giving up their Play records.  Every affected Android user is now subject to a

21  heightened risk of these and other security events.

22  **C.  Invasion of Privacy Interests: Android App Disclosure Subclass**

23  173.  Plaintiffs Goldberg, DeMars, and McCullough each suffered, and suffers an

24  unexpected and highly offensive invasion of their privacy interests each time that Google disclosed

25  to third-party application developers their personal information when they purchased an Android

26  application during the February 1, 2009 to May 31, 2014 period.

27

28

174.   This compulsory, non-consensual disclosure was unexpected by Plaintiffs Goldberg, DeMars, and McCullough because such disclosure was and is not permitted by any privacy policy or terms of service or other agreement between Google and these Plaintiffs.

175.   The disclosure is also highly offensive because it subjects Plaintiffs Goldberg, DeMars, and McCullough to a heightened, unreasonable risk of security breaches, including identity theft.   Google's extraordinarily low barrier to entry for Android app developers – a $25 registration fee – guarantees that individuals with little or no security measures in place have received transmissions of personal information from each of these Plaintiffs.

**D.   Invasion of Privacy Interests: Gmail Users**

176.   Plaintiffs Marti, Nisenbaum, DeMars, Barrios, Anderson, Villani, and McCullough each created Gmail accounts prior to March 1, 2012.

177.   The terms under which each Plaintiff agreed to create their Gmail accounts provided that Google would (a) "ask for [Plaintiffs'] consent prior to" any use "different than the purpose for which [the information collected in connection with the Gmail account] was collected"; (b) "not use any of [Plaintiffs'] content for any purpose except to provide [Plaintiffs] with the Service"; and (c) "store[], process[], and maintain[] [Plaintiffs'] messages, contact lists, and other data related to [Plaintiffs'] account[s] in order to provide the service to you."

178.   Plaintiffs Marti, Nisenbaum, DeMars, Barrios, Anderson, Villani, and McCullough, each used and/or created accounts with other Google products prior to March 1, 2012, including google.com, Android, YouTube, Picasa, Voice, Google+, Maps, Docs, and other products.

179.   Each Plaintiff provided Google with certain information, including their names, email addresses, physical contact information, email contacts, and contents of emails drafted and received, in connection with their Gmail accounts, and provided Google with different information (voluntarily or otherwise), including their search queries, web browsing histories, images, telephone contacts, locations (including geolocation data and GPS coordinates), and video consumption history, in connection with their other Google accounts and/or product usage.

180.   Each Plaintiff intended and reasonably believed that the information he or she provided in connection with Gmail would not be used for any purpose other than to allow Google to provide each Plaintiff with the Gmail service, as stated in the Gmail Legal Notice prior to March 1, 2012.

181.   On or around March 1, 2012, Google began combining information provided by each Plaintiff in connection with Gmail with information provided in connection with the other Google products – not to provide any particular service, but to create a more comprehensive and thus more lucrative representation of each individual Plaintiff.   As alleged above, this change was part of a much more expansive plan to redesign Google from the ground up as a social media advertising company, called Emerald Sea.

182.   Google did not seek or acquire the explicit consent of any Plaintiff in combining the different categories of information that they provided in connection with the different services. Indeed, Google purposely kept silent about its intentions prior to announcing the elimination and unification of the privacy policies.

**E.   Unauthorized Access and Wrongful Disclosure of Communications**

183.   Plaintiffs Marti, Nisenbaum, DeMars, Barrios, Anderson, Villani, and McCullough, each consented prior to March 1, 2012 to provide information to the Gmail service only to allow Google to provide them with the Gmail service (i.e., the provision of the capacity to send and receive email, store email messages, maintain contact lists and calendars).   No Plaintiff agreed to grant Google a generalized license to combine their Gmail information, including contact lists and specific email communications, with information obtained through their use of products other than Gmail.

184.   On or around March 1, 2012, Google accessed each Plaintiff's stored email communications (in Gmail) and made their contents available to products other than Gmail, including google.com search, Picasa, Voice, Google+, Maps, Docs, and other products.

185.   Such access was not accidental but was done pursuant to the new unified privacy policy introduced on March 1, 2012, and was intended by Google as part of the Emerald Sea plan, formulated and approved by Google executives no later than May 2010.

186.   After March 1, 2012, each Plaintiff began to receive google.com search results and to be shown ads, on various Google products and on third-party websites participating in Google advertising networks, that draw information from their Gmail activity, including the contents of the messages in their Gmail boxes, and are tailored to specific interests described in their messages and locations described in their messages or derived from personal information provided to Gmail but not to google.com or any other Google product.

187.   Further, insofar as Google engages independent, unidentified third-party entities to process and distribute user information across its product platforms, including the contents of Plaintiffs' Gmail communications, Google intentionally discloses the contents of those communications outside of Google.  Because this is itself a violation of the pre-March 1, 2012 privacy policies and the unified privacy policy, this practice falls outside the *legitimate* scope of Google's ordinary course of business, even if Google ordinarily and systematically violates its privacy policies, as alleged herein.

## F.  Unauthorized Interception of Communications

188.   Plaintiffs Marti, Nisenbaum, DeMars, Barrios, Anderson, Villani, and McCullough, each consented prior to March 1, 2012 to provide information to the Gmail service *only* to allow Google to provide them with the Gmail service.  No Plaintiff agreed to grant access to such information to any service other than Gmail, or for any purpose other than to permit Google to provide them with the Gmail service (i.e., the provision of the capacity to send and receive email, store email messages, maintain contact lists and calendars).

189.   On or around March 1, 2012, each Plaintiff's Gmail communications, including but not limited to communications sent by Plaintiffs and en route to their destinations in other users' e-mailboxes as well as communications sent to Plaintiffs and en route to their destinations in Plaintiffs' e-mailboxes, were accessed by Google products other than Gmail, including google.com search, Picasa, Voice, Google+, Maps, Docs, and others.  Such access occurred through Google's use of computer systems, applications, and/or codes that were not necessary to deliver the Gmail service to Plaintiffs, but which were designed to export portions of the contents of each Plaintiff's

Gmail communications to other services or products and for use on third-party sites that have partnered with Google in advertising networks. As described above, the Gmail platform has in place an automatic mechanism that routes incoming and outgoing messages contemporaneously to independent third parties – not, or not only, to facilitate the transmission of such messages, but to distribute portions or derivations of the contents of Gmail communications to other Google services for use in those other services and in advertising on third-party websites that have partnered with Google in advertising networks.

190.    Plaintiffs know this because, after March 1, 2012, each Plaintiff began to receive google.com search results and to be shown ads, on various Google products and on third-party websites participating in Google advertising networks, that draw information from their Gmail activity, including the contents of the messages in their Gmail boxes (including the Sent mailbox, which contains messages that are en route to their destination in other users' e-mailboxes), and are tailored to specific interests described in their messages and locations described in their messages or derived from personal information provided to Gmail but not to google.com or any other Google product.

191.    Because this is itself a violation of the pre-March 1, 2012 privacy policies and the unified privacy policy, this practice falls outside the legitimate scope of Google's ordinary course of business, even if Google ordinarily and systematically violates its privacy policies, as alleged herein.

**Ongoing Governmental Investigations Regarding Google's Violations of the Privacy and Legal Rights of Its Users Demonstrate the Seriousness of the Injuries that Google's New Privacy Policy Has Inflicted on the Class**

192.    Google's conduct as herein alleged, and the injuries caused to the Plaintiffs, are consistent with its historical practice of violating the privacy of the consumers of its products and its disrespect for legal rights.

**A.  FTC Penalty Concerning Google Buzz**

193.    In February 2010, Google launched a social networking service called Google Buzz, which is the antecedent of Google+. Two of Google Buzz's key features were called "Rich fast sharing" (which combined a variety of social media sources such as Picasa and Twitter into a single

news feed), and "Automatic friends lists" (consumers' Gmail contacts were automatically added to a consumer's Google Buzz account).    Thus, Google Buzz was Google's first attempt at cross-pollinating content across different Google products.  Google took information consumers provided for use within one Google product, Gmail, and used it to populate Google Buzz, a separate Google product.

194.    Google transferred this information despite the fact that, as described above, Google's prior privacy policies stated that Google would only use a consumer's Gmail information for the purpose of providing Gmail services, and would not use this information for any other purpose without the consumer's consent.  Contrary to its terms of service, however, Google was using consumers' Gmail information to populate Google Buzz.

195.    Such cross-referencing of data harmed all consumers by violating their expectation of privacy in their emails and contact lists; but Google's practice was particularly harmful to clients of mental health professionals, attorneys, and finance professionals, as well as to the professionals themselves, who must promise confidentiality.

196.    Not only did Google cross-index this information between products without consumers' consent, but Google did not adequately disclose that Google was automatically making certain private information public through use of the Google Buzz product, and there was no clear way for a consumer to opt out of Google Buzz or to make the information non-public.  Indeed, options for controlling the privacy of this information were very difficult to locate and confusing to consumers.

197.    These unfair and deceptive trade practices resulted in an October 13, 2011 Consent Order between Google and the Federal Trade Commission ("FTC").  The FTC found that Google "failed to disclose adequately that consumers' frequent email contacts would become public by default."

198.    The FTC also found that controls for limiting disclosure of personal information were "confusing and difficult to find…."

199.    Further, the "options for declining or leaving the social network were ineffective."

200.   Google had also failed "to give consumers notice and choice before using their information for a purpose different from that for which it was collected."

201.   In announcing the Consent Order, Jon Leibowitz, Chairman of the FTC, stated, "when companies make privacy pledges, they need to honor them."

202.   The FTC found that Google deceptively claimed that it would seek consumers' consent before using their information for a purpose other than that for which it was collected; Google misrepresented the consumers' ability to exercise control over their information; and Google misrepresented the extent of its compliance with the U.S.-EU Safe Harbor Framework by claiming that the company complied with the framework while violating the principles of Notice and Consent.

203.   In addition to these findings, the Consent Order governs Google's current and future conduct.  Part I of the Consent Order prohibits Google from misrepresenting:  (a) the extent to which it "maintains and protects the privacy and confidentiality" of personal information; and (b) the extent to which it complies with the U.S.-EU Safe Harbor Framework.   Part II of the Consent Order requires Google to obtain "express affirmative consent" before "any new or additional sharing by [Google] of the Google user's identified information with any third party…."

204.   On February 13, 2013, the public learned that Google is flouting this Consent Order by requiring the automatic disclosure to third-party Android application developers of Android device users' names, email addresses, and physical or geographical locations, whenever such users download an application.

205.   Prior to February 13, 2013, Android device users did not know that Google was disclosing their personal information to third-party application developers each time they downloaded an application.  Indeed, because the transmission of such information occurs without notifying Android users, they could not have known this was the case until one of the third-party application developers came forward and informed the public.  Since then, other application developers have confirmed that such personal information is transmitted to them each time the application they have created, or which they market, is downloaded.

1   206.   The risks associated with such unconsented – and concealed – disclosure of personal

2   information include an increased likelihood of suffering identity theft or having malware implanted

3   on one's device, because the application developers in receipt of such information may decide to sell

4   pools of personal data to malicious groups, or because those developers may themselves suffer

5   security breaches.

6   207.   Google has not admitted to this conduct.

7   **B.  FTC Penalty Concerning DoubleClick**

8   208.   Google continued to disregard its customers' concerns about and interests in their

9   privacy by blithely violating its obligations under the FTC Consent Order.  On August 8, 2012, the

10  FTC filed a complaint in the U.S. District Court for the Northern District of California against

11  Google, charging Google with having misrepresented to users of Apple, Inc.'s Safari internet

12  browser that it would not place tracking cookies or serve targeted ads to those users and that users

13  would automatically be opted out of such tracking and targeting as a result of the default settings of

14  the Safari browser.

15  209.   According to the FTC's complaint, Google specifically told Safari users that because

16  the Safari browser is set by default to block third-party cookies, as long as users did not change their

17  browser settings, this setting "effectively accomplishes the same thing as [opting out of this

18  particular Google advertising tracking cookie]."  In addition, Google represented that it is a member

19  of an industry group called the Network Advertising Initiative, which requires members to adhere to

20  its self-regulatory code of conduct, including disclosure of their data collection and use practices.

21  210.   Despite these promises, the FTC charged that Google placed advertising tracking

22  cookies on consumers' computers, in many cases by actively circumventing the Safari browser's

23  default settings.  Google exploited an exception to the browser's default setting to place a temporary

24  cookie from the DoubleClick domain.  Because of the particular operation of the Safari browser, that

25  initial temporary cookie opened the door to all cookies from the DoubleClick domain, including the

26  Google advertising tracking cookie that Google had represented would be blocked from Safari

27  browsers.

28

211.    Google's actions expressly violated the FTC's October 2011 Consent Order which barred Google from, inter alia, misrepresenting the extent to which consumers can control the collection of behavioral and related information.

212.    The FTC's action was settled pursuant to a new Consent Order, dated August 9, 2012, that required Google to pay a record $22.5 million and required Google to disable all tracking cookies it had said it would not place on consumers' computers.

213.    In announcing the Order, FTC Chairman Jon Leibowitz said, "No matter how big or small, all companies must abide by FTC Orders against them and keep their privacy promises to consumers, or they will end up paying many times what it would have cost to comply in the first place."

### C.  The European Union's Investigation of Google's New Privacy Policy

214.    As set forth above, on March 1, 2012, Google changed its privacy policy, which, yet again, allows the commingling of user data between Google's products without consumers' consent or an effective ability to opt out.  It commingles data in the same manner that resulted in the October 2011 Consent Order, and consumers of Google's products and services have been harmed as a result.

215.    The new privacy policy came under governmental scrutiny in Europe last year, and the investigation of European Union ("EU") authorities was still ongoing as of the date of filing of this Consolidated Amended Complaint.

216.    On February 2, 2012, the EU notified Google CEO Larry Page ("Page") that an Article 29 Working Party – an "independent European advisory body on data protection and privacy" – would be reviewing "the possible consequences for the protection of the personal data of [EU member state] citizens in a coordinated procedure."  The Article 29 Working Party designated a French national regulatory body, the National Commission for Computing and Civil Liberties ("CNIL"), to lead the investigation.

217.    In the same letter, the Article 29 Working Party "call[ed] for a pause [on Google's behalf] in the interests of ensuring that there can be no misunderstanding about Google's

commitments to information rights of their users and EU citizens, until we have completed our analysis."

218.     On February 27, 2012, the CNIL informed Page of the CNIL's preliminary findings. According to the letter, "[the CNIL's] preliminary analysis shows that Google's new policy does not meet the requirements of the European Directive on Data Protection (95/46/CE), especially regarding the information provided to data subjects" (emphasis in original).  To comply, the CNIL explained, Google would have to provide more specific disclosures about how it plans to use different categories of user information.

219.     The CNIL further observed that, "rather than promoting transparency, the terms of the new policy and the fact that Google claims publicly that it will combine data across services raises fears about Google's actual practices. Our preliminary investigation shows that it is extremely difficult to know exactly which data is combined between which services for which purposes, even for trained privacy professionals."

220.     The same letter adds, "The CNIL and the EU data protection authorities are deeply concerned about the combination of personal data across services: they have strong doubts about the lawfulness and fairness of such processing, and about its compliance with European Data Protection legislation…" (emphasis in original).  The letter concludes by "reiterat[ing], on behalf of the Working Party, our call for a pause until we have completed our analysis" (emphasis in original).

221.     The CNIL sent Page another letter on March 16, 2012, in which it stated, "The CNIL deeply regrets that Google did not delay the application of the new policy, despite the first conclusions of our analysis regarding its compliance with the European data protection legislation."

222.     The March 16, 2012 letter annexed a questionnaire containing 69 questions regarding Google's new privacy policy.  A second questionnaire was sent to Google on May 22, 2012 because Google's responses were inadequate, imprecise, or incomplete.

223.     On October 16, 2012, the Article 29 Working Party sent Page a letter outlining the CNIL investigation findings.  After noting that the new privacy policy "suggests the absence of any limit concerning the scope of the collection and the potential uses of the personal data" of users, the

letter presents a series of legal deficiencies associated with the new privacy policy. Most importantly, the letter states that "the investigation confirmed our concerns about the combination of data across services" (emphasis in original).

224. Based on the CNIL's investigation, it is now clear that, "The new Privacy Policy allows Google to combine almost any data from any services for any purpose." Because Google has failed to obtain user consent, and has failed to limit or to balance its data collection and cross-platform sharing practices, the CNIL stated that, "Combining personal data on such a large scale creates high risks to the privacy of users. Therefore, Google should modify its practices when combining data across services for these purposes."

225. The CNIL investigation also confirmed that Google's new policy provides insufficient information to users about what kinds of data will be collected and shared with different services, and the purposes for which such data will be collected and shared with different services.

226. The CNIL offered Google several practical recommendations. Regarding combination of data, the CNIL stated that "Google should take action to clarify the purposes and means of the combination of data. In that perspective, Google should detail more clearly how data is combined across its services and develop new tools to give users more control over their personal data," and that Google should provide an opt-out mechanism that would allow users to prevent Google from aggregating their personal data.

227. In its formal findings, the CNIL made clear that "Google's interests to implement the extensive combination of data detailed above are overridden by the interests for fundamental rights and freedoms of the data subject [i.e., user]" (emphasis in original).

228. Google was given until February 2013 to respond adequately and completely to the CNIL's queries, and to explain how it plans to bring its new unified privacy policy into line with the EU's legal requirements. The deadline for a response was February 18, 2013, and Google failed to make any further reply or to implement a less restrictive, more transparent privacy policy.

229. On February 18, 2013, the CNIL stated that it would lead a new Working Group that would impose a penalty or other repressive measures against Google by summer 2013. The EU

1   authorities have not yet announced the nature or severity of the repressive measures they expect to

2   impose on Google.

3       230.    On January 8, 2014, the CNIL announced that it was fining Google €150,000

4   ($203,000) for the above privacy violations.  The fine is the largest allowed under French privacy

5   law for first-time offenders and the highest penalty that the regulatory has ever issued.

6       231.    These are not the only fines that Google has faced in Europe in recent months.  In

7   December 2013, the Spanish Data Protection Agency fined Google €900,000 ($1.2 million) for not

8   complying with Spain's privacy laws.  Spain complained of many of the same acts as Plaintiffs

9   herein.  The Spanish authorities said, "The combination of data collected through different services

10  … exceeds the reasonable expectations of the majority of users, who are not aware of it and lose

11  control of their own personal information[.]"

12      232.    Also in December 2013, the Dutch Data Protection Authority found that Google had

13  violated Dutch privacy laws by failing to adequately inform users that their data would be collected

14  and combined across all of Google's services, or to offer any explicit options to consent to or reject

15  the processing of their data in this manner.  The Dutch authorities have not yet announced a penalty.

16      233.    Other regulatory organizations representing the interests of states and citizens outside

17  of Europe, including the Asia Pacific Privacy Authorities (which comprises privacy authorities of

18  Australia, Canada, Hong Kong, Korea, Mexico, and New Zealand), conducted investigations into

19  Google's new privacy policy, and pleaded with Google to grant more control to users regarding the

20  manner in which their personal data is handled and to clarify the extent to which personal data is

21  shared across Google products.

22  **Consumers Do Not Want Google to Aggregate Their Information**

23      234.    Studies show that an overwhelming number of consumers do not want to receive

24  advertisements targeted based on behavior or the contents of their emails, or search results based on

25  their prior activity and behavior on other platforms, such as Gmail.

26      235.    According to a March 9, 2012 study released by the Pew Internet & American Life

27  Project, 800 Web users were asked how they would feel about a search engine remembering their

28

1 prior queries and using that data to personalize future results. Seventy-three percent of the

2 respondents said they "would not be okay with it" because they felt it was an invasion of privacy.

3     236. The study also asked 1,700 Web users how they felt about receiving targeted

4 advertisements. Sixty-eight percent of respondents were "not okay with it" because they do not want

5 to be tracked and profiled. Only 28% said they were "okay with it" because they received ads and

6 information relevant to their interests.

7     237. These results are consistent with a study released in September of 2009 by professors

8 at the University of Pennsylvania's Annenberg School for Communication and the University of

9 California, Berkeley School of Law, which found that sixty-six percent of Web users do not want

10 customized ads.

11     238. Seizing on the rampant unpopularity of Google's new privacy policy and its invasive

12 advertising practices, Microsoft, which operates Outlook.com, launched a new campaign to promote

13 its service over Gmail on the premise that Outlook.com respects user privacy more than Gmail. To

14 bolster its promotion (labeled, "Don't Get Scroogled"), Microsoft commissioned research on

15 consumer perceptions of Google's practices.

16     239. Microsoft hired GfK Roper to conduct field research on February 1-4, 2013 and

17 issued its results on February 7, 2013. The research indicates that 47% of internet users did not

18 believe that any major email service providers scan the contents of their personal emails to target ads

19 to them, while 19% did not know; only 34% believed, accurately, that some email providers do scan

20 the contents of their emails for advertising purposes.

21     240. The research also indicated that 89% of internet users disapprove of the notion that

22 email providers would scan the contents of their personal emails to target ads to them.

23     241. The research also showed that 86% of internet users feel that email providers'

24 scanning of their personal emails to target ads to them is an invasion of their privacy. 90% of

25 internet users agreed that this practice should not be allowed. 87% also agreed that email providers

26 should allow users to opt out of such content-scanning.

27

28

242.   As alleged more fully elsewhere herein, Google not only scans the contents of Gmail users' emails in order to target ads to those users within Gmail; Google goes much further and discloses the contents of those communications to entirely different services (and unidentified third-party processing entities), in contravention of the pre-March 1, 2012 privacy policies, in contravention of users' reasonable expectations of privacy, and in contravention of common law and statutory protections afforded to Google's users.

## TOLLING OF THE STATUTE OF LIMITATIONS

243.   There is no way to categorically opt out of Google's new privacy policy.   The existing means of opting out are limited, partial, and not readily ascertainable.  A user would have to abstain from using Google products to effectively prevent Google from conducting the invasive and injurious actions complained of herein.  Accordingly, exercising reasonable care, Plaintiffs and the Class and Subclass members cannot effectively opt out of Google's new privacy policy.

244.   By reason of the foregoing, and because Google deliberately concealed its intention not to honor the pre-March 1, 2012 privacy policies that placed a limit on Google's ability to combine user data across product platforms, a plan it formulated no later than May 2010, as alleged in more detail above, the claims of Plaintiffs and other Class and Subclass members are timely under any applicable statute of limitations (as tolled by the filing of the initial Complaint) pursuant to the discovery rule and the doctrine of fraudulent concealment.

245.   Google has been aware of the deceptive nature of its prior privacy policies at least since the decision was made to collapse most of the discrete privacy policies into one, no later than May 2010, but likely even earlier.

246.   Despite this knowledge and awareness, Google continues to aggregate consumers' personal data without their consent and a meaningful ability to opt out.

247.   Google's failure to obtain consumers' explicit consent to the practice of combining and sharing or disclosing users' personal information across its platforms and in the compilation of a comprehensive individual dossier for each user, its failure to provide a meaningful opt-out mechanism, and its failure to compensate users the likenesses of whom are incorporated into

1  Google-managed ads was and is willful, wanton, malicious, outrageous, and was and continues to be

2  undertaken in deliberate disregard of, or with reckless indifference to, the rights and interests of

3  Plaintiffs and the Class and Subclass members.

**CAUSES OF ACTION**

**A.     Counts Brought On Behalf Of The Android Device Switch Subclass**

**COUNT I[1]**

**VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**

**California Civil Code § 1750 *et seq.***

248.   Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

249.   Plaintiff Nisenbaum brings this claim on behalf of the Android Device Switch Subclass.

250.   California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, prohibits certain enumerated unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result in the sale or lease of goods or services to any consumer, including "[r]epresenting that goods or services have … characteristics … which they do not have" (§ 1770(a)(5)), "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another" (§ 1770(a)(7)), "[a]dvertising goods or services with intent not to sell them as advertised" (§ 1770(a)(9)), "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law" (§ 1770(a)(14)), or "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not" (§ 1770(a)(16)).

251.   As described above, Plaintiff Nisenbaum acquired an Android-powered device in June 2010 and continued to own that device on March 1, 2012, when the new privacy policy took

---

[1] Plaintiffs include this Count I (Violation of California Consumers Legal Remedies Act) on behalf of the Android Device Switch Subclass solely in order to preserve the claim for appellate review.

1   effect.  Plaintiff Nisenbaum created an account in connection with his use of his Android device, as

2   required by Google to access the Android Market (now Google Play).

3        252.   Thereafter, Plaintiff Nisenbaum was permanently logged in to his Android-related

4   account.

5        253.   However, in June 2010, when Plaintiff Nisenbaum acquired his Android-powered

6   device, the Android-powered device privacy policy was in effect.  In that document, Google placed

7   definite limits on its ability to combine user data across its product platforms.  In particular, Google

8   stated that it would not associate the following discrete categories of Android user information with

9   that user's Google profile or account:

10           (i) the hardware model of a user's Android-powered phone or device;

11           (ii) the version of Android software used by a user;

12           (iii) information about crashes or other phone-level events experienced by an Android

13       user;

14           (iv) information generated by the use of third-party applications or features, such as

15       mobile browsers, social networking software, address books, and reference applications, used

16       by an Android user; and

17           (v) an Android user's location information, including Cell ID and GPS information.

18        254.   However, the March 1, 2012 privacy policy, which replaced the Android-powered

19   device privacy policy, discloses that the following categories of Android user information, among

20   many others, is collected and associated with the user's account: "device-specific information (such

21   as your hardware model, operating system version, unique device identifiers, and mobile network

22   information including phone number)," "device event information such as crashes, system activity,

23   hardware settings, browser type, browser language …," and "GPS signals sent by a mobile device"

24   as well as "sensor data from your device that may, for example, provide information on nearby Wi-

25   Fi access points and cell towers."

26        255.   Google's assurances in its Android-powered device privacy policy that precisely

27   these categories of information would not be used to identify Android users individually, or be

28

otherwise associated with other information capable of identifying users individually, were false when made because Google already decided, no later than May 2010, not to honor these terms. Google's decision to eliminate this policy and its terms in favor of a unified policy on March 1, 2012 permitting Google to do precisely what it was not formerly allowed to do represents a substantially increased invasion of Android users' privacy interests, including Plaintiff Nisenbaum's, because it permits Google to commingle data that was previously off-limits to Google by virtue of its own policies.

256.    Had Google disclosed in June 2010 that it did not intend to honor the terms of the Android-powered device privacy policy at that time, Plaintiff Nisenbaum would not have purchased his Android device.

257.    Unknown to Plaintiff Nisenbaum in June 2010, but known to Google no later than May 2010, Google in fact had no intention of honoring the Android-powered device privacy policy. As alleged in more detail above, by May 2010, Google had designed an "ambitious plan" (*i.e.*, Emerald Sea) that required the elimination of all existing barriers between Google platforms and products, including Android, and thus also of all limitations on combining user data across platforms and products. However, Google "consciously" decided to withhold this information from the public, including Plaintiff Nisenbaum.

258.    Google therefore intentionally misrepresented the ability of Plaintiff Nisenbaum and other members of the Android Device Switch Subclass to prevent the association and commingling of their personal information (that is, of the specific categories of information delineated as off-limits in the Android-powered device privacy policy) with that user's Google Account and other, non-Android data.  This misrepresentation was made to induce Plaintiff Nisenbaum's, and the Android Device Switch Subclass members', dependence on Google products and services, including Android and the Android Market/Google Play, even while Google knew there was no way for users to prevent such data from being associated, commingle, and used in connection with other, non-Android products, once the Android-powered device privacy policy was eliminated pursuant to the Emerald Sea plan, so that Google could enjoy substantial profits.

259.     Google thereby violated Cal. Civ. Code § 1770(a)(5), (7), (9), (14), and (16).

260.     As a result of Google's aggregation of his Android-related information (such as device-specific information, geolocation data, third-party application data, and others specifically delineated as off-limits in the Android-powered device privacy policy) with his non-Android related information, Plaintiff Nisenbaum felt that his privacy interests were invaded and purchased an alternative, non-Android mobile device in or about May 2012.  Plaintiff Nisenbaum ceased using his Android-powered device upon purchasing the alternative non-Android device.

261.     Plaintiff Nisenbaum and the members of the Android Device Switch Subclass are "consumers" within the meaning of Cal. Civ. Code § 1761(d) insofar as Plaintiff Nisenbaum and the members of the Android Device Switch Subclass acquired, by purchase or lease, Android-powered devices.

262.     On March 29, 2012, a CLRA notice letter complying in all respects with Cal. Civ. Code § 1782(a) was served on Google.  Plaintiff Anderson sent Google a letter via certified mail, return receipt requested, advising Google that it is in violation of the CLRA and demanding that it cease and desist from such violation, and make full restitution by refunding the monies received therefrom.  Google was further advised that in the event that the relief requested has not been provided within thirty (30) days, Plaintiff Anderson would amend his complaint to include a request for monetary damages pursuant to the CLRA.  That 30-day period having passed, Plaintiffs include such a request.  A true and correct copy of Plaintiff Anderson's CLRA letter is attached hereto as Exhibit A.

## COUNT II[2]

## VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW

### Cal. Bus. & Prof. Code § 17200 *et seq.*

263.     Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

---

[2] Plaintiffs include this Count II (Violation of California Unfair Competition Law) on behalf of the Android Device Switch Subclass solely in order to preserve the claim for appellate review.

1    264.    Plaintiff Nisenbaum brings this claim on behalf of the Android Device Switch

2  Subclass.

3    265.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et*

4  *seq.*, prohibits any unlawful, unfair, or fraudulent business act or practice, or any unfair, deceptive,

5  untrue, or misleading advertising.

6    266.    As described in more detail hereinabove, and specifically in Count I, above, Google's

7  conduct with respect to the Android Device Switch Subclass constitutes a violation of the CLRA.

8  Therefore, this same conduct constitutes a violation of the UCL's "unlawful" prong.

9    267.    Google's conduct with respect to the Android Device Switch Subclass also

10  constitutes a violation of the UCL's "unfair" prong.  A business act or practice is unfair when it

11  contravenes a public policy, is immoral, unethical, oppressive, or unscrupulous, and/or runs afoul of

12  principles tethered to constitutional, statutory, or regulatory enactments.  California's constitution

13  provides individuals with a fundamental and inalienable right to privacy.  *See* Calif. Const. Art. 1, §

14  1 ("All people are by nature free and independent and have inalienable rights.  Among these are

15  enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing

16  and obtaining safety, happiness, and privacy.").  The State of California has also enacted numerous

17  statutes and regulations intended to protect the individual right to privacy from unscrupulous

18  corporations such as Google, though not all feature a private right of action.  *See, e.g.*, Cal. Civ.

19  Code § 1798.83-84; Cal. Civ. Code § 1708.8; Cal. Civ. Code § 1798.29.

20    268.    Google's conduct with respect to the Android Device Switch Subclass was unfair

21  because, *inter alia*, it resulted in the violation of Plaintiff Nisenbaum's right to and reasonable

22  expectation of privacy, as well as that of other members of the Android Device Switch Subclass.

23    269.    Finally, as alleged in more detail hereinabove, Google's conduct violates the UCL's

24  "fraudulent" prong because, no later than May 2010, Google devised a plan (Emerald Sea) according

25  to which it would violate all existing product-specific privacy policies that placed any limit on

26  Google's ability to combine user data across product platforms, including the Android-powered

27  device privacy policy.  Statements in the Android-powered device privacy policy assuring users that

28

Google would not associate certain discrete categories of information with other information obtained by Google in connection with that user's use of non-Android Google products, or with that user's Google Account or profile, were thereby rendered false no later than May 2010.  However, Google permitted users to continue to rely upon that language in becoming an Android customer or in opting to remain an Android customer after that date.

270.    The UCL requires a showing of loss of money or property.  Plaintiff Nisenbaum, and the other members of the Android Device Switch Subclass, suffered monetary loss in that they replaced their Android-powered devices with non-Android devices after the introduction of the new unified privacy policy, at their own cost.  They are entitled to restitution of such sums.

**B.    Counts Brought On Behalf Of The Android App Disclosure Subclass**

**COUNT III**

**BREACH OF CONTRACT**

271.    Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

272.    Plaintiffs Goldberg, DeMars, and McCullough bring this claim on behalf of the Android App Disclosure Subclass.

273.    Plaintiffs Goldberg, DeMars, and McCullough were, during the February 1, 2009 to May 31, 2014 time period, Android device users that have purchased at least one paid Android application through Google Play during that period.  Each of these Plaintiffs registered for and maintained a Google Play account.

274.    As a result, on information and belief, Google has caused certain personal information pertaining to Plaintiffs Goldberg, DeMars, and McCullough, including their names, email addresses, and physical or geographical locations, to be disclosed to third parties that sell apps through Android Market/Google Play that each Plaintiff has purchased during the February 1, 2009 to May 31, 2014 time period.  Each such disclosure was made without the authorization or consent, or indeed the knowledge, of the Plaintiffs.  Further, each such disclosure was triggered or initiated by a transmission of data from the Android device on which the applications were purchased,

resulting in the consumption of limited resources, including battery power and bandwidth.  Plaintiffs Goldberg, DeMars, and McCullough never consented or authorized Google to cause those transmissions for the purpose of making such disclosures.

275.   Google, in various policy documents discussed hereinabove (including versions of the Google Wallet privacy policy, the Google Play terms of service, the Android-powered device privacy policy, and the general or default Google privacy policy), represented that it would not share such personal information with third parties absent certain specific circumstances: where necessary to process payments, or to maintain an account, or to complete registration for a service.  None of these circumstances is applicable here.

276.   Plaintiffs Goldberg, DeMars, and McCullough entered into a contract with Google by registering for an Android Market/Google Play account, the key terms of which were provided in the relevant terms of service and privacy policies (for Google Play, Google Wallet, Android devices, and Google generally).   By causing the surreptitious, non-consensual, unauthorized disclosure of Plaintiffs' personal information to third-party app developers, Google breached these contracts.

277.   Because such disclosures occurred at least in part through Plaintiffs' Android devices, certain finite resources purchased by Plaintiffs for their own use – including bandwidth and battery power/capacity – were consumed by Google, for Google's own benefit in maintaining relations with app developers and/or advertisers.

278.   Google has not compensated Plaintiffs for this depletion of resources that resulted from Google's breach of its contracts with Plaintiffs.

## COUNT IV

## INTRUSION UPON SECLUSION[3]

279.   Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

---

[3] Plaintiffs include this Count IV (Intrusion Upon Seclusion) on behalf of the Android App Disclosure Subclass solely in order to preserve the claim for appellate review.

280.   Plaintiffs Goldberg, DeMars, and McCullough bring this claim on behalf of the Android App Disclosure Subclass.

281.   Plaintiffs Goldberg, DeMars, and McCullough were, during the February 1, 2009 to May 31, 2014 time period, Android device users that have purchased at least one Android application through Google Play during that period.  Each of these Plaintiffs registered for and maintained a Google Play account.

282.   As a result, on information and belief, Google has caused the disclosure of certain personal information pertaining to Plaintiffs Goldberg, DeMars, and McCullough, including their names, email addresses, and physical or geographical locations, to third parties that sell apps through Android Market/Google Play that each Plaintiff has purchased during the February 1, 2009 to May 31, 2014 time period.

283.   In doing so, Google invaded upon something secret, secluded or private pertaining to Plaintiffs Goldberg, DeMars, and McCullough and the other members of the Android App Disclosure Subclass, including without limitation the names, email addresses, and physical or geographical location of each Plaintiff, all of which are (when bound together in a single disclosure) categories of information in which Plaintiffs and other individuals have a reasonable expectation of privacy.

284.   Google's actions constitute an impermissible intrusion upon Plaintiffs' seclusion or solitude, and/or their private affairs, as well as that of the other members of the Android App Disclosure Subclass.

285.   Google's invasion would be highly offensive to a reasonable person, as evidenced for instance by the fact that Plaintiffs Goldberg, DeMars, and McCullough and the Android App Disclosure Subclass members are now, as a result of Google's conduct, each subject to an increased, unexpected, and unreasonable risk to their personal information, including risks of further invasions of privacy, and of harassment, identity theft, and other security events.

286.   Google's invasion violates expectations of privacy that have been established by general social norms.

## COUNT V[4]

## VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW

### Cal. Bus. & Prof. Code § 17200 *et seq.*

287.   Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

288.   Plaintiffs Goldberg, DeMars, and McCullough bring this claim on behalf of the Android App Disclosure Subclass.

289.   Plaintiffs Goldberg, DeMars, and McCullough were, during the February 1, 2009 to May 31, 2014 time period, Android device users that have purchased at least one Android application through Google Play during that period.

290.   The UCL prohibits any unlawful, unfair, or fraudulent business act or practice, or any unfair, deceptive, untrue, or misleading advertising.

291.   For the period between February 1, 2009 and May 31, 2014, Google violated the "fraudulent" prong of the UCL by intentionally and knowingly misrepresenting that it would not disclose Android users' personal information, including the names, email addresses, and physical or geographical locations of Plaintiffs Goldberg, DeMars, and McCullough and the members of the Android App Disclosure Subclass, to any third party except in certain limited circumstances not present here, as alleged above.

292.   In fact, Google did disclose such users' personal information, including the names, email addresses, and physical or geographical locations of Plaintiffs Goldberg, DeMars, and McCullough and the members of the Android App Disclosure Subclass, with third-party application developers, each time they purchased a paid Android application through Google Play during the February 1, 2009 to May 31, 2014 period – without obtaining their consent or authorization for such disclosure, and without notifying them that such disclosure is being made, and indeed in direct

---

[4] Plaintiffs assert claims under the "unlawful" and "unfair" prongs of the California Unfair Competition Law on behalf of the Android Device Switch Subclass solely in order to preserve those claims for appellate review.  For avoidance of doubt, Plaintiffs add that they presently assert claims under the "fraudulent" prong of the California Unfair Competition Law.

contravention of Google's promises in the relevant policy documents, as alleged in more detail above.

293.    Google represented that it did not disclose Android users' personal information to third parties, with the intent of inducing people to purchase Android devices and of inducing Android users to register for, and to use, its products and services, including Google Play, and to download applications through Google Play.  Google did so even while knowing that there was, during the February 1, 2009 to May 31, 2014 period, no meaningful way to prevent one's name, email address, and physical or geographical location from being disclosed to third-party application developers, as long as such applications were purchased by the user.

294.    Plaintiffs Goldberg, DeMars, and McCullough and the members of the Android App Disclosure Subclass justifiably relied upon those misrepresentations when deciding to use Google Play and to purchase Android applications.

295.    Each time Plaintiffs Goldberg, DeMars, and McCullough purchased Android applications between February 1, 2009 and May 31, 2014, Google caused their personal information to be disclosed to the developer or developers of the applications purchased.  Because this disclosure was triggered or initiated by a transmission of data from the Android device used to purchase such applications, Google's practice resulted in the consumption of finite resources purchased by Plaintiffs Goldberg, DeMars, and McCullough, including device battery power and bandwidth.

296.    Plaintiffs Goldberg, DeMars, and McCullough and the members of the Android App Disclosure Subclass suffered damages in the form of consumed device battery power and bandwidth, as alleged above, in an amount to be proven at trial.

297.    Further, Google violated the "unfair" prong of the UCL by leading Plaintiffs Goldberg, DeMars, and McCullough and the members of the Android App Disclosure Subclass to believe that their personal information would be withheld from all third parties, encouraging Plaintiffs and the members of the Android App Disclosure Subclass to make Android devices and applications indispensable to their lives, and then secretly using Plaintiffs Goldberg, DeMars, and McCullough's and the Android App Disclosure Subclass members' personal information in a

manner in which Plaintiffs Goldberg, DeMars, and McCullough and the Android App Disclosure Subclass members did not and would not agree, in a manner from which they cannot effectively opt out, and in a manner that runs afoul of established California public policies and constitutional, statutory, and regulatory enactments, including Calif. Const. Art. 1, § 1, which furnishes an inalienable right to individual privacy.

298.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs Goldberg, DeMars, and McCullough and the members of the Android App Disclosure Subclass seek an order from this Court permanently enjoining Google from continuing to engage in the unlawful, unfair, and fraudulent conduct described herein.    Plaintiffs Goldberg, DeMars, and McCullough and the Android App Disclosure Subclass seek an order requiring Google to (1) immediately cease the unlawful practices described in this Complaint; and (2) award Plaintiffs Goldberg, DeMars, and McCullough and the Android App Disclosure Subclass reasonable costs and attorneys' fees pursuant to Cal. Code of Civ. Proc. § 1021.5.

299.    Plaintiffs Goldberg, DeMars, and McCullough and the Android App Disclosure Subclass members have expended funds in acquiring the resources necessary to cause the disclosure of their personal information to third-party application developers, including the costs of powering their Android devices and of acquiring internet access and bandwidth for their Android devices, and Google has deprived them of these funds by automatically and nonconsensually causing their devices to transmit data triggering or initiating the disclosure of such information to third-party application developers.

300.    In addition, Plaintiffs Goldberg, DeMars, and McCullough and the Android App Disclosure Subclass members are each subject to an increased, unexpected, and unreasonable risk to their personal information, including risks of further invasions of privacy, and of harassment, identity theft, and other security events, thanks to Google's practice of disclosing to third-party app developers their personal information each time they purchased a paid app on Google Play between February 1, 2009 and May 31, 2014.

**C.    <u>Claims Brought On Behalf Of The Class</u>**

## COUNT VI[5]

## INTRUSION UPON SECLUSION

301.    Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

302.    Plaintiffs bring this claim on behalf of the Class.

303.    Google invaded upon something secret, secluded or private pertaining to the Plaintiffs and the Class, including without limitation contents of Gmail communications and Gmail contact lists, records of calls made using Voice, and research conducted in Correlate, and other information in which Plaintiffs and the Class have a reasonable expectation of privacy, and which, by virtue of the Gmail Legal Notice, the Voice Additional Terms of Service, and the Correlate legal notice, Google was expressly prohibited from "us[ing] … for any purpose except to provide [users] with the Service."

304.    Google's actions constitute an impermissible intrusion upon Plaintiffs' and the Class' seclusion or solitude, and/or their private affairs.  The contents of emails in Gmail and telephone calls made using Voice in particular constitute highly sensitive, private information.  It is for precisely this reason that these products' privacy policies and legal notices place limitations on Google's ability to use the content of users for any purpose other than to provide the service to them.

305.    Google's invasion would be highly offensive to a reasonable person, as evidenced for instance by the allegations contained in the section titled, "Consumers Do Not Want Google to Aggregate Their Information."

306.    Google's invasion violates expectations of privacy that have been established by general social norms.

307.    Plaintiffs and the Class were damaged by such unauthorized actions in amounts to be proven at trial.

## COUNT VII[6]

---

[5] Plaintiffs include this Count VI (Intrusion Upon Seclusion) on behalf of the Class solely in order to preserve the claim for appellate review.

**BREACH OF CONTRACT**

308.    Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

309.    Plaintiffs bring this claim on behalf of the Class.

310.    At all times prior to March 1, 2012, Google has maintained a general or default privacy policy purporting to permit Google to "combine the information you submit under your account with information from other services."

311.    However, prior to March 1, 2012, Google has also maintained separate, product-specific privacy policies containing terms that conflict with this general self-authorization.   In particular, these product-specific privacy policy statements include (leaving aside the Android-powered device privacy policy, which is discussed in connection with the claims asserted on behalf of the Android Device Switch Subclass and the Android App Disclosure Subclass) the Gmail Legal Notice, the Voice Additional Terms of Service, and the Correlate legal notice.   In each of these privacy documents, Google affirmatively represented to users that, "We will not use any of your content for any purpose except to provide you with the Service."

312.    On information and belief, Plaintiffs further allege that Google has maintained, prior to March 1, 2012, additional privacy policies and/or legal notices associated with specific products including identical or substantially identical language, but has caused these documents to be removed, erased, deleted, or otherwise made unavailable.  Through discovery, Plaintiffs will identify these additional product-specific limitations on Google's purported ability to combine user data across its platforms.

313.    Commingling user data across product platforms is not "provid[ing] you with the Service."   In the Gmail Legal Notice and the Correlate legal notice, "Service" is undefined.  In the Voice Additional Terms of Service, "Service" is expressly defined as "Google Voice (including the 'Call Phones' feature in Gmail and Google+ Hangouts)."  Providing users with the Gmail service,

---

[6] Plaintiffs include this Count VII (Breach of Contract) on behalf of the Class solely in order to preserve the claim for appellate review.

1   the Voice service, or the Correlate service means, respectively, allowing users to draft, send, and

2   receive emails and maintain calendars and contact lists; allowing users to place audio and video

3   phone calls through internet protocol; and allowing users to research search trends and create graphs

4   and charts depicting such research.

5   314.   Even if "serving users targeted advertising" is included within the definition of "the

6   Service" in any particular case – which it is not – Google's practice of commingling user data across

7   platforms after March 1, 2012 is still not permissible under the terms of these product-specific policy

8   documents.   Nothing prevents Google from creating and serving targeted advertising on the Gmail,

9   Voice, and Correlate platforms *without* commingling users' personal information provided in

10   connection with those platforms with information provided or otherwise obtained in connection with

11   other Google platforms the privacy policies of which did not place similar limitations on Google's

12   ability to do so.   Because of the specific limitation on Google's ability to combine user data across

13   platforms conveyed in the Gmail Legal Notice, the Voice Additional Terms of Service, and the

14   Correlate legal notice, Google was required to refrain from "us[ing] any of [users'] content for any

15   purpose except to provide [users] with the Service," including using such content to construct a

16   detailed digital dossier on each individual user and to serve more highly targeted advertising on

17   these and other Google product platforms.

18   315.   Google eliminated the restriction on its ability to combine user data across platforms

19   contained in the Gmail Legal Notice shortly after implementing the new privacy policy on March 1,

20   2012.   The same language still appears in the Voice Additional Terms of Service and the Correlate

21   legal notice, although Google has been openly violating its terms since at least March 1, 2012.

22   316.   The elimination of the separate product-specific privacy policies on March 1, 2012,

23   and the process by which Google automatically commingles all user data across platforms that was

24   introduced on March 1, 2012, constitutes a breach of the contract entered into by Google and users

25   of Gmail, Voice, and Correlate, and any other Google product platform the product-specific privacy

26   policies of which placed any limits on Google's ability to combine user data across platforms.

27

28

317.   Google has offered no meaningful way to express consent to or rejection of the elimination of the prior product-specific privacy policies.  Google did not require all users to indicate affirmatively that they agreed to the change in terms, nor did it provide an effective means of opting out of the practice, but simply stipulated that continued use constitutes consent.  This is insufficient under California law.

318.   Plaintiffs and the Class have suffered and will continue to suffer damages including, without limitation, deprivation of money earned by the misuse of their personal information by Google, invasions of their privacy interests, and loss of personal information, all of which have ascertainable value to be proven at trial.

### COUNT VIII[7]

### VIOLATIONS OF THE FEDERAL WIRETAP ACT

### 18 U.S.C. § 2511, *et seq.*

319.   Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

320.   Plaintiffs bring this claim on behalf of the Class.

321.   The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, prohibits the intentional interception of any wire, oral or electronic communication through use of a device.

322.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted through use of a device.

323.   Through its use of computer systems, applications, and/or code unrelated to the provision of the Gmail service (*i.e.*, to the provision of the capacity to send and receive email, store email messages, maintain contact lists and calendars), Google is intercepting the contents of Plaintiffs' electronic communications on Gmail by scanning the contents of such communications, including without limitation communications sent to Plaintiffs and en route to their destinations in

---

[7] Plaintiffs include this Count VIII (Violations of the Federal Wiretap Act) on behalf of the Class solely in order to preserve the claim for appellate review.

1  Plaintiffs' e-mailboxes as well as communications sent by Plaintiffs and en route to their destinations

2  in other users' e-mailboxes, in order to provide targeted advertisements within the Gmail service.

3  Such scanning occurs contemporaneously with the transmission of Gmail communications.

4  324.   Through its use of computer systems, applications, and/or code unrelated to the

5  provision of the Gmail service (*i.e.*, to the provision of the capacity to send and receive email, store

6  email messages, maintain contact lists and calendars), Google is also intercepting the contents of

7  Plaintiffs' electronic communications on Gmail by scanning the contents of such communications

8  and disclosing the contents of such communications to services other than Gmail, including without

9  limitation Google+, YouTube, Picasa, Maps, Docs, Reader, google.com search, Voice, and others, in

10 order to provide targeted advertisements on those services and on third-party sites that have

11 partnered with Google in an advertising network.   Such scanning and disclosure occurs

12 contemporaneously with the transmission of Gmail communications.

13 325.   Through its use of computer systems, applications, and/or code unrelated to the

14 provision of the Gmail service (*i.e.*, to the provision of the capacity to send and receive email, store

15 email messages, maintain contact lists and calendars), Google is also intercepting the contents of

16 Plaintiffs' electronic communications on Gmail by scanning the contents of such communications

17 and disclosing the contents of such communications to independent, unidentified third-party entities

18 that Google has engaged.   Such scanning and disclosure occurs contemporaneously with the

19 transmission of Gmail communications.

20 326.   Neither Plaintiffs nor members of the Class consented, nor were they aware that

21 Google was violating its own privacy policy, and tracking and aggregating consumers' internet use

22 across Google platforms, creating a single profile of each consumer that aggregates all information

23 about the consumer across Google platforms – even after logging off of Google accounts – and then

24 appending the aggregated information to consumers' Google accounts when they log back in.

25 327.   The data Google is intercepting and aggregating, which include the contents of Gmail

26 messages and contact lists, are "communications" within the meaning of the Wiretap Act.

27

28

328.   Google intentionally and willfully intercepts the electronic communications of its consumers and intentionally and willfully aggregates consumers' personal information for its own financial benefit pursuant to the new privacy policy introduced on March 1, 2012.

329.   The independent, unidentified third-party entities to which Google exposes Plaintiffs' electronic communications are engaged not to deliver the Gmail service but to facilitate the targeting of advertisements to Plaintiffs.

330.   Plaintiffs are persons whose electronic communications were intercepted within the meaning of Section 2520.

331.   The practices complained of in this Count fall outside of the scope of Google's ordinary course of business because they constitute violations of Google's own privacy policies, including without limitation all privacy policies and/or legal notices that place any limits on Google's ability to combine user data across platforms or to use personal information for any purpose other than to provide the service, *i.e.*, the Gmail Legal Notice, the Voice Additional Terms of Service, the Correlate legal notice, and the Android-powered device privacy policy, as alleged in more detail hereinabove.

332.   Section 2520 provides for preliminary, equitable and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 a day for each day of violation, actual and punitive damages, reasonable attorneys' fees, and disgorgement of any profits earned by Google as a result of the above-described violations.

## COUNT IX[8]

## VIOLATIONS OF THE STORED ELECTRONIC COMMUNICATIONS ACT

## 18 U.S.C. § 2701, *et seq.*

333.   Plaintiffs reallege and incorporate by reference each and every allegation set forth above as though fully set forth herein.

334.   Plaintiffs bring this claim on behalf of the Class.

---

[8] Plaintiffs include this Count IX (Violations of the Stored Electronic Communications Act) on behalf of the Class solely in order to preserve the claim for appellate review.

335.    The Stored Electronic Communications Act ("SECA") provides a cause of action against a person who intentionally accesses without authorization a facility through which an electronic communication service is provided, or who intentionally exceeds an authorization to access that facility and thereby obtains, alters or prevents authorized access to a wire or electronic communication while it is in storage in such a system.

336.    "Electronic Storage" is defined in the statute to include "any temporary, immediate storage of a wire or electronic communication incidental to the electronic transmission thereof."

337.    Google's new privacy policy intentionally exceeds its authorized access to consumers' electronic communications stored on Google's systems, including without limitation Plaintiffs' Gmail messages and contact lists, thus violating the SECA.

338.    Pursuant to its new privacy policy, Google also discloses the contents of Plaintiffs' and other consumers' electronic communications, including without limitation Plaintiffs' Gmail messages and contact lists, to other services or products to which no Plaintiff gave authorization to access such communications, thus violating the SECA.

339.    Google also intentionally places cookies on consumers' computers that access members' stored electronic communications without authorization, thus violating the SECA.

340.    Further, Google engages independent, unidentified third-party entities to process and distribute user information across its product platforms, including the contents of Plaintiffs' Gmail communications.   Such third parties are thus exposed to Plaintiffs' electronic communications, without Plaintiffs' authorization.

341.    Plaintiffs and the other Class members were, and continue to be, harmed by Google's violations, and are entitled to statutory, actual and compensatory damages, injunctive relief, punitive damages and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray the Court to enter judgment against Google and in favor of Plaintiffs, on behalf of themselves and the Class members, and to award the following relief:

A.     Certifying this action as a nationwide class action, certifying Plaintiffs as representatives of the Class and Subclasses, and designating their counsel as counsel for the Class and Subclasses;

B.     Tolling the statute of limitations pursuant to the discovery rule and the doctrine of fraudulent concealment;

C.     Awarding the Plaintiffs and each Class and Subclass member actual and compensatory damages for the acts complained of herein;

D.     Awarding the Plaintiffs and each Class and Subclass member treble damages for the acts complained of herein, where permitted by law;

E.     Awarding the Plaintiffs and each Class and Subclass member costs of suit and attorneys' fees, as allowed by law, and/or awarding counsel for the Class attorneys' fees;

F.     Awarding the Plaintiffs and each Class and Subclass member statutory pre-judgment interest;

G.     Awarding legal and equitable relief as this Court may deem just and proper; and

H.     Granting such other or further relief as may be appropriate under the circumstances.

### **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury as to all issues so triable.

Dated:  February 12, 2015            **BURSOR & FISHER, P.A.**

By:    */s/ L. Timothy Fisher*

L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, California 94596
Tel:  925-300-4455
Fax:  925-407-2700

**GARDY & NOTIS, LLP**
Mark C. Gardy
James S. Notis *(pro hac vice)*
Orin Kurtz *(pro hac vice)*
560 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337

**GRANT & EISENHOFER P.A.**
James J. Sabella *(pro hac vice)*
Diane Zilka *(pro hac vice)*
Kyle McGee *(pro hac vice)*
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501

*Interim Lead Counsel for the Class*

**CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO**
James E. Cecchi
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: 973-994-1700
Fax: 973-994-1744

**LAW OFFICES OF
RICHARD S. SCHIFFRIN LLC**
Richard S. Schiffrin
P.O. Box 2258
West Chester, Pennsylvania 19380
Tel: 610-203-7154

**JAMES SCHWARTZ & ASSOCIATES PC**
Michael Schwartz
1500 Walnut Street, 21st Floor
Philadelphia, Pennsylvania 19102
Tel:  215-751-9865
Fax: 215-751-0658

**LAW OFFICES OF MARTIN S. BAKST**
Martin S. Bakst (65112)
15760 Ventura Boulevard, Sixteenth Floor
Encino, California 91436
Tel: 818-981-1400
Fax: 818-981-5550

*Of Counsel for the Class*

**EXHIBIT A**

# BURSOR & FISHER

P.A.

**1990 N. CALIFORNIA BLVD**
**WALNUT CREEK, CA 94596**
**www.bursor.com**

**SARAH N. WESTCOT**
TEL: 925.300.4455
FAX: 925.407.2700
**swestcot@bursor.com**

March 29, 2012

**_Via Certified Mail – Return Receipt Requested_**

Google Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043

Re:    *Demand Letter Pursuant to California Civil Code § 1782*

To Whom It May Concern:

This letter serves as a preliminary notice and demand for corrective action by Google Inc. ("Google") pursuant to the provisions of California Civil Code § 1782, on behalf of our client, Nicholas Anderson, and all other persons similarly situated.

On March 1, 2012, Google implemented a new Privacy Policy that allows it to consolidate user data across dozens of Google services, including Google Search, Gmail, YouTube, Google+, and AdSense. For example, from within Youtube, Google can now access users' search histories from Google Search, browsing habits from AdSense, and social networking data from Google+. Previously, Google did not consolidate its user data across its services. Each service kept its own records of users' activities. Users expected this level of privacy when they signed up for Google services prior to March 1, 2012.

Google has engaged in a uniform marketing and advertising program representing that its new Privacy Policy — and the decision to consolidate user data — was implemented for the sake of simplicity and to improve users' experiences on Google services. These representations were prominently displayed on Google's Official Blog, Google's Good to Know advertising campaign, and in an open letter to eight Congressional representatives.

However, Google misled consumers because it failed to highlight its true goal: consolidating user data for advertising purposes. Writers, technology experts, and even a former Google Engineering Director recognize that the new Privacy Policy is intended to help Google place targeted advertisements. Advertisers are willing to pay a premium to advertise with Google because it has this user data.

Google's previous privacy policies prohibit the consolidation of user data. Users did not agree to have Google consolidate their user data for advertising. Users did not agree to share this information across Google's dozens of different services. There is no simple and effective way to opt out; users must manage their privacy settings in each Google service.

**BURSOR & FISHER**
P.A.

If a computer user disagrees with Google's new Privacy Policy, the remedy is to stop using his or her Google Account.  But terminating a Google Account is time-consuming, inconvenient, and costly.  Users may have Google Accounts for email, advertising, webpage analytics, or other purposes.  A loss of a Google Account means a loss of business, advertising, and opportunity.

Users with Android phones are in the worst position.  Google connectivity is heavily integrated into these devices.  Google connectivity is used for email, chat, and purchasing content.  If an Android user disagrees with the change, the only remedy is to discard the phone or cease using smartphone functionality.

Nicholas Anderson is a citizen of the State of California and is a consumer as defined in California Civil Code §1761(d) in that he purchased an Android phone and has a Google account "for personal, family or household purposes."  At the time of purchase, Mr. Anderson was familiar with Google's existing privacy policies, and he relied on such misrepresentations in deciding to purchase his Android phone.

Mr. Anderson would not have purchased an Android phone if he had known that Google would breach its existing privacy policies by consolidating his user data.  Mr. Anderson suffered a loss of money as a result of Google's misrepresentation in the amount of the purchase price of his Android phone.

By misrepresenting its existing privacy policies and misrepresenting the reasons for consolidating user data, Google has violated numerous provisions of California law including the Consumers Legal Remedies Act, Civil Code § 1770, including but not limited to subsections (a)(9), (14), and (16).

We hereby demand that Google immediately (1) abide by the terms of its privacy policies prior to March 1, 2012; (2) remove consolidated user data from its possession; (3) adequately disclose that advertising considerations were a material factor in Google's decision to consolidate user data; (4) cease using consolidated user data to deliver targeted advertisements; and (5) agree that it will only consolidate user data on a purely opt-in basis.

It is further demanded that Google preserve all documents and other evidence which refer or relate to any of the above-described practices including, but not limited to, the following:

1.    All documents concerning the development and implementation of consolidating user data;

2.    All communications with advertisers and marketing affiliates concerning the potential uses of consolidated user data;

3.    All documents comparing Google's user data to the data held by its competitors, including Facebook; and

4.    All communications with customers concerning complaints or comments relating to consolidated user data.

Please comply with this demand within 30 days from receipt of this letter.  If the relief requested has not been provided within 30 days from receipt of this letter, Plaintiff will amend the Complaint to include a request for monetary damages pursuant to the CLRA.

We are willing to negotiate with Google to attempt to resolve the demands asserted in this letter.  If Google wishes to enter into such discussions, please contact me immediately.

If Google contends that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents immediately upon receipt of this letter, but in no event later than 30 days from the date of receipt.

Very truly yours,

Sarah N. Westcot