DURIE TANGRI LLP
MICHAEL H. PAGE (SBN 154913)
mpage@durietangri.com
JOSHUA H. LERNER (SBN 220755)
jlerner@durietangri.com
SONALI D. MAITRA (SBN 254896)
smaitra@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:    415-362-6666
Facsimile:     415-236-6300

Attorneys for Defendant
GOOGLE INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE, INC. PRIVACY POLICY LITIGATION | Case No. 5:12-cv-01382-PSG<br><br>**CONSOLIDATED CLASS ACTION**<br><br>**DEFENDANT GOOGLE INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT, OR IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT**<br><br>Date:    April 21, 2015<br>Time:   10:00 a.m.<br>Ctrm:   5 - 4th Floor<br>Judge:  Honorable Paul Singh Grewal |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...................................................................................................................1

II. ARGUMENT ..........................................................................................................................4

    A. *Robertson v. Facebook* is Irrelevant ................................................................................4

        1. *Facebook* Addresses a Claim Plaintiffs Have Not Made.........................................4

        2. Plaintiffs Cannot Seek Reconsideration Now..........................................................7

    B. Plaintiffs Have no Evidence of Damages or Injury-in-Fact.................................................9

        1. Plaintiffs Have No Evidence of Disclosure to Anyone ..........................................9

        2. Plaintiffs' Own Conduct Impeaches Any Claim of Injury ...................................10

        3. Plaintiffs' Claim of Battery Life Depletion Has No Nexus With the Alleged Breach of Contract .................................................................................................11

    C. Mr. Torres' Report Does Not Create a Triable Issue of Fact............................................12

    D. Leave to Amend Should be Denied ..................................................................................14

III. CONCLUSION....................................................................................................................15

i

GOOGLE'S REPLY MEM. IN SUPP. MTD PLS.' CONSOLIDATED 3RD AM. CLASS ACTION COMPL., OR IN THE ALTERNATIVE MOT. FOR SUMM. J. / CASE NO. 5:12-CV-01382-PSG

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Daubert v. Merrell Dow Pharm. Inc.*,
  509 U.S. 579 (1993) ...........................................................................................................14

*Dwyer v. Am. Express Co.*,
  652 N.E.2d 1351 (Ill. App. Ct. 1995) ..................................................................................6

*In re DoubleClick Inc. Privacy Litig.*,
  154 F. Supp. 2d 497 (S.D.N.Y. 2001) .................................................................................6

*In re Facebook Privacy Litig.*,
  791 F. Supp. 2d 705 (N.D. Cal. 2011) ............................................................................1, 4

*In re Facebook Privacy Litig.*,
  No. C 10–02389 JW, 2011 WL 6176208 (N.D. Cal. Nov. 22, 2011) .................................5

*In re JetBlue Airways Corp. Privacy Litig.*,
  379 F. Supp. 2d 299 (E.D.N.Y. 2005) .................................................................................6

*In re Zynga Privacy Litig.*,
  750 F.3d 1098 (9th Cir. 2014) .............................................................................................5

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ...........................................................................................................14

*LaCourt v. Specific Media, Inc.*,
  No. SACV 10-1256-GW(JCGx), 2011 WL 1661532 (C.D. Cal. Apr. 28, 2011) ...............6

*Robertson v. Facebook, Inc.*,
  572 F. App'x 494 (9th Cir. 2014) ................................................................................ passim

*Ruiz v. Gap, Inc.*,
  380 F. App'x 689 (9th Cir. 2010) .....................................................................................10

*Svenson v. Google Inc.*,
  No. 13-cv-04080-BLF, ECF No. 118 (N.D. Cal. Apr. 1, 2015) .....................................8, 9

**Rules**

Fed. R. Civ. P. 12 .............................................................................................................5, 6, 8, 9

Fed. R. Civ. P. 12(b)(6) ............................................................................................................1

Fed. R. Evid. 408 ......................................................................................................................2

Fed. R. Evid. 702 ....................................................................................................................14

L.R. 7-3(d)(2) ...........................................................................................................................7

L.R. 7-9 ....................................................................................................................................7

L.R. 7-9(b) ..................................................................................................................................7

L.R. 7-9(b)(1).............................................................................................................................7

## I. INTRODUCTION

If there is an elephant in the room, Plaintiffs took their sweet time noticing it. According to Plaintiffs, the Ninth Circuit's May 8, 2014 one-paragraph unpublished and non-precedential memorandum disposition in *Robertson v. Facebook, Inc.*, 572 F. App'x 494 (9th Cir. 2014), requires reconsideration and reversal of this Court's December 13, 2013 *and* July 21, 2014 Orders, both of which dismissed Plaintiffs' intrusion upon seclusion claims and found that the *only* allegation of injury-in-fact supporting Article III standing for Plaintiffs' breach of contract claim was a claim for depletion of battery life and use of bandwidth.

Plaintiffs' belated attempt to reshape their complaint yet again fails for multiple reasons. *First*, if Plaintiffs believed the unpublished *Facebook* opinion dictated a different result, the time to seek reconsideration was nearly a year ago. Nothing precluded Plaintiffs from seeking leave to bring the *Facebook* decision to the Court's attention even *before* the Court's July 21, 2014 Order, as it was issued two-and-a-half months earlier. Instead, Plaintiffs ignored the elephant while the parties started *and completed* fact discovery, mediated, and prepared expert reports, all based on the claims as they stood after the Court's July Order. Plaintiffs also ignored that elephant as they amended their complaint again, leaving their allegations of contract damages completely unchanged. Nothing excuses that delay: this Court's rules on motions to reconsider are clear, and bar Plaintiffs' from inventing a new damages theory a year later, after the close of discovery.

*Second*, the unpublished *Facebook* opinion has *nothing* to do with the allegations in this case. In *Facebook*, the complaint alleged that Facebook transmitted to advertisers both the user's Facebook user id and the page the user was viewing at the time, which advertisers could then combine with the information on the user's Facebook page to assemble a comprehensive dossier. *In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 708 (N.D. Cal. 2011). More importantly, the *Facebook* plaintiffs affirmatively pled both that there was a "robust" market for that information and that they had been financially harmed by Facebook usurping their ability to sell that information themselves. *Id.* at 708–09. Judge Ware nonetheless dismissed the claim on a Rule 12(b)(6) motion, based on Facebook's argument that it had in fact not interfered with the plaintiffs' ability to sell their own personal information. *Id.* at 718.

1

The Ninth Circuit's reversal was terse, but its basis is clear: the plaintiffs alleged that they were harmed "by the dissemination of their personal information *and by losing the sales value of that information*." *Facebook*, 572 F. App'x at 494 (emphasis added). But there are not, and have never been, any such claims in *this* case. The *sole* injury alleged by Plaintiffs in their breach of contract claim is battery depletion and bandwidth use, and the parties have completed discovery based on those pleadings. To the extent Plaintiffs asserted any injury to the value of their "personal information"—their email address and name—it was in connection with their intrusion upon seclusion claim, which has been dismissed with prejudice. The CSAC breathed not a word of injury in the form of loss of the Plaintiffs' ability to sell their own information. Nor could it, as the named Plaintiffs, their experts, and their own counsel all freely publish their names and email addresses to the world. *Facebook* is wholly irrelevant here.

*Third*, if *Facebook* were indeed the "elephant," and if Plaintiffs thought they had a claim of injury by dint of being precluded from selling their own email addresses, they had ample opportunity to say so long ago: as the Court is well aware, the CTAC was only recently filed, after more than a year of urging from Google, and nearly a year after *Facebook*. And yet it too omits the allegation of injury Plaintiffs now urge: its allegations of breach of contract damages are word-for-word unchanged from its predecessor, and have nothing to do with either the market value of their email addresses or their ability to sell that information.

*Finally*, Plaintiffs' attempt to substitute alleged "notice" of their new theory for having pled it must be rejected. It is the complaint, not the brief, which must state a claim, and it is the complaint's failure to do so that is at issue here. Moreover, Plaintiffs' argument that Google "cannot claim it was prejudiced" by Plaintiffs' post-discovery change of theory must be rejected as an unconscionable violation of both Federal Rule of Evidence 408 and the express confidentiality agreement the parties signed at mediation.[1] Plaintiffs' reliance on the confidential alleged contents of their mediation brief to suggest that Google should have taken discovery on a damages claim that did not appear in any of their

---

[1] Declaration of Michael Page in Support of Google's Reply Memorandum ("Page Decl.") Ex. A.

complaints is nothing short of outrageous.[2]

The balance of Plaintiffs' arguments fare no better. They have no answer to the fact that, after discovery has closed, they have no admissible evidence that *any* developer ever looked up the name or email address of *any* customer, much less any evidence this happened to one of them personally. They could have taken discovery on that central issue but chose not to, and now simply deride the requirement of *evidence* of damages as making "no sense." Opp'n at 23. But if "sense" is to substitute for proof, it makes perfect sense: Plaintiffs cannot explain why an app developer who has already sold one of them an app would go to the trouble of looking up, one by one, their email addresses. After all, app developers have a much more direct route to their own customers: they can simply require those customers to register (as, for example, Mr. McCullough registered for the GPS app he bought by providing his name and email), or contact them within the app. Neither can they explain any marketing reason the developers would want to collect their email addresses: after all, by definition Plaintiffs have already bought the products, and thus constitute the only class to whom the developer would *not* want to market them.

Faced with that complete failure of proof, Plaintiffs fall back on their prior semantics, describing the *possibility* that a given developer could go through the steps to look up the email address of a given buyer as "transmission," "disclosure," "dissemination," or "publication," and likening it to putting up a billboard. But these calisthenics conflate disclosure with the *risk* of disclosure. Plaintiffs can—at best—claim the latter, and calling it actual disclosure cannot avoid the mountain of authority that precludes claims based on a mere *risk* of improper disclosure and misuse. *See* Opening Brief at 9-11. Plaintiffs have no evidence that any developer ever received any of their information, much less did anything untoward with it, and without that evidence they have no injury-in-fact and no proof of damages.

Next, Plaintiffs attempt to revive their battery life theory by labelling the processes of signing up for a Wallet account, buying an app, and then having a developer look up the buyer's name or email address as an "integrated process." At some level, anything can be described as an integrated process: if

---

[2] The same rule and contract preclude Google from responding on the merits, but we can represent to the Court that there was not a word in Plaintiffs' mediation brief alleging either the existence of a market for the information at issue or the loss of the ability to sell their own information in such a market.

I get in my car, go buy gas, drive to a parking garage, and then later the parking attendant scratches my car, that is an "integrated process": After all, if I hadn't bought gas, I wouldn't have made it to the parking lot. Buying gas is a "but for" cause of the later damage. But it is hardly the same thing as saying the cost of my gasoline is an element of damages *caused* by the attendant, or that it would constitute injury in fact for Article III purposes. Similarly, buying an app is in a trivial sense a but-for cause of the alleged disclosure: absent the purchase, there would be no record in Google's Wallet database, and nothing for the developer to look up, but as explained in detail in our opening brief and declaration, the battery consumption of buying an app does not change if a developer later looks up the transaction.

Finally, Plaintiffs seek to create a triable issue of fact with the declaration of Mr. Torres. As noted above, this effort is wasted because it seeks to offer proof of a claim—loss of sales value—that does not appear in the CTAC. But it also fails on the merits: Mr. Torres' report is devoid of factual underpinnings, and consists of nothing but an essentially random selection of valuations of information irrelevant to this case. The amount of money one would spend to protect the privacy of one's medical history, credit card numbers, age, weight, social security number, or the like is of no probative value in *this* case. Even if pled, the relevant question would be what one would pay to avoid disclosure of one's email address and name, and the only evidence Mr. Torres offers (albeit inadvertently) on that question is that he freely discloses that information (along with his phone number and street address) to the world for precisely $0.00.

## II. ARGUMENT

### A. *Robertson v. Facebook* is Irrelevant

Plaintiffs' belated discovery of and reliance on the unpublished *Facebook* opinion can do them no good for two distinct reasons: it is irrelevant, and it is too late.

#### 1. *Facebook* Addresses a Claim Plaintiffs Have Not Made

In *Facebook*, the allegation was that Facebook transmitted to advertisers both the user's Facebook user id and the page the user was viewing at the time, which advertisers could then combine with the information on the user's Facebook page to assemble a comprehensive dossier. The court dismissed the first version of this complaint as too amorphous in its allegation of damage. 791 F. Supp. 2d at 717. In response, the plaintiffs amended their complaint to include allegations that "consumers themselves are

beginning to recognize the value of their own PII . . . . [C]onsumers *can* now sell their own data for considerable and measurable sums of money, thus realizing the sort of gains that Facebook is accustomed to generating from the sale of personal data." *See* Page Decl. Ex. B (*Facebook* FAC, ECF No. 92) ¶ 23.

A second motion to dismiss ensued, in which Plaintiffs argued that Facebook's misappropriation deprived them of information with actual pecuniary value, and that they therefore had been harmed by being precluded from selling that data themselves:

> Robust and established markets exist that can provide valuations for numerous pieces of personal information and allow individuals and entities to purchase and exchange personal information. (FAC ¶ 23.) In the absence of consent, Plaintiffs should be the ones profiting from the distribution of their personal data, not Facebook. Plaintiffs did not provide consent for Facebook to reveal their valuable personal information to advertisers or other third-parties. (FAC ¶¶ 4, 5, 34, 116.) Therefore, Plaintiffs have lost the right to sell that data to the entities that now no longer need to pay Plaintiffs for it because they obtained it from Facebook. That is how Plaintiffs have suffered damages. Facebook has deprived them of the right to sell their own personal data, which Plaintiffs have alleged is of real, demonstrable value.

Page Decl. Ex. C (*Facebook* Pls.' Opp'n to Def.'s Mot to Dismiss, ECF No. 101) at 12.

In reply, Facebook argued that "[c]ourts also have recognized that even if certain information can be valuable in the aggregate, that value implies nothing about the existence of an individualized market for that information," and thus that Plaintiffs had not adequately alleged that they had been injured by being denied the opportunity to sell their own information. Page Decl. Ex. D (*Facebook* Def.'s Reply, ECF No. 102) at 13.

Judge Ware agreed with Facebook, rejecting the proposition that personal information either "constitutes currency," or "is a form of property," (*In re Facebook Privacy Litig.*, No. C 10–02389 JW, 2011 WL 6176208, at *5 & n.10 (N.D. Cal. Nov. 22, 2011)), and again dismissed the claim, this time with prejudice. The *Robertson v. Facebook* Ninth Circuit appeal followed.

Although the primary focus of that appeal was on the dismissal of Stored Communications Act claims, which resulted in the published affirmance of that ruling (*In re Zynga Privacy Litig.*, 750 F.3d 1098 (9th Cir. 2014)), the Ninth Circuit reversed Judge Ware's contract claim dismissal in the separate, unpublished opinion on which Plaintiffs rely here. The Ninth Circuit agreed that, on a Rule 12 motion, the allegation that a market for that information existed, and that the plaintiff had "los[t] sales value," was sufficient. The Ninth Circuit merely rejected Facebook's factual argument that the Plaintiff had *not*

actually lost sales value:

> Plaintiff argues that his personal information may have value . . . but he did not allege that his personal information had any *less* value after any alleged transmission of a "Referral Header" to any advertiser. To the extent Plaintiff's personal information has value – to him or anyone else – its value is the same as it would be if no disclosure had occurred. *See Low*, 2012 WL 2873847, at *13 ("Plaintiffs have not alleged that they . . . have been foreclosed from opportunities to capitalize on the value of their personal data.").

Page Decl. Ex. E (*Robertson v. Facebook, Inc.*, No. 12-15619, ECF No. 17 (9th Cir. Sept. 26, 2012)) at 46–47.

None of which has anything to do with *this* case. The law, both before and after *Facebook*, was and is that the mere misappropriation of personal information, without a resultant economic harm, for example in the form of being deprived of the ability to monetize that information, is neither damage nor injury-in-fact. *LaCourt v. Specific Media, Inc.*, No. SACV 10-1256-GW(JCGx), 2011 WL 1661532, at *5 (C.D. Cal. Apr. 28, 2011) ("[T]he Complaint does not identify a single individual who was foreclosed from entering into a 'value-for-value exchange' . . . . Plaintiffs do not explain how they were 'deprived' of the economic value of their personal information[.]"); *In re JetBlue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 328–29 (E.D.N.Y. 2005) ("[E]ven if [plaintiffs'] privacy interests were indeed infringed by the data transfer, such a harm does not amount to a diminishment of the quality or value of a materially valuable interest in their personal information."); *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 525 (S.D.N.Y. 2001) ("Demographic information is constantly collected on all consumers . . . . [W]e are unaware of any court that has held the value of this collected information constitutes damage to consumers[.]"); *Dwyer v. Am. Express Co.*, 652 N.E.2d 1351, 1356 (Ill. App. Ct. 1995) ("[D]efendants' practices do not deprive any of the [plaintiffs] of any value their individual names may possess.").

*Facebook* merely states the converse: where the plaintiff *had* alleged that "Facebook has deprived them of the right to sell their own personal data, which Plaintiffs have alleged is of real, demonstrable value," that allegation was sufficient to survive Rule 12 practice, as it was an allegation of actual loss of actual money. But *there is no such allegation in this case*. Plaintiffs plead neither the existence of a market for their email addresses and names nor any impairment of their ability to participate in that market. The allegations of injury in the CTAC are identical to those in the CSAC, and

are listed at paragraphs 146 through 151.  None have anything to do with a market value of their names.  As this Court held in its prior Order (ECF No. 85 at 9, July 21, 2014), only two of those claimed injuries "remain[ed] pertinent"; depleted battery life and bandwidth use, and Mr. Nisenbaum's cost of replacing his phone.  The latter is now out of the case, so the *only* allegation of injury in the CTAC is battery life/bandwidth.

Plaintiffs try mightily to patch that hole with both attorney argument and expert opinion, but (in addition to the failings of that opinion, discussed below) neither can substitute for pleading, particularly on what is Plaintiffs' *fifth* attempt.  If Plaintiffs could have pled a market for their information and loss of sales in that market, they should have done so long ago, particularly when their most recent amendment postdated *Facebook* by nearly a year.  The CTAC simply contains no claim of financial injury to which *Facebook* has the slightest relevance.

### 2.     Plaintiffs Cannot Seek Reconsideration Now

Even if *Facebook* had any relevance to this case—and it does not—the time to bring it to the Court's attention has long since passed.  *Robertson v. Facebook* was issued on May 8, 2014.  At the time, Google's motion to dismiss the CSAC was under submission, and this Court's Order issued July 21, over two months later.  Plaintiffs thus had ample time to seek leave to bring the order to the Court's attention.[3]

Once the Court's Order issued last July, Plaintiffs were also free to seek reconsideration based on *Facebook*.  Local Rule 7-9 allows a party to seek leave for reconsideration if "at the time of the motion for leave, a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought." L.R. 7-9(b)(1).  Facebook, if it was in fact relevant, meets that criterion, as it issued after briefing and oral argument.  But L.R. 7-9(b) also requires that "[t]he moving party must specifically show reasonable diligence in bringing the motion . . . ."  Plaintiffs clearly fail this test.  *Facebook* is nearly a year old.  In the intervening year, the parties have both begun and *concluded* fact discovery based on the damages claims in the CSAC and CTAC.  Adding a completely different theory of harm without the opportunity to test it through discovery is clearly prejudicial.  Similarly, the parties have begun and completed expert reports based on the existing claims,

---

[3] Local Rule 7-3(d)(2) allows the submission of relevant opinions issued after the reply date, although as the hearing had already been held, that submission would have required "prior Court approval."

have mediated based on the existing claims, and Plaintiffs have already sought and received eleventh-hour leave to amend, only to file yet another complaint that does not contain the clam of injury they now urge was endorsed by *Facebook* a year ago.  This is the antithesis of diligence.

We suspect Plaintiffs' lack of diligence has a simple explanation:  that until Judge Freeman issued her ruling last week in *Svenson v. Google Inc.*, No. 13-cv-04080-BLF, ECF No. 118 (N.D. Cal. Apr. 1, 2015) ("*Svenson*"), it never occurred to Plaintiffs that *Facebook* was relevant.  *See* ECF No. 108-5, Sabella Decl. Ex. M.  But *Svenson*, far from supporting Plaintiffs' arguments here, illustrates precisely why they fail.  *Svenson*, although it also concerns Google Wallet and Google Play, has very different (albeit just as fanciful) factual allegations, of which Judge Freeman was required to assume the truth.  Specifically, Ms. Svenson alleges that each App purchase involves the transmission of "Packets Contents" that are transmitted "in packets sent by Plaintiff and the class to Defendants," and contain "personal information about Buyers, including credit card information, purchase authorization, addresses, zip codes, names, phone numbers, email addresses, and/or other information."  *Svenson* at 2, quoting complaint.[4]

More importantly, Ms. Svenson, unlike the Plaintiffs in this case, alleges precisely the damage theory at issue in *Facebook*:  a market for the types of personal information she imagines were transmitted, and her loss of the opportunity to participate in that market:

> Svenson also alleges that Google's conduct in making her personal information available to YCDroid diminished the sales value of that personal information.  FAC ¶ 125.  As the Court recognized in its prior order, the Ninth Circuit expressly has recognized that this type of allegation may be sufficient to establish the element of damages for a breach of contract claim.  *See In re Facebook Privacy Litig.*, 572 Fed. Appx. 494 (9th Cir. 2014).  The Court concluded that Svenson's original complaint did not allege facts sufficient to make out this theory of contract damages because it did not allege a market for Svenson's personal information.  Order of Aug. 12, 2014 at 8, ECF 83.  **Svenson now alleges that "[t]here is a robust market for the type of information contained within the Packets Contents,"** FAC ¶ 98, and that **"[a]s a result of Defendants' actions, Plaintiff and the Class have been deprived of their ability to sell their own personal data on the market,"** *Id.* ¶ 157.

---

[4] As explained in Mr. Kirkpatrick's declaration, and confirmed by Plaintiffs' own expert Mr. Curtin, these allegations are fantasy.  But on a Rule 12 motion, they were presumed true.


*Id.* at 8–9 (emphasis added).  Judge Freeman found those market-based claims of financial loss sufficient to survive an Article III challenge at the Rule 12 stage.  But this is not that case:  the complaint in *this* case contains no such allegations, and Plaintiffs have no evidence that could support such a claim.

**B.     Plaintiffs Have no Evidence of Damages or Injury-in-Fact**

**1.     Plaintiffs Have No Evidence of Disclosure to Anyone**

As Google explained in its opening brief, Plaintiffs have no evidence that any app developer ever obtained their email addresses or names.  The facts are not in dispute here, and nothing in Plaintiffs' opposition creates a factual dispute.  Plaintiffs' experts do not contradict any of the facts set forth in Mr. Kirkpatrick's declaration, and Plaintiffs offer no evidence that any developer ever obtained that information (other, as discussed below, from Plaintiffs themselves).  Instead, they simply parrot counsel's semantic twists.  Mr. Curtin, Plaintiffs' technical expert, agrees in every detail with Mr. Kirkpatrick's technical description, and in fact relies solely on Mr. Kirkpatrick for his opinions.  Nowhere does he opine that any of Plaintiffs' information ever came into the possession of any developer or third party; instead, he simply describes the *possibility* that a developer might look up that information as "publication" and "disclosure."  Plaintiffs' damages expert, Mr. Torres, follows suit, describing that same possibility as" dissemination," "disclosure," and the like.  But in deposition, he admitted that he is unaware of any evidence that any developer ever came into possession of any Plaintiff's information:

> Q:  [Y]ou're not aware of any evidence that any of the plaintiffs', in this case, email addresses or names or coarse addresses were actually obtained by any of the developers who sold them apps, correct?
>
> A:  Right.  I haven't reviewed the specific evidence in the case.

Page Decl. Ex. F (Torres Dep., Apr. 7, 2015) at 80–81:  *see also id.* at 104 (no evidence developers used information for marketing); 114–15 (no evidence developers have accessed or used Google Wallet data); 143 (no evidence of use for marketing); 143–44 (no evidence that developers have disclosed data to others); 144 (no evidence of any security breach at any developer).  Mr. Torres' sole source of "evidence," in fact, is the CTAC itself:

> Q:  I see.  So your evidence for the transmission having happened is the allegation of the complaint – in the complaint?
>
> MS. ZILKA: Objection to form.

9

>   Q:  Is that correct?
>
>   A:  So my analysis and my opinions are based on my review of the complaint.  I – that's – that's it.

*Id.* at 14.

Semantic labels cannot change facts.  There is no *evidence* that any third party developer has ever seen, or had possession of, or had knowledge of, or misused or passed on, any Plaintiff's email address or name.[5]  Without having that information, a developer can neither use nor misuse it.  And if the developer cannot use the information, *a fortiori* the Plaintiffs cannot have suffered any injury from that nonexistent use.  With neither allegation nor evidence of "appreciable and actual" harm, *Ruiz v. Gap, Inc.*, 380 F. App'x 689, 691–92 (9th Cir. 2010), Plaintiffs state no claim and have suffered no injury-in-fact.

### 2. Plaintiffs' Own Conduct Impeaches Any Claim of Injury

Moreover, Plaintiffs' own conduct belies any claim that the mere disclosure of their names or email addresses—even if that disclosure had in fact occurred—constitutes injury.  Although Plaintiffs' expert opines that there is an inflated "privacy value" to "personal information" (based, as discussed below, on studies and markets for very different and more sensitive types of information), Plaintiffs' own actions speak much louder.

Mr. McCullough, for example, is a photographer.  He publishes (in the real sense of making it available to the entire internet for free without restriction) a biography page on the popular website Flickr, which contains his name, his email address, and both his hometown and his current residence.  Page Decl. Ex. G.  He also had no compunction about providing that same information to the very app developers at issue here:  as he testified in deposition, the first thing he did after downloading one of the two apps he purchased, Backpacker GPS Trails Pro, was to register with the developer by providing his name and email address, which he also includes on his business cards.  Page Decl. Ex. H (McCullough Dep., Apr. 3, 2015) at 27–33.  Mr. Goldberg, the newest Plaintiff, is himself a plaintiff's class action lawyer, and maintains a public website containing his name, his full street address, his phone and fax

---

[5] For this reason, Plaintiffs' lengthy discussion of the difference between cases concerning "collection" and "dissemination" of information (Opp'n at 17–19) is entirely irrelevant.

numbers, and a "vcard" containing his email address. *Id.* Ex. I. And Mr. DeMars maintains a public Kickstarter page via which he can be emailed freely. *Id.* Ex. J.

Indeed, Plaintiff's own damages expert, Mr. Torres, while opining on the cash value of keeping one's name and email secret, has his own public website, containing his name, email, phone number, and full street address. *Id.* Ex. K. Plaintiffs' technical experts, Interhack, similarly publish their street address, email addresses, phone number, and web address on their public website. *Id.* Ex. L. And Plaintiffs' counsel, as do we all, puts all that "personal information" in the upper corner of every pleading. Any claim that this information has a quantifiable privacy value is impeached by Plaintiffs', their experts', and their counsel's own actions, each demonstrating that they place exactly zero value on keeping that information secret.

### 3. Plaintiffs' Claim of Battery Life Depletion Has No Nexus With the Alleged Breach of Contract

Plaintiffs next take one last run at trying to connect their alleged cause of action ("disclosure" of email addresses and names to developers) to their alleged harm (depleted battery life and bandwidth use), via the expert report of Mr. Curtin. But Mr. Curtin offers no expert opinion to support the proposition that a developer looking up an email address on Google's servers can possibly cause a user's phone to consume additional power, much less that such consumption has any economic impact.[6] He does not dispute Mr. Kirkpatrick's testimony that no personal information is transmitted to Google, let alone anyone else, in the purchase process, as it is already in the users' Wallet records: in fact, he affirmatively agrees with that statement. Curtin Report at 4, Sabella Decl. Ex. B. Nor does he make any claim that the process of looking up a buyer's email address from Google's servers could possibly alter the amount of battery use in the already-completed purchase. Neither does he opine there is anything contained in the purchase-related transmissions that serves only to enable disclosures to third-parties: Mr. Kirkpatrick's declaration confirms there is not, and Mr. Curtin does not disagree. Instead, he simply states the

---

[6] Mr Torres' report offers some data on the average price of mobile data service, but without any effort to tie that data to any alleged additional use caused by Google. The data are remarkable: they show that the current average price for a megabyte of data is down to one cent, and that the average smartphone user consumes 3.4 *gigabytes* of data per month. But he is careful to note that he is *not* opining that Plaintiffs in this case in fact suffered any financial loss from either bandwidth or battery costs. *Compare* Torres Report at 14 and data cited there *with* Page Decl. Ex. F (Torres Dep.) at 52–53.

11
GOOGLE'S REPLY MEM. IN SUPP. MTD PLS.' CONSOLIDATED 3RD AM. CLASS ACTION COMPL., OR IN THE ALTERNATIVE MOT. FOR SUMM. J. / CASE NO. 5:12-CV-01382-PSG

amorphous mantra that the sequence of purchasing an app, updating Google Wallet's records, and then having (he assumes) a developer look up a particular transaction is an "integrated process."

It is a connected sequence, but so what? Virtually any sequence of events can be described as "integrated," and in virtually any sequence of events (such as our parking garage example) earlier events in the sequence may be the but-for cause of later events. But time flows only one way: the purchase of an app may be one of the but-for causes of the alleged disclosure in the trivial sense that absent a purchase there is no data for a seller query, but the reverse cannot be true. A subsequent query from a developer's server to Google's—no matter how immediately subsequent it might in theory be—cannot change the past, or cost the Plaintiffs even the tiniest fraction of a fraction of a cent.

### C. Mr. Torres' Report Does Not Create a Triable Issue of Fact

Finally, Plaintiffs attempt to establish a triable issue of fact via the expert report of Mr. Torres, which offers various purported valuations of Plaintiffs' "personal information." There are myriad problems with that report, each of which independently renders it of no probative value. *First*, as quoted above, Mr. Torres freely admits that there is absolutely no factual underpinning supporting the proposition that any damage has occurred at all. Mr. Torres' report is remarkable in that its *sole* factual basis consists of citations to the complaint. The circularity of proving the allegations of a complaint by citing them is patent. To be clear, this is not a case where an expert is asked to assume *liability* and then value the resulting damages. Here, Mr. Torres goes much further, assuming the very *occurrence* of the events he is supposed to be valuing.

*Second*, Mr. Torres' methodology, as set forth in greater detail in the rebuttal report of Douglas Kidder ("Kidder Report," Page Decl. Ex. M), is unsupportable. Even were one to assume a developer had obtained a user's email address and name from Google (and Mr. Torres does simply assume that), the data on which he bases his valuations concern types of data so radically different as to be of no probative value whatsoever.

He first attempts to assign a "baseline" value to personal information sold in the marketplace, while carefully obfuscating exactly what "personal information" he is discussing. He describes this process as a "survey" of the market, but it actually consisted of looking up prices for two different public databases, and then picking without explanation the (by more than an order of magnitude) higher price.

1    Put aside the fact, as discussed above, that there is no claim in the CTAC for market loss damages.  Even
2    if there were, Mr. Torres has not developed or relied on any relevant data that might speak to the value of
3    one's email, name, and zip code standing alone.  Instead, he takes as his value the price ($0.18 per
4    person) of a very different VistaPrint mailing list:  one that provides direct mail marketers with the name,
5    email address, and street address of persons who have recently moved to a specified zip code.[7]  As
6    discussed in Mr. Kidder's report, this is apples to raisins:  the value to a contractor or gardening service
7    or decorator or plumber any of scores of other home-related businesses of a list of mailing addresses of
8    persons known to have recently moved into their market (along with the additional service of designing
9    and mailing direct-mail postcards at an upcharge) simply cannot be probative of the value of a mere
10   email address and name:  Built into the price of the former is the not inconsiderable cost of reviewing and
11   assembling public records of home sales, and then researching the new owners' data, in order to create a
12   qualified mailing list limited to the target market.

13       Neither does Mr. Torres offer any reason for choosing VistaPrint's $0.18 per name price over the
14   other list he priced:  EmailZipcode's $0.015 per name (other than the obvious fact that one number was
15   better for his client than the other).  And even that mailing list offered far more than the data at issue
16   here: it also includes street address, gender, and date of birth.  Kidder Report Ex. 4.  But most
17   fundamentally, Mr. Torres' report assumes a market where none exists, or more accurately where the
18   market value of the information is self-evidently set at exactly zero, as evidenced by the fact that the
19   Plaintiffs and their experts disclose the same information to app developers and the public for free.

20       Mr. Torres' next valuation is even farther afield.  He attempts to set a "privacy value" on the
21   information at issue based upon a 2007 study entitled Overcoming Online Information Privacy Concerns:
22   An Information-Processing Theory Approach, *Journal of Management Information Systems*, Fall 2007,
23   Vol. 24, No. 2, pp. 13–42 (Page Decl. Ex. N).  The study concludes that "[a]mong U.S. subjects,
24   protection against errors, improper access, and secondary use of personal information is worth $30.49–
25   $44.62."  *Id.* at 14.  But Mr. Torres carefully omits any mention of *what* personal information that study
26   attempted to value, describing it only as "private personal information."  Torres Report at 10.  In fact, the

---

[7] Mr. Torres apparently believes this is only an email list.  He is mistaken:  it is a mailing list.  Kidder Report at ¶ 34 and Ex. 3.

information "consisted of name, home address, phone number, e-mail address, credit card information, and some industry-specific information . . . occupation, travel purpose, destination, and frequency of travel, as well as frequent flyer numbers . . . medical history, drug allergies, and prescription record . . . household income, stock portfolio, and previous stock trading experience." Page Decl. Ex. N at 23.

To use the experimental value of such a laundry list of intensely personal and valuable information as a proxy for one's email address is absurd. To do so *without disclosing the nature of the data*, instead describing it simply as "private personal information," is unconscionable.

Finally, Mr. Torres opines that the Plaintiffs might have been harmed to the tune of the $6.00 cost of a credit monitoring service or credit freeze, in order to guard against the multiply-hypothetical scenario that a developer (1) collected each buyer's email address, (2) either compiled them together with other information or sold them to others to do so, (3) used that information to steal their identity, and (4) thereby impacted their credit. Putting aside that there is no factual basis for any of these imaginings, the Plaintiffs themselves, like virtually everyone else in the modern world, make their email addresses available: after all, an email address is of no use if people don't know it. We don't need an expert to speculate whether the Plaintiffs might have incurred this cost: if they had, they would have said so.

In short, Mr. Torres's report offers no *facts* that can create a triable issue: its purported factual bases consist entirely of citations to the CTAC and utter speculation. It fails to meet the requirement of Fed. R. Evid. 702 that the testimony "is based on sufficient facts or data . . . the testimony is the product of reliable principles and methods; and . . . the expert has reliably applied the principles and methods to the facts of the case," and thus must be rejected on *Daubert* grounds.[8]

### D. Leave to Amend Should be Denied

Finally, Plaintiffs ask for leave to amend yet again, which would make the *sixth* version of their claims, asserting that Google would suffer no prejudice as a result. Nonsense. Google has litigated this

---

[8] The Supreme Court has emphasized that "[i]n *Daubert*, this Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant but reliable.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 589 (1993)). The *Daubert* factors require considering an expert's methodology not only with respect to its "reasonableness *in general*," *Kumho Tire* at 153 (emphasis in original), but also in light of "*the particular matter to which the expert testimony was directly relevant.*" *Id.* at 154 (emphasis in original).

case for three years, defending against seriatim, wholesale reshaping of claims and theories. We have gone through three rounds of motion practice based on the battery life damages theory, completed discovery and expert reports (and by the time this motion is heard, expert depositions) based on the claims as pled, and have a deadline for opening class certification briefs (May 12) only two weeks after this motion is heard. To have to start over with a completely different damages theory would further prejudice Google both in cost and in delay.

**III.   CONCLUSION**

It is long past time to be done with this case, and long past time for yet another do-over. The Court should dismiss this case for lack of Article III standing, or in the alternative grant summary judgment in Google's favor.

Dated:  April 10, 2015                                                DURIE TANGRI LLP


                                                                                By:   */s/ Michael H. Page*
                                                                                          MICHAEL H. PAGE

                                                                                Attorneys for Defendant
                                                                                GOOGLE INC.

## CERTIFICATE OF SERVICE

I certify that all counsel of record is being served on April 10, 2015 with a copy of this document via the Court's CM/ECF system.

                                               */s/ Michael H. Page*
                                               MICHAEL H. PAGE