**GARDY & NOTIS, LLP**
Mark C. Gardy
James S. Notis *(pro hac vice)*
Orin Kurtz *(pro hac vice)*
560 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337

**GRANT & EISENHOFER P.A.**
James J. Sabella *(pro hac vice)*
Diane Zilka *(pro hac vice)*
Kyle McGee *(pro hac vice)*
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, California 94596
Tel:  925-300-4455
Fax:  925-407-2700

*Interim Co-Lead Counsel for the Class and Subclasses*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE GOOGLE, INC. PRIVACY POLICY LITIGATION | CASE NO. 12-CV-01382 PSG<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE THE TESTIMONY OF FERNANDO TORRES**<br><br>Date:     July 21, 2015<br>Time:     10:00 a.m.<br>Courtroom:     5 – 4th Floor<br>Judge:     Honorable Paul Singh Grewal |

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................................ii

PRELIMINARY STATEMENT ...............................................................................1

ARGUMENT ...........................................................................................................3

I.     THE STANDARDS APPLICABLE TO A *DAUBERT* MOTION...................................3

II.    GOOGLE'S MOTION SHOULD BE DENIED BECAUSE IT IS PREMISED ON THE ASSUMPTION THAT THE JURY WILL ACCEPT GOOGLE'S THEORY OF DAMAGES AND WILL REJECT PLAINTIFFS' POSITION...............4

III.   THE TORRES OPINIONS ARE SUFFICIENTLY RELIABLE AND WILL BE HELPFUL TO THE JURY........................................................................5

      A.    MR. TORRES APPROPRIATELY ASSUMED LIABILITY ON GOOGLE'S PART ............6

      B.    MR. TORRES' OPINIONS ARE SUPPORTED BY RELIABLE DATA AND A RELIABLE METHODOLOGY........................................................................7

           1.    Reliability of the Factual Data Mr. Torres Relies Upon..........................7

           2.    Reliability of the Methodology Mr. Torres Employs ..............................9

           3.    Reliability of Estimated Cost of Bandwidth Depletion .........................14

           4.    Reliability of Estimate of Increased Risks of Future Harm....................14

IV.   BECAUSE GOOGLE'S MOTION TO EXCLUDE TORRES WAS FILED AFTER THE BRIEFING ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND GOOGLE'S MOTION TO DISMISS  OR FOR SUMMARY JUDGMENT WAS CLOSED, THE COURT SHOULD NOT CONSIDER GOOGLE'S MOTION TO EXCLUDE IN CONNECTION WITH THE ADJUDICATION OF THOSE OTHER MOTIONS .................................15

CONCLUSION.........................................................................................................16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Accentra, Inc. v. Staples, Inc.*,
  851 F. Supp. 2d 1205 (C.D. Cal. 2011), *rev'd*, 500 F. App'x 922 (Fed. Cir. 2013)..............6

*Avery Dennison Corp. v. Four Pillars Enter. Co.*,
  45 F. App'x 479 (6th Cir. 2002) ...........................................................................................6

*Brown v. 24 Hour Fitness, Inc.*,
  No. 99-cv-2063, 2001 U.S. Dist. LEXIS 26470 (S.D. Cal. Mar. 6, 2001) ...........................3

*City of Pomona v. SQM N. Am. Corp.*,
  750 F.3d 1036 (9th Cir. 2014) ..........................................................................................3, 5

*Clausen v. M/V New Carissa*,
  339 F.3d 1049 (9th Cir. 2003) ........................................................................................5, 14

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)..................................................................................................*passim*

*Humetrix, Inc. v. Gemplus S.C.A.*,
  268 F.3d 910 (9th Cir. 2001) ................................................................................................5

*In re Cathode Ray Tube Antitrust Litig.*,
  MDL No. 1917, 2013 U.S. Dist. LEXIS 137944 (N.D. Cal. June 20, 2013) ........................3

*In re Sulfuric Acid Antitrust Litig.*,
  235 F.R.D. 646 (N.D. Ill. 2006).............................................................................................6

*Kennedy v. Collagen Corp.*,
  161 F.3d 1226 (9th Cir. 1998) ..............................................................................................3

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir. 2010) .......................................................................................3, 5, 14

*Schonfeld v. Hilliard*,
  218 F.3d 164 (2d Cir. 2000)................................................................................................10

*Sys. Components Corp. v. Fla. Dept. of Transp.*,
   14 So. 3d 967, 980 (Fla. 2009) ..................................................................................10, 11

*U.S. ACCU-Measurements, LLC v. Ruby Tuesday, Inc.*,
   No. 10-cv-5011, 2013 U.S. Dist. LEXIS 59888 (D.N.J. Apr. 26, 2013) ..............................6

*United States v. Cartwright*,
   411 U.S. 546 (1973) .........................................................................................................10

*United States v. Farrell*,
   563 F.3d 364 (8th Cir. 2009) .............................................................................................7

*United States v. Sandoval-Mendoza*,
   472 F.3d 645 (9th Cir. 2006) .............................................................................................3

*Zeolla v. Ford Motor Co.*,
   No. 09-40106-FDS, 2013 U.S. Dist. LEXIS 10462 (D. Mass. Jan. 24, 2013) ......................9

STATUTES AND RULES

Fed. R. Evid. 702 ...................................................................................................................2, 5

Local Civil Rule 7-1...............................................................................................................15

Local Civil Rule 7-2(b)...........................................................................................................15

OTHER AUTHORITIES

Berbardo A. Huberman, *et al.*, *Valuating Privacy*, IEEE SECURITY & PRIVACY (2005)
   (*Digital Edition*), http://www.computer.org/csdl/mags/sp/2005/05/
   j5022-abs.html. ....................................................................................................................9

Il-Horn Hann, *et al.*, *Overcoming Online Information Privacy Concerns: An Information-
   Processing Theory Approach*, 24 JOURNAL OF MANAGEMENT INFORMATION SYSTEMS
   13-42 (2007)..........................................................................................................................9

Jeffrey M. Risius, BUSINESS VALUATION: A PRIMER FOR THE LEGAL PROFESSIONAL chs.
   8, 10, 12 ABA Book Publishing (2007)..............................................................................10

1      Plaintiffs respectfully submit this memorandum of law in opposition to the motion by

2  defendant Google, Inc. ("Google") pursuant to *Daubert v. Merrell Dow Pharms., Inc*., 509

3  U.S. 579 (1993), and its progeny, to exclude the testimony of Plaintiffs' damages expert,

4  Fernando Torres.

5                  **PRELIMINARY STATEMENT**

6      Google's motion is fundamentally flawed, because it presupposes that the jury will

7  accept the position on damages of Google and its expert, and reject the position of Plaintiffs

8  and their expert.  Thus, relying on the opinion of its expert, Douglas Kidder, Google asserts

9  that its admitted practice of exposing Class members' personal data to the view of third party

10  app developers causes no injury unless the app developers are shown to have accessed

11  individual Class members' information and then misused it.  Google then claims, on the basis

12  of this faulty conclusion, that because Mr. Torres does not know if app developers accessed

13  and used individual Class members' information or not, his opinions should be excluded.

14  Google reasons that, absent such knowledge of app developer activity, Mr. Torres must be

15  merely "assum[ing]" that the Class was damaged.[1]  This is a mischaracterization of Mr.

16  Torres', and Plaintiffs', position that is entirely dependent upon Google's own theory

17  concerning the merits of the case.

18      Google may contend on the merits that damages depend on whether or not the app

19  developers used Class members' information, but Mr. Torres and Plaintiffs have a different

20  position.  Mr. Torres' opinion is that by making the Class members' personal information

21  available to app developers in violation of its privacy policies, Google damaged Class

22  members regardless of the extent to which the app developers looked at or misused the

23  information.  Supported by Mr. Torres' opinions, Plaintiffs' position on the merits is, *inter*

24  *alia*, that Class members' information has quantifiable economic value, which value was

25  compromised when Google gave that information away to app developers without

26  compensating those Class members or securing their consent to disseminate it.  Simply put,

27

28  [1] *See* Defendant's Memorandum of Points and Authorities, dated June 16, 2015 ("Def. Mem.") (Dkt. No. 131), at 2.

what app developer would pay the Class members for their names and email addresses when the app developer was provided that information by Google without having to make any payment?  This injury does not depend on whether or not the app developers have heretofore accessed or used the information that Google made available to them.  Mr. Torres' report and testimony quantifies this injury, among others.  Perhaps the jury will accept the view of Google's expert that there is no injury and no damage unless the app developers can be shown to have taken some kind of action with respect to the information Google gratuitously, and impermissibly, provided to them, in which case Mr. Torres' opinions will prove largely irrelevant.  But that is the jury's call.  On a *Daubert* motion, the Court cannot predict how the jury will decide and then exclude expert opinions that do not coincide with that prediction.

Furthermore, Google's attack on the analyses performed by Mr. Torres goes to the weight, not the admissibility, of his opinions, which are sufficiently reliable and helpful to the jury to be admitted into evidence.  Google has not challenged Mr. Torres' qualifications to opine on the fact of harm or the economic value of such harm.  Google merely takes issue with the accuracy of Mr. Torres' analyses – a hallmark of challenges to expert *credibility*, not *reliability* under Rule 702.  Challenges to expert credibility are properly addressed through cross-examination.  Mr. Torres' opinions rest on appropriate assumptions (as Google's expert, Mr. Kidder, himself eventually agreed) and his analyses are supported by reliable data that he has examined using a reliable methodology, explaining its application each step of the way in his Report.  Accordingly, Google's critique of Mr. Torres does not undermine the admissibility of his opinions.

Lastly, Plaintiffs relied on Mr. Torres' opinions both in support of their motion for class certification and in opposition to Google's most recent motion to dismiss or for summary judgment.  Google did not move to exclude Mr. Torres' opinions prior to the close of briefing on either of those motions.  Now, perhaps sensing that that was a tactical mistake, Google has made its *Daubert* motion.  But it is too late.  Since the briefing on the motions for class certification and to dismiss/for summary judgment is closed, Google cannot use this belated *Daubert* motion as a way of reopening that briefing.  Those motions should be decided on the

basis of the papers properly submitted, and the instant *Daubert* motion should not be a factor. Instead, Google's *Daubert* motion must be viewed as a request to exclude Mr. Torres' opinions from trial.  However, for the reasons addressed herein, that request must be denied.

**ARGUMENT**

**I.     THE STANDARDS APPLICABLE TO A DAUBERT MOTION**

A trial court's role with respect to expert evidence is to assure that it "both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597.  Such evidence is "relevant if the knowledge underlying it has a valid connection to the pertinent inquiry" and is "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline."  *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)).

As the Ninth Circuit has emphasized, "*Daubert* makes the district court a gatekeeper, not a fact finder."  *Sandoval-Mendoza*, 472 F.3d at 654.  Therefore, "[j]udges in jury trials should not exclude expert testimony simply because they disagree with the conclusions of the expert."  *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998).  "A factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat."  *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014).  A judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions *merely* because they are impeachable."  *Alaska Rent-A-Car*, 738 F.3d 960, 969 (9th Cir. 2013).  Attacks by opposing experts on an expert's conclusions generally go to the weight, but not the admissibility, of the expert's opinions.  *Kennedy*, 161 F.3d at 1231.

"Despite the care with which the court must scrutinize an expert's opinions, it should also adhere to the 'liberal policy of admissibility' that favors admission of any evidence that may assist the trier of fact."  *In re Cathode Ray Tube Antitrust Litig.*, MDL No. 1917, 2013 U.S. Dist. LEXIS 137944, at *68 (N.D. Cal. June 20, 2013), *adopted by*, 2013 U.S. Dist. LEXIS 137946 (N.D. Cal. Sept. 19, 2013).  On a motion to exclude expert testimony, "doubts should be resolved in favor of admissibility."  *Brown v. 24 Hour Fitness, Inc.*, No. 99-cv-2063, 2001 U.S. Dist. LEXIS 26470, at *8 (S.D. Cal. Mar. 6, 2001).

1   **II.    GOOGLE'S MOTION SHOULD BE DENIED BECAUSE IT IS PREMISED ON**
2   **THE ASSUMPTION THAT THE JURY WILL ACCEPT GOOGLE'S THEORY**
    **OF DAMAGES AND WILL REJECT PLAINTIFFS' POSITION**

3          Google's arguments that Mr. Torres is merely "assuming" that Class members were

4   injured and that he is speculating as to what app developers may have done with the

5   information that Google made available to them[2] rests entirely on Google's assumption that the

6   jury will accept Google's theory of damages.  While it may be the position of Google and its

7   expert on the merits that the existence and amount of damage to Class members depends on

8   whether or not app developers took particular actions following Google's own actions – the

9   latter of which alone form the basis of the present lawsuit – Mr. Torres has a different opinion.

10  As set forth in his Report, Mr. Torres opines, *inter alia*, that because Google exposed Class

11  members' personal information to the view of third party app developers, Class members lost

12  an opportunity to monetize that information themselves.  *See, e.g.*, Torres Report ¶ 14:

13         Because GOOGLE has disclosed this information to the application
           developers, the members of the [Class] have lost the sales value of that
14         information that they otherwise would have had.  In short, the [Class]
           members have lost the opportunity to sell the personal information that
15         GOOGLE discloses to third-party application developers….

16         Thus, contrary to Google's accusations, Mr. Torres is not speculating that app

17  developers may have accessed and misused the information, and therefore simply *assuming*

18  that Class members were damaged; it is his opinion that they *were in fact* damaged by

19  Google's conduct, regardless of what any particular app developer did or did not do with any

20  Class member data.

21         Google relies on Mr. Kidder's expert opinions to support its argument.  Mr. Kidder has

22  opined that Mr. Torres must be assuming that Class members were damaged by Google's

23  conduct because he reviewed no evidence showing what particular app developers did with

24  particular Class members' information.  This criticism is founded solely on Google's own

25  flawed theory of damages, and not – as would be necessary to throw Mr. Torres' opinions into

26  question – Plaintiffs' theory of damages.  Where, as here, two opposing experts give opposing

27  opinions as to whether or not damage has occurred, it is for the jury, not the Court on a

28  _____
    [2] Def. Mem. at 2-3.

PLAINTIFFS' OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF FERNANDO TORRES / CASE
NO. 12-CV-01382 PSG

*Daubert* motion, to decide which opinion to accept.  "Under Rule 702, it is reasonable for the jury to be presented with conflicting expert testimony."  *SQM N. Am. Corp*., 750 F.3d at 1049 (reversing exclusion of expert testimony).  "Where two credible experts disagree, it is the job of the fact finder, not the trial court, to determine which source is more credible and reliable."  *Id*.  "Authority to determine the victor in such a battle of expert witnesses is properly reposed in the jury."  *Humetrix, Inc. v. Gemplus S.C.A*., 268 F.3d 910, 919 (9th Cir. 2001) (internal quotation marks omitted).

## III.    THE TORRESS OPINIONS ARE SUFFICIENTLY RELIABLE AND WILL BE HELPFUL TO THE JURY

Mr. Torres' opinions rest upon appropriate assumptions and are supported by reliable data that he has examined using a reliable methodology, explaining its application each step of the way in his Report.  "The test of reliability is flexible.  The court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance.  But these factors are meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case."  *SQM N. Am. Corp.*, 750 F.3d at 1044 (citations and internal quotations omitted).   Moreover, where the subject matter of an expert opinion concerns emerging issues in the relevant discipline, these factors must be weighted in accordance with the progress of the discipline.  *Primiano*, 598 F.3d at 565 (observing that "the [*Daubert*] inquiry must be flexible" and that "[p]eer-reviewed scientific literature may be unavailable because the issue may be too particular, new, or of insufficiently broad interest, to be in the literature.").  Where certain factors, like peer-reviewed literature, are lacking, other factors, like the general acceptance of the methodology, take on greater importance.  *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056-57 (9th Cir. 2003).

## A.   MR. TORRES APPROPRIATELY ASSUMED LIABILITY ON GOOGLE'S PART

The only assumption Mr. Torres made is that Plaintiffs will be able to prove their allegations as to Google's wrongful conduct.[3]  This is wholly proper, as "[e]xpert opinions on damages commonly assume liability, which must be established independently."  *U.S. ACCU-Measurements, LLC v. Ruby Tuesday, Inc.*, No. 10-cv-5011, 2013 U.S. Dist. LEXIS 59888, at *26 (D.N.J. Apr. 26, 2013); *see, e.g.*, *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 486-87 (6th Cir. 2002) (declining to exclude damages experts' testimony where opinions "proceeded from several assumptions" including assumptions resolving "the central questions of liability in the case"); *Accentra, Inc. v. Staples, Inc.*, 851 F. Supp. 2d 1205, 1228 (C.D. Cal. 2011), *rev'd on other grounds*, 500 F. App'x 922 (Fed. Cir. 2013) ("There was nothing inherently unreliable about [plaintiff's damages expert's] assumption that all three patents were infringed in determining the reasonable royalty rate …; he testified that damages experts routinely assume infringement liability in order to assess damages."); *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 660 (N.D. Ill. 2006) (observing that damages experts "necessarily assume liability").

Google's own rebuttal expert agreed that expert witnesses opining on damages may assume liability to assess damages.  "[A]s a damages expert," Mr. Kidder testified, "you always assume liability."[4]  In the face of this concession, Mr. Kidder backtracked on his critique of Mr. Torres, explaining that his criticisms depend "not [on] the act of assumption" that Google engaged in wrongful conduct, but rather on "the act of assumption in the face of contrary evidence."[5]  But there is no "contrary evidence," and neither Google nor Mr. Kidder has pointed to any.  More fundamentally, no legal authority requires Mr. Torres to weigh evidence on liability in order to render an opinion on the two narrow issues presented to him,

---

[3] *See* Declaration of James J. Sabella, dated June 30, 2015 ("Sabella Decl.") Ex. 1 (excerpts of deposition of Fernando Torres) ("Torres Tr.") at 14:21-23 ("the underlying assumption is that what is argued in the complaint is correct, yes."); Torres Report at ¶ 11 ("In this report, I am assuming that the dissemination actions taken are considered as a breach of contract, and proceed to analyze the compensation for the consequent damages from an economic perspective.").

[4] Sabella Decl. Ex. 2 (excerpts of deposition of Douglas Kidder) ("Kidder Tr.") at 83:10-11.

[5] *Id.* at 92:3-4.

namely whether Class members were harmed as a result of Google's alleged misconduct, and what value may reasonably and objectively be assigned to such harm.  Quite the contrary, "an expert witness may not usurp the jury's function to weight evidence…."  *United States v. Farrell*, 563 F.3d 364, 377 (8th Cir. 2009).  Mr. Kidder – not Mr. Torres – is the only expert proffering unfounded and indeed legally impermissible opinions in this litigation.

### B.   MR. TORRES' OPINIONS ARE SUPPORTED BY RELIABLE DATA AND A RELIABLE METHODOLOGY

Mr. Torres' fundamental opinion is that Google's alleged wrongdoing has resulted in economic harm.[6]  This opinion is based upon a twofold foundation: the existence of a market for the personally identifiable information Google impermissibly shared with third party app developers, and scholarly behavioral-economics research into web users' privacy interests.  Mr. Torres' methodology for valuing the harms resulting from Google's alleged wrongdoing is a market-based approach to the valuation of intangible assets, including information and privacy interests.   With respect to the economic harms associated with the unauthorized consumption of device resources and the increased risk of future harm, Mr. Torres considered the relevant markets in which mobile connectivity and credit monitoring services are offered. The data and methodology Mr. Torres relies upon in forming each of his opinions meet all applicable *Daubert* criteria.

### 1.   Reliability of the Factual Data Mr. Torres Relies Upon

Google contends that there are "no facts underlying [Mr. Torres'] opinion."  Def. Mem. at 1.  Even a cursory review of Mr. Torres' Report reveals the falsity of this contention.  Mr. Torres has correctly identified the data elements shared by Google with app developers (name, email address, and coarse location data)[7] as well as the circumstances in which Google shared that data (each time a user purchased a paid app through the Android Market/Play Store retail

---

[6] Torres Report at ¶29(a) (identifying primary conclusion of Report as follows: "The damage imposed on the members of the [Class] as a result of the breach of contract resulting from the unauthorized and unnecessary disclosure of personally identifiable information to third parties is quantifiable in economic terms.").

[7] Torres Report at ¶8.

channels, between February 1, 2009 and May 31, 2014).[8]   Moreover, although he offers no expert opinion on the technical or computer-science aspects of the underlying allegations of wrongdoing, Mr. Torres is absolutely correct in his assumption that Google has disclosed the names, email addresses, and location data of each Class member to third parties.  As Plaintiffs' computer expert C. Matthew Curtin has opined, "Between February 2009 and May 2014, Google published to third parties the names, email addresses, and locations of users that purchased content such as Android applications in the Google Play store."[9]  This publication does not require any action on the part of the recipients of the information, *i.e.*, the app developers; it is Google's action alone.[10]   Google takes a different view, contending that making information available does not constitute disclosure, but regardless, it is well beyond the scope of a damages expert to wade into the technical evidence that, in this case, demonstrates liability on the merits.  As noted above, Mr. Torres' opinion that Class members have suffered damage does not depend on whether or not particular app developers looked at or misused the information that Google made available to them.

As part of his assessment of the market value of this personal information, Mr. Torres consulted publicly-available commercial resources in the business of selling both unqualified and qualified (or targeted) leads for marketing purposes, which demonstrate the existence of a market for the data at issue.[11]   In his Report, Mr. Torres cited EMAILZIPCODE.NET resources (which offers for sale unqualified lists of email addresses within a particular zip code) and VistaPrint resources (which offers for sale qualified lists of home addresses within a particular zip code),[12] and in his Reply Declaration, Mr. Torres also cited to Nextmark resources (which offers for sale qualified lists of email addresses based on multiple criteria, including mobile OS platform).[13]  Although Google claims that one of these three resources

---

[8] Torres Report at ¶10.

[9] Sabella Decl. Ex. 3 (Computer Expert Report of C. Matthew Curtin) at 3.

[10] *Id.* at 5.

[11] Torres Report at ¶17.

[12] *Id.*

[13] Sabella Decl. Ex. 4 (Reply Declaration of Fernando Torres) at ¶6.  "[I]n response to a motion to exclude," it is unquestionably proper for parties to submit, and the Court to consider,

PLAINTIFFS' OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF FERNANDO TORRES / CASE NO. 12-CV-01382 PSG

(VistaPrint) has no application to its alleged wrongdoing – which, as discussed below, is incorrect – Google has not even suggested that the availability for sale of lists of personal information comparable to the information shared by Google does not evince the existence of a market for this information.  Google simply glosses over this inconvenient fact.

In assessing the value of Class members' privacy interests that have been violated by Google's alleged wrongdoing (as distinguished from the market value of the information itself), Mr. Torres relies upon behavioral economics research that appeared in a peer-reviewed academic journal and a digital security industry publication.[14]  The studies Mr. Torres relies upon examine the "threshold to overcome [users'] objection to disclose" their personal information to third parties.[15]  Google does not object that this research is flawed or faulty in any way.  Instead, it contends that it has no applicability here because, in the underlying experiments, the personal information considered included more categories of personal information than those disclosed by Google to app developers.  Def. Mem. at 6-7.  Google misconstrues both the nature of this research – which was designed to determine the existence and degree of economic thresholds that must be overcome to convince web users to disclose any personal details, rather than some specific subset of information – and Mr. Torres' use of it.  Mr. Torres does not simply transpose the findings of these studies to the context of Google's alleged wrongdoing.  Instead, those findings act as inputs in his own independent analysis, as discussed below.

### 2.      Reliability of the Methodology Mr. Torres Employs

Google also contends that "[t]here is no methodology to assess" in Mr. Torres' Report.  Def. Mem. at 1.  On the contrary, Mr. Torres utilizes a generally accepted approach to the

additional declarations from the expert "intended to establish the reliability of already proffered opinions.  *Zeolla v. Ford Motor Co.*, No. 09-40106-FDS, 2013 U.S. Dist. LEXIS 10462, at *29 (D. Mass. Jan. 24, 2013).

[14]  Torres Report at ¶¶18-21.   The articles are Il-Horn Hann, *et al.*, *Overcoming Online Information Privacy Concerns: An Information-Processing Theory Approach*, 24 JOURNAL OF MANAGEMENT INFORMATION SYSTEMS 13-42 (2007); and Berbardo A. Huberman, *et al.*, *Valuating Privacy*, IEEE SECURITY & PRIVACY (2005) *(*Digital Edition*)*, http://www.computer.org/csdl/mags/sp/2005/05/ j5022-abs.html.

[15]  Torres Report at ¶18.

valuation of the intangible assets at issue in this case, namely, Class members' personal information and Class members' privacy interests.  In the field of asset valuation, there is scarcely an approach that is more "generally accepted" than comparative market analysis: where a market for the asset or comparable assets exists, look to the going rate.  *See Schonfeld v. Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000) ("If no prior sales history [regarding the asset] is available, experts may give their opinion of the asset's value; and evidence of sales of comparable assets may be introduced."); *see also United States v. Cartwright*, 411 U.S. 546, 551 (1973) ("The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.").

With respect to the valuation of intangible assets, one or more of three methodologies is typically employed: income-based, market-based, and asset-based approaches.  *See* Jeffrey M. Risius, BUSINESS VALUATION: A PRIMER FOR THE LEGAL PROFESSIONAL chs. 8, 10, 12 ABA Book Publishing (2007); *see also Sys. Components Corp. v. Fla. Dept. of Transp.*, 14 So. 3d 967, 980 (Fla. 2009) (describing all three approaches).  The income-based approach and the asset-based approach were not used by Mr. Torres because they have no applicability to the particular kinds of information at issue.[16]

The only mainstream alternative left is the market-based approach, and that is what Mr. Torres used.  The market-based approach calls for identification of assets for sale that are similar to those being valued.  Based on a survey of the market for email lists being sold for marketing purposes, Mr. Torres opined that "the market price [is] in the range of $0.015 [per record] for an unqualified list, to $0.07 [per record] for residential consumers, to $0.18 per name for a more specific list of recent movers and new homeowners per unique email address."[17]  Based on his view that the information at issue in this case "is of higher quality

---

[16] Income-based valuation of intangible assets determines value based on current and future revenue streams discounted to a total present value, and is useful in analyzing the value of intellectual property and going concerns.  Asset-based valuation determines value based on total assets net of liabilities, and is used in the valuation of a (typically unprofitable) going concern.  Plainly, neither of those approaches would produce a reliable valuation of a set of personal data including name, email address, and coarse location.

[17] Torres Report at ¶17.

than that typically sold for marketing purposes" because it includes "current, validated email addresses for individuals with sufficient resources to have active mobile phone service on sophisticated phones or mobile devices and that have spent money for premium applications for those phones and devices," Mr. Torres concluded from this survey that "the most comparable proxy" for the information at issue in this case is the list of recent movers and new homeowners.[18]  Google argues that Mr. Torres arrived at this conclusion because it was on the high end of the spectrum (Def. Mem. at 5), but this is plainly a mischaracterization.  As Mr. Torres himself explains, his conclusion is premised on the application of a market-based methodology that takes account of differences and similarities in the assets compared.  The unqualified list ($0.015/record) and the residential consumer list ($0.07/record) do not contain highly-targeted records; only the recent movers list ($0.18/record) contains "qualified leads" comparable to the records of app purchasers (*i.e.*, Class members) exposed by Google to the view of app developers.[19]

Google disagrees that the records in the recent movers list are comparable to the records it has exposed to app developers.  In particular, Google has pointed out that that list contains residential addresses of recent movers rather than email addresses.  This point changes nothing.  Mr. Torres expressly stated that the list was being utilized as a "proxy,"[20] and it is comparable because it provides contact information for a highly-targeted kind of consumer: recent movers in one case, Android users that have made app purchases in the other.  It is well within the scope of Mr. Torres' expertise in economics and asset valuation to make this judgment concerning the proper proxy.  Google's challenge to Mr. Torres' judgment is a challenge to his credibility, not the reliability of his opinion, and is accordingly reserved for the jury.

With respect to Mr. Torres' valuation of the privacy interests of Class members, his methodology entails reliance on behavioral economics research concerning the monetary

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

PLAINTIFFS' OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF FERNANDO TORRES / CASE NO. 12-CV-01382 PSG

threshold that must be satisfied before web users will consent to divulge different kinds of information to third parties.  Mr. Torres does not, however, rely blindly on this scholarship. Instead, he makes appropriate adjustments to its economic findings, excluding certain irrelevant considerations and using his judgment to arrive at a reasonable value supported by the academic literature but shaped to account for the circumstances of this litigation.[21]  As noted above, Google takes issue with Mr. Torres' reliance on the Hann article because the data elements shared with the hypothetical websites in that study go beyond the names, email addresses, and locations of users.  Def. Mem. at 7.  But the Hann study did not examine the value of *any* particular kind of information, nor does Mr. Torres rely on that study to value the set of information (name, email address, location) disclosed by Google to app developers. Instead, the Hann study examines the economic threshold that a web service provider, such as Google, would have to cross in order to convince ordinary web users to volunteer any personal details.  The purpose of the study is to "characteriz[e] … the trade-offs of outcome valences,"[22] meaning to assess the monetary value (a key type of valence studied) web service providers would need to supply to abate users' privacy concerns (another key type of valence studied). Thus, the Hann study investigates *the monetary value of information privacy*, not, as Google suggests, the value of any particular kind of information.  At his deposition, Mr. Torres explained exactly how Google misconstrued the Hann study and its use in Mr. Torres' Report:

> Q: So you think it's okay to take a study which, as you say, among U.S. subjects protection against errors, improper access, and secondary use of personal information, such as we just listed, and use that value as the value of protecting against disclosure of only your name, email address, and coarse address?
>
> Ms. Zilka: Objection.
>
> A: I think you're misconstruing how the experiment works and how it's being used here.  The experiment values their consideration of what the privacy is worth.  What does it take to overcome the privacy concerns.  To

---

[21] Torres Report at ¶21 ("According to this study among US subjects, protection against errors, improper access, and secondary use of personal information is worth between $30.49 and $44.62.  To apply these results to the case at hand, it would be appropriate to exclude the error protection from consideration and focus on the 'access' and 'unauthorized use' elements.").

[22] Declaration of Michael H. Page, dated June 16, 2015 (Dkt. No. 131-1) Ex. G at 20.

1
2
> properly do that, you have to consider a lot of variables that are involved and a range, a full range of disclosure from the minimal to the more complete, which varies depending on the industry, but it's a whole range.[23]

3 And as Mr. Torres went on to explain, according to the Hann study, "[t]he initial disclosure of
4 – of the information is more valuable than … continuing to disclose more and more and more
5 information ….  The marginal utility of keeping that additional information private diminishes
6 … because once you – you know, the disclosure of the basic information we're talking about in
7 this case is the first step."[24]  According to the peer-reviewed research Mr. Torres utilizes, then,
8 and in direct contrast to Google's assertions, the monetary value of Class members'
9 information privacy interests with respect to the basic personal details disclosed by Google to
10 app developers is *greater* than the value of such interests with respect to more discrete kinds of
11 information that would have meaning only *after* those basic details have been disclosed.

12 Mr. Torres' use of this study is entirely consistent with its stated objectives.  He relies
13 on it only in determining the threshold value at which Google would need to compensate Class
14 members to convince them to allow the disclosure of their personal details to third parties.
15 Google merely misinterprets the Hann study as assessing the value of personal information,
16 which it manifestly does not do, and imputes to Mr. Torres this same error.[25]  This essentially
17 incoherent argument reaches, at best, Mr. Torres' credibility or judgment, but not the reliability
18 of his opinion.

19 Moreover, it bears noting that academic studies into both the economic value of
20 specific types of personal information and the economic value of information privacy concerns
21 generally are not yet in abundance.  Although Mr. Torres identified and appropriately used
22 certain highly relevant, peer-reviewed academic research articles in valuing the injuries
23 suffered by Class members, the novelty of online information privacy issues accounts for the
24 relative dearth of sophisticated, highly-targeted research with analyses perfectly on-point with

25
26
[23] Sabella Decl. Ex. 1 (Torres Tr.) at 95:8-95:24.

[24] *Id*. at 96:21-97:10.

27
28
[25] As Mr. Torres also pointed out in his deposition: "First, they're not valuing the information. We've already covered the value of the information outside of this section of the report." Sabella Decl. Ex. 1 (Torres Tr.) at 93:23-25.

respect to Plaintiffs' claims in this case.  In such instances, the importance of factors other than peer-reviewed academic literature supporting an expert's opinion must be given greater weight. *Clausen*, 339 F.3d at 1056-57; *Primiano*, 598 F.3d at 565.  That Mr. Torres employs the virtually universally accepted market-based methodologies exhibited in his Report and outlined herein outweighs any deficiencies alleged by Google, in its motion or its reply, to exist in the academic research he relies upon.  The Court should discount Google's erroneous arguments regarding this component of the *Daubert* analysis accordingly.

### 3.    Reliability of Estimated Cost of Bandwidth Depletion

Mr. Torres' estimation of the cost of bandwidth is based on a national average of market prices for mobile bandwidth over the Class Period.  In his Report, he explains that the average cost per megabyte of mobile bandwidth has declined over the five years covered by the Class Period, starting at, on average, $0.19/MB in 2009, and dropping to $0.10/MB in 2010, $0.06/MB in 2011, $0.03/MB in 2012, $0.02/MB in 2013, and finally $0.01/MB in 2014.[26]  This yields an average of $0.068/MB across the Class Period.[27]  There is nothing remotely approaching "rank speculation and unchecked falsehoods," Def. Mem. at 8, in this analysis.  Rather than critique Mr. Torres' data or methodology in computing the cost of bandwidth depletion, Google resorts to unconvincing *ad hominem* attacks.  Google insists that no bandwidth consumption is causally tied to its offensive practices, but this is a (flawed) merits argument that has no place in a *Daubert* motion.  Accordingly, this aspect of Mr. Torres' Report stands unchallenged.

### 4.    Reliability of Estimate of Increased Risks of Future Harm

Finally, Mr. Torres estimated that "the monetary amount needed in the market today to mitigate the risk and compensate Android users in covering the risk with a monitoring policy would cost between $6 per user (considering the lowest cost of a security freeze on three credit bureaus) and $10/month per user (considering the most basic identity monitoring service)."[28]

---

[26] Torres Report at n.47.

[27] *Id*. at ¶28.

[28] Torres Report at ¶27.

This opinion is based on Mr. Torres' survey of consumers' options in responding to the improper dissemination of their personal information, whether such dissemination occurs through a data breach or another party's (here, Google's) voluntary action.[29]   These options include placing a security freeze on credit reports (which costs from $2 to $15 per bureau), purchasing third-party credit monitoring services (which costs from $10 to $30 per month),[30] and diligently self-monitoring one's own credit, which requires "expend[iture]" of "time and resources" that are valued by proxy to the other options.[31] Mr. Torres' estimation of a $6.00 minimum value is as conservative as possible because it reflects the cheapest alternative (placing a security freeze with all three major bureaus).   Google contests only whether Plaintiffs are entitled to seek this element of damages, rather than Mr. Torres' analysis in support of his conclusion.  Def. Mem. at 8.  Again, such challenges are not properly raised under *Daubert*, but should be articulated in the context of cross-examination.

## IV.   BECAUSE GOOGLE'S MOTION TO EXCLUDE TORRES WAS FILED AFTER THE BRIEFING ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND GOOGLE'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT WAS CLOSED, THE COURT SHOULD NOT CONSIDER GOOGLE'S MOTION TO EXCLUDE IN CONNECTION WITH THE ADJUDICATION OF THOSE OTHER MOTIONS

In their opposition to Google's motion to dismiss or for summary judgment, Plaintiffs relied on Mr. Torres' opinions concerning the damages Plaintiffs' have sustained by reason of Google's wrongful conduct.  *See* Dkt. No. 113.  In its reply brief on that motion, Google stated that Mr. Torres' opinions did not satisfy *Daubert*, *see* Dkt. No. 115 at 14, but Google did not make a *Daubert* motion to exclude such opinions, which this Court's Rules would require in order to grant such relief.[32]   The briefing on the motion to dismiss/for summary judgment is closed, and the motion was argued on April 28, 2015.

---

[29] Torres Report at ¶¶25-27 and accompanying notes.

[30] *Id*. at ¶26.

[31] *Id*. at n.46.

[32] Rule 7-1 of this Court's Local Civil Rules provides that "[a]ny written request to the Court for an order must be presented by … [a] duly noticed motion pursuant to Civil L.R. 7-2…." Rule 7-2(b) provides that "a motion must contain … (b) …(3) "[i]n the second paragraph, a concise statement of what relief or Court action the movant seeks…."  A statement in the body of a memorandum of law does not satisfy the requirements of a motion.

15

1       Then, in support of their motion for class certification, Plaintiffs again relied on Mr.

2   Torres' opinions, *see* Dkt. No. 120, and again Google failed to move to exclude Mr. Torres'

3   opinions.  Indeed, in their reply brief in support of class certification, Plaintiffs specifically

4   stressed to the Court that Google had not moved to exclude Mr. Torres' opinions. *See* Dkt. No.

5   130 at 6 n.9.  Briefing on the motion for class certification is now closed and argument is

6   scheduled for July 21.

7       Now, suddenly, Google has woken up and decided that it needs to move to exclude Mr.

8   Torres and has filed this motion.  The fact that Google was asleep at the switch and forgot to

9   move to exclude the Torres opinions until after the close of the briefing on *both* the motion for

10  class certification *and* the motion to dismiss/for summary judgment does not provide any

11  justification for allowing Google, in essence, to reopen such briefing with its *Daubert* motion.

12  The briefing on those motions is closed, and those motions should be decided based on the

13  papers submitted on such motions, without consideration of Google's belated, and

14  fundamentally flawed, *Daubert* motion.

15                                   **CONCLUSION**

16      Google's motion to exclude the testimony and opinions of Mr. Torres should be denied

17  in all respects.

18  Dated:  June 30, 2015

19                                     Respectfully submitted,

20                                     **BURSOR & FISHER, P.A.**

21                                   By:   */s/ L. Timothy Fisher*

22                                   L. Timothy Fisher (State Bar No. 191626)
                                     1990 North California Boulevard, Suite 940

23                                   Walnut Creek, California 94596
                                     Tel:  925-300-4455

24                                   Fax:  925-407-2700

25                                   **GARDY & NOTIS, LLP**
                                     Mark C. Gardy

26                                   James S. Notis *(pro hac vice)*
                                     Orin Kurtz *(pro hac vice)*

27                                   560 Sylvan Avenue
                                     Englewood Cliffs, New Jersey 07632

28                                   Tel: 201-567-7377
                                     Fax: 201-567-7337

16

**GRANT & EISENHOFER P.A.**
James J. Sabella *(pro hac vice)*
Diane Zilka *(pro hac vice)*
Kyle McGee *(pro hac vice)*
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501

*Interim Co-Lead Counsel for the Class and Subclasses*

**CARELLA, BYRNE, CECCHI OLSTEIN, BRODY & AGNELLO**
James E. Cecchi
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: 973-994-1700
Fax: 973-994-1744

**LAW OFFICES OF RICHARD S. SCHIFFRIN LLC**
Richard S. Schiffrin
P.O. Box 2258
West Chester, Pennsylvania 19380
Tel: 610-203-7154

**JAMES SCHWARTZ & ASSOCIATES PC**
Michael Schwartz
1500 Walnut Street, 21st Floor
Philadelphia, Pennsylvania 19102
Tel:  215-751-9865
Fax: 215-751-0658

**LAW OFFICES OF MARTIN S. BAKST**
Martin S. Bakst (65112)
15760 Ventura Boulevard, Sixteenth Floor
Encino, California 91436
Tel: 818-981-1400
Fax: 818-981-5550

*Of Counsel for the Class and Subclasses*

PLAINTIFFS' OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF FERNANDO TORRES / CASE NO. 12-CV-01382 PSG